```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2

3    KRISTEN EJCHORSZT

4              Plaintiff,          CIVIL ACTION NO.
        VS.                        3:02-CV-1350 (CFD)
5
     JAMES F. DAIGLE, JR.
6    ET AL.

7              Defendants.         FEBRUARY 7, 2005

8
              DEPOSITION OF KRISTEN EJCHORSZT
9

10   APPEARANCES:

11

12       For the Plaintiff:

13           THE GALLAGHER LAW FIRM
                 1377 Boulevard
14               Post Office Box 1925
                 New Haven, Connecticut  06509
15           BY:  BARBARA L. COX, ESQ.

16       For the Defendant, James F. Daigle, Jr.:

17           HALLORAN & SAGE, LLP
                 One Goodwin Square
18               225 Asylum Street
                 Hartford, Connecticut  06103
19               (860) 522-6103
             BY:  ERIC P. DAIGLE, ESQ.
20

21
                 Diane J. Dunn, No 0018
22            Licensed Shorthand Reporter

23      NIZIANKIEWICZ & MILLER REPORTING SERVICES
                    972 Tolland Street
24        East Hartford, Connecticut   06108-1533
                     (860) 291-9191
25
```

```
 1  APPEARANCES:

 2

 3      For the Defendants, City of Norwich, City of
          Norwich Police Department, Louis J. Fusaro and
 4        Mark Lounsbury:

 5          HOWD & LUDORF
                65 Wethersfield Avenue
 6              Hartford, Connecticut  06114-1190
                (860) 249-1361
 7      BY:  DANIEL DeMERCHANT, ESQ.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q    Were there other officers or detectives in

2    the area while he was having this conversation with

3    you?

4    A    I believe there was a couple.  At their

5    desks.

6    Q    Were they directly involved in the

7    conversation with you?

8    A    No.

9    Q    Okay.  And what did he tell you about the

10   fact that you would be wired?

11   A    At first they were going to use a pager.  And

12   I guess that had no batteries in it.  They had gotten

13   that out, to use that.

14   Q    Okay.

15   A    And so he decided that he was going to wire

16   me.

17   Q    Did you witness any conversations between

18   Daigle and any other officers regarding use of the

19   pager or other wiring implements?

20   A    I did not witness them.

21   Q    Okay.  When the pager was out, where was it?

22   A    I don't recall.

23   Q    Did Daigle go and talk to anybody else about

24   the pager or use of the pager?

25   A    I believe it was Mark Rankowitz.  That had

1   gotten out the pager.

2        Q    Okay.  Did Daigle talk -- go ahead.

3        A    It was in a box.  Some kind of holder.

4        Q    Okay.  Did you witness, did you witness Mark

5   taking it out of that box or holder?

6        A    I don't believe so.

7        Q    Okay.  Did you witness Mark talking to Daigle

8   about it?

9        A    Yes.

10        Q    And what were they talking about?

11        A    I wasn't listening.

12        Q    Okay.  And at some point what happened, the

13   fact that you weren't utilizing the pager?

14        A    The final outcome was that the pager

15   batteries were dead or something to that effect.  It

16   couldn't be used.

17        Q    And then what did he tell you after that?

18        A    That they were going to have to use a body

19   wire.

20        Q    Did he describe that to you?

21        A    I believe he did.  I believe he told me that

22   there was the box that would go in my back pocket or

23   somewhere around there, and that a wire would come out

24   my back and sit on my shoulder somewhere.

25        Q    Okay.  Did you have any apprehension about

1   using that?

2       A    No.

3       Q    Were you concerned by that at all?

4       A    No.

5       Q    Any explanations as to how that device would

6   be placed on you?

7       A    No.

8       Q    Okay.  What happened next?

9       A    The next thing I remember was going in to the

10  conference room and Daigle told me to take off my

11  shirt.

12      Q    Okay.  Did he explain why?

13      A    Because he had to put the body wire on.

14      Q    Did he explain how?

15      A    No.

16      Q    Did you ask him?

17      A    No.

18      Q    Did you ask him why you should take off your

19  shirt?

20      A    No.

21      Q    Did you have any apprehension regarding

22  taking off your shirt?

23      A    Yes.

24      Q    Did you talk to him about that?

25      A    No.  He's a lieutenant.

1    Q    He's not your lieutenant.

2    A    But I figured he knew my family, he wouldn't,

3    he wouldn't do something that wasn't all right.

4    Q    Okay.  Was there anyone else in the room with

5    you at that time?

6    A    No.

7    Q    What equipment did Daigle have in the room

8    with him at that time?

9    A    I don't know if -- at that time I'm not sure

10   that he had anything except for the body wire.

11   Q    Okay.

12   A    And its case or whatever.

13   Q    Okay.  What happened next?

14   A    He left the room twice.

15   Q    When was the first time?

16   A    Right after.  And I'm not sure if he was

17   grabbing the camera or if the camera was with him

18   originally.

19   Q    Okay.  So let's -- I'm trying get this in a

20   chronological order, if you can work with me on that.

21   What I'm looking to do is we work through this whole

22   event.  At some point you were told to take off your

23   shirt?

24   A    That was when we first walked in.

25   Q    Okay, what happens next?

```
 1        A    He left.

 2        Q    Okay.  Do you take off your shirt before or

 3   after he leaves?

 4        A    Before.

 5        Q    Okay.  So he leaves the room and you have no

 6   shirt on, and what are you wearing at that time?

 7        A    A bra and jeans.

 8        Q    Okay.  What did you have on when you entered

 9   the room?

10        A    A black shirt and my jeans.

11        Q    Were you wearing a jacket?

12        A    Yes.

13        Q    Okay.  So you had a jacket, a black shirt and

14   jeans?

15        A    Yes.

16        Q    And a bra, since that's what you were

17   wearing?

18        A    Yes.

19        Q    Okay.  Does he say anything to you after you

20   take your shirt off and he leaves the room?

21        A    He says, "If anybody comes in, cover up."

22        Q    And he leaves?

23        A    Yes.

24        Q    And how long was he gone for?

25        A    Not long.  A minute or less.
```

1  time?

2      A     I believe it was for scissors or tape.

3      Q     Okay.  And how long was he gone?

4      A     Not long.  Again, it was probably a minute or

5  less.

6      Q     And what happened when he returned the second

7  time?

8      A     From what I recall he came around the back of

9  me, started playing with the wires again, unhooked my

10 bra, came around the front of me and slid it off.

11     Q     Okay.

12     A     And then told me that he had to take pictures

13 to prove that I did not have any fake ID hidden in my

14 bra.

15     Q     Okay.  Now, your testimony is that Daigle

16 unhooked your bra?

17     A     Yes.

18     Q     You didn't unhook your bra?

19     A     No.

20     Q     And that Daigle slid your bra off you, you

21 didn't drop your bra yourself?

22     A     No.

23     Q     Are you sure?

24     A     Positive.

25     Q     And at this point there is a camera in the

1    Q    And how big is this camera?

2    A    It's about this big (indicating).  It was a

3 bigger --

4    Q    What would you estimate that in inches?  You

5 just held your hands up.  The court reporter can't

6 document that.

7    A    Four or five by six or eight.

8    Q    Okay.  And it was not the digital cameras of

9 today, it was an older model with a quite larger body

10 style, correct?

11    A    Yes.

12    Q    And how big would you say the screen on the

13 camera was?

14    A    I'm not sure.  It was on the back of the

15 camera.

16    Q    Okay.  At any time did you view any

17 photographs in the back of the camera?

18    A    Not that I recall.

19    Q    But you were about a foot away you testified?

20    A    About.

21    Q    Did Daigle seem to be having any difficulty

22 with the camera during that time?

23    A    Only at the point that he said the screen was

24 fuzzy.  Or that something was going wrong with the

25 screen.  Because he did turn the camera around at one

1   point and said, "See the screen, see how it isn't

2   focusing?"  Or something to that effect.

3       Q    So you don't know whether or not there were

4   actual photographs taken, then?

5       A    No.

6       Q    It's possible that there was camera

7   malfunction and the photographs weren't taken?

8       A    Yes.

9       Q    What happened after you left, left the

10  conference room here?

11      A    Went back into the detectives division.

12      Q    Okay.  And at this point you have your shirt

13  back on?

14      A    Yes.

15      Q    And you have your -- you're fully wearing the

16  wire at that time?

17      A    Yes.  And have a leather coat over it.

18      Q    Okay.  And had it been tested to see if it

19  worked yet?

20      A    I believe so.  I think we tested before he

21  walked out.

22      Q    Okay.  And how did that testing occur?

23      A    There was a big box that looked like

24  recording things in there.  And Mark Rankowitz stood by

25  the box and we shut the door and he had me talk into

```
1    minute.  He was going over the list with me.  And I
2    looked up and Daigle and Mark Lounsbury were standing
3    at a filing cabinet looking at the camera.  And Daigle
4    had said that the pictures were formatted.  I believe.
5    And that we were going to have to take them again when
6    we got back.
7         Q    Okay.  And any other discussion about
8    photographs?
9         A    Not that I recall.
10        Q    So Det. Lounsbury and Det. Daigle are
11   examining the back of the camera?
12        A    Yes.
13        Q    And at that point did it appear that there
14   were any photographs to view?
15        A    I don't know.  I couldn't see.
16        Q    Okay.  And what happened next?
17        A    The next thing I remember is us leaving.
18        Q    You went out on the operation?
19        A    Yes.
20        Q    Okay.  Would you like to take a break?  I'm
21   going to move on so this would be a good time to take
22   five minutes if you'd like.
23        A    I'm fine.
24                  (Discussion off the record.)
25                  (Luncheon recess from 1:00 p.m. to 2:00
```

1      A     Yes.

2      Q     Do you have any knowledge that defendant

3   Daigle published your photographs to anybody else?

4      A     No.

5      Q     Do you have any proof that he published your

6   photographs to anybody else?

7      A     No.

8      Q     Do you have any knowledge that he preserved

9   your photographs for his own use?

10     A     No.

11     Q     Do you have any proof or evidence to support

12  that he preserved your photograph?

13     A     No.

14     Q     Do you have any knowledge that Daigle printed

15  your photographs for distribution to others?

16     A     No.

17     Q     Do you have any evidence to support that he

18  printed your photographs for use to give to others?

19     A     No.

20     Q     You state that Daigle had previously shown

21  sexually explicit photographs of other females in your

22  interrogatory reponses.  Can you explain that?

23     A     It was in the, I'm sorry, the investigation.

24     Q     You have no independent knowledge of that?

25     A     No.

1    arrived?

2        A    I think he got up and met me at the doorway.

3        Q    The doorway to the detectives office?

4        A    Yes.

5        Q    And what happened when he met you at the

6    doorway to the detectives office?

7        A    We walked over to his desk.

8        Q    Okay.  And was Det. Lounsbury in the area at

9    that time?

10        A    I don't remember.

11        Q    Okay.  When was the first time that you

12    noticed that Det. Lounsbury was at the police

13    department that evening?

14        A    I don't remember when.

15        Q    Okay.

16        A    I do remember seeing him at his desk.  I

17    don't know if I saw him right away, or ...

18        Q    Well, we went over the fact that Det. Daigle

19    did take photographs of you in the detectives office,

20    is that correct, when you first got there?

21        A    Yes.

22        Q    Okay.  Do you know whether or not you saw

23    Det. Lounsbury in the area before that time?

24        A    I don't know.

25        Q    Okay.  Do you know whether Det. Lounsbury was

```
 1   in the area at the time those photographs were taken?
 2        A    I don't know.
 3        Q    Now, at some point Det. Daigle took you into
 4   what is listed as a detectives briefing room on
 5   Defendant's Exhibit 1; is that correct?
 6        A    Yes.
 7        Q    Now, before that time did you become aware of
 8   Det. Lounsbury being at the police department?
 9        A    Yes.
10        Q    Okay.  So at some point after the
11   photographs, the original photographs were taken until
12   the time you were taken into detectives briefing room
13   you became aware that Det. Lounsbury was at the police
14   department?
15        A    Yes.
16        Q    Okay.  Did you speak with Det. Lounsbury
17   before that time?
18        A    Before I went into the conference room?
19        Q    That's correct.
20        A    I think "Hi, how are you?"
21        Q    Okay.  Just casual greetings?
22        A    Yes.
23        Q    Okay.  At some point Det. Daigle did mention
24   to you that he was going to be taking you into the
25   detectives briefing room to take photographs?
```

```
 1        A     Yes.

 2        Q     Okay.  And was Det. Lounsbury in the area at

 3   that point in time?

 4        A     I don't know.

 5        Q     So as you sit here today you do not know as

 6   to whether or not Det. Lounsbury heard that detective

 7   Daigle was going to be taking you into the conference

 8   briefing room to take photographs?

 9        A     I don't remember if he was around, no.

10        Q     Was there other people around in that area at

11   the same time?

12        A     I don't remember.  There was people coming in

13   and out and doing things.  I don't remember who was

14   exactly there.

15        Q     Okay.  Do you know of anyone other than Det.

16   Daigle being around in the area when the initial

17   photographs were taken?

18        A     I don't know.

19        Q     I'm going to show you what's been marked as

20   Defendant's Exhibit 3 for identification and ask you to

21   look at that photograph for me, please (handing).  Do

22   you see a gentleman in the background in that

23   photograph?

24        A     Yes.

25        Q     Do you know who that is?
```

```
 1        A     No.

 2        Q     Do you know how much time elapsed from the

 3   time that you got to the police department until the

 4   time Det. Daigle brought you into the conference room,

 5   the initial?

 6        A     I don't know.

 7        Q     Was it more than a half hour?

 8        A     No, I don't believe so.

 9        Q     Okay.  Was it more than 15 minutes?

10        A     Maybe around 15 minutes.

11        Q     Okay.  Now, at some point Det. Daigle did

12   take you into the conference room that we were

13   discussing, the detective briefing room that's listed

14   on Defendant's Exhibit 1; is that correct?

15        A     Yes.

16        Q     During the time that you were in the

17   detective briefing room, and we're talking about this

18   initial time period before you went out on the sting

19   operation, did Det. Lounsbury come into that room?

20        A     No.

21        Q     Was there anyone else in that room at any

22   point in time when you were in that detectives briefing

23   room?

24        A     No.

25        Q     At that point in time had you had any
```

1  hallway?

2       A    I believe so.

3       Q    Okay.  Now, when you entered the detectives

4  area and you were speaking to Mark Redowitz --

5       A    Mark Rankowitz.

6       Q    -- what was the substance of that

7  communication with him?

8       A    I'm sorry?

9       Q    What did you talk about?

10      A    Nothing.  He just went through the paper.

11      Q    Okay.  He just went through the list of where

12 you were going to be going on that sting operation?

13      A    Yeah.

14      Q    Okay.  Was Det. Lounsbury listening to you

15 and Mark Rankowitz going through the list?

16      A    I don't know.

17      Q    Okay.  Do you know what Det. Lounsbury was

18 doing during the time you were speaking with Det.

19 Rankowitz?

20      A    He was sitting at I believe it was the filing

21 cabinet with Daigle, doing something with the camera.

22      Q    Okay.

23      A    And that's when Daigle looked at me and told

24 me that they were formatted.

25      Q    Now, at this time you saw Det. Lounsbury

1    doing something with the camera that Det. Daigle had

2    been using to photograph you, allegedly, in the

3    conference room?

4        A    Daigle was holding the camera, Lounsbury was

5    with him looking at the camera.

6        Q    Okay.  And at some point someone said that

7    the photographs had been formatted; is that correct?

8        A    Yes.

9        Q    Okay, what did you believe that meant to be?

10       A    I had no idea.

11       Q    Okay.  And who mentioned that the photographs

12   were formatted, was it Det. Lounsbury or Det. Daigle?

13       A    Daigle.

14       Q    Now, as you sit here today do you know if

15   Det. Lounsbury saw any photographs that you allegedly

16   said were taken in the conference room?

17       A    I don't know for sure.

18       Q    Okay.  You said you don't know for sure.  Do

19   you know at all as to whether or not he saw any

20   photographs that were taken of you allegedly in the

21   detectives briefing room?

22       A    No.

23       Q    Did you have any communications with Det.

24   Lounsbury while at the station but before you went out

25   on the sting operation?

1          A     I don't remember.  I don't think so.

2          Q     Was there ever a time while you were at the

3     police station after coming out of the detective

4     briefing room -- of course, before you went on the

5     sting operation -- where you discussed photographs

6     being taken of you in the detectives briefing room by

7     Det. Daigle?

8          A     No.

9          Q     There were two vehicles used for the sting

10    operation; is that correct?

11         A     Yes.

12         Q     Okay.  And you were in one vehicle while

13    there was other officers in another vehicle; is that

14    correct?

15         A     Correct.

16         Q     Who was in the vehicle with you?

17         A     Mark Lounsbury and Daigle.

18         Q     Okay.  And this was in the van?

19         A     Yes.

20         Q     Okay.  Now, who was seated where in the van?

21         A     Lounsbury was driving, Daigle was passenger

22    and I was in the back seat.

23         Q     Okay.  Now, without going into the whole

24    night of the sting operation, at any point in time

25    during the conversation in the van did there ever come

1  understanding that Det. Lounsbury informed Det. Daigle

2  that he was going to go back inside?

3      A    I believe so.

4      Q    Okay.  Now, when you went back inside the

5  Norwich police department with Det. Daigle, did you

6  ever see Det. Lounsbury again that evening?

7      A    I don't think so.

8      Q    So is it fair to say you didn't talk to Det.

9  Lounsbury again that evening?

10     A    Yes.

11     Q    Now, there was some discussions about a

12 Complaint that you had filed with the court earlier in

13 your testimony.  In your Complaint you allege that Mark

14 Lounsbury knew or should have known that Det. Daigle

15 was taking partial nude photographs of yourself.  Are

16 you aware of that?

17     A    Yes.

18     Q    Okay.  Do you have any knowledge as you sit

19 here today that Det. Lounsbury knew that Det. Daigle

20 was taking those photographs in the conference room?

21     A    No.

22     Q    Okay.  Have you seen any documents or other

23 materials that lead you to believe Det. Lounsbury knew

24 that Det. Daigle was taking partial nude photographs of

25 you in the conference room?

1        A    No.   All I know is they were looking at the
2    camera together.
3        Q    But like I said before, you don't know if
4    Det. Lounsbury actually saw photographs of you; is that
5    correct?
6        A    Correct.
7        Q    In fact, when Det. Lounsbury was looking at
8    that camera, the photographs could have been deleted;
9    is that correct?
10       A    Correct.
11       Q    In fact, we don't know as we sit here today
12   whether or not actual photographs were taken of you in
13   the detectives conference room; is that correct?
14       A    Correct.
15       Q    And it's my understanding that it's your
16   testimony that Det. Daigle informed you that he had to
17   retake photographs after the sting operation; is that
18   correct?
19       A    Yes.
20       Q    And he told you that because he informed you
21   that the original photographs had been deleted; is that
22   correct?
23       A    Formatted.
24       Q    Okay, formatted.  But you don't know what
25   formatted means; is that correct?

1      A      Correct.

2      Q      And with respect to your Complaint, it also

3   states, like I just stated earlier, that Det. Lounsbury

4   should have known that Attorney Daigle -- I'm sorry,

5   Det. Daigle was taking partial nude photographs of

6   yourself.

7                       (Discussion off the record.)

8      Q      Could I possibly rephrase that question.  My

9   apologies.  In your Complaint you also allege that Det.

10  Lounsbury should have known that Det. Daigle was taking

11  partial nude photographs of yourself.  What do you base

12  that knowledge on?

13     A      He was there.  Him and Daigle had talked and

14  they were looking at the camera together.

15     Q      Okay.  So your allegation that Det. Lounsbury

16  should have known stems from Det. Daigle and Det.

17  Lounsbury looking at the camera after you and Daigle

18  had came out of the conference room; is that correct?

19     A      Correct.

20     Q      Okay.  Do you have any idea when Det. Daigle

21  and Det. Lounsbury were looking at the camera whether

22  or not they were looking at the photographs that were

23  taken that were described in or identified by

24  Defendant's Exhibit 2 and Defendant's Exhibit 3 versus

25  anything that was taken in the conference room?

1      Q     Okay.  And now who said that, the chief or

2   the deputy chief?

3      A     I don't remember.

4      Q     Okay.  Now, on the night of November 30,

5   2001, do you recall where in the chain of command Det.

6   Daigle was in respect to the officers that were present

7   at the police department that evening?

8      A     I have no idea.

9      Q     Do you know the rank of Det. Daigle at the

10  time of November 30 of 2001?

11     A     Lieutenant I believe.

12     Q     Okay.  And do you know in the hierarchy of

13  the city of Norwich police department where that

14  stands?

15     A     No.

16     Q     Do you have any knowledge as you sit here

17  today that Chief Fusaro had any information before

18  November 30 that would lead him to believe Det. Daigle

19  would photograph you partially nude?

20     A     I don't know.  I guess a lot of the guys at

21  the police department had seen nude photos previously.

22  Just of women.  That I believe to be consensual.  And I

23  also know that he had gotten in trouble a couple of

24  times before that, too.

25     Q     Now, you mention that a lot of guys at the

1  police department saw nude photographs before.  What

2  were these nude photographs of?  Partially nude women?

3      A    Nude women.  From what I understood.

4      Q    Okay.  And who were these guys that you are

5  referring to?

6      A    Just guys at the police department.  I mean,

7  they constantly had nude photos.

8      Q    Who at the police department are you learning

9  this information from?

10     A    Just some of the officers.  Pat Daly.  I

11  can't remember the other one.

12     Q    And Officer Daly informed you that Det.

13  Daigle had --

14     A    He actually told my father.

15     Q    So Officer Daly informed your father at some

16  point that Det. Daigle had nude photographs and was

17  showing them at the police department?

18     A    Yes.  But it wasn't only him.  There was a

19  few officers, I just don't remember.

20     Q    Do you know their names?

21     A    I don't remember who.

22     Q    Was Det. Lounsbury one of those persons?

23     A    I don't know.

24     Q    And was it Officer Daly that informed your

25  father of this information?

1        A    I believe.

2        Q    Do you have any information as you sit here

3   today as to whether Chief Fusaro was aware that Det.

4   Daigle was showing nude photographs at the police

5   department?

6        A    Do I have any information?

7        Q    Yes.  Do you have any knowledge that Chief

8   Fusaro knew as to whether or not Det. Daigle was

9   showing nude photographs at the police department at

10  any time?

11       A    No, I don't.

12       Q    You mention also that it's your understanding

13  that Det. Daigle got in trouble in the past?

14       A    Yes.

15       Q    What is your understanding as to what trouble

16  you are referring to?

17       A    Honestly, I don't remember exactly what.  But

18  they did a -- I don't know if it was in the

19  investigation or a time line of his career I saw.  And

20  he had gotten in trouble a couple of times and just

21  kept moving up in rank.

22       Q    As you sit here today do you have any

23  knowledge that Chief Fusaro had any information before

24  November 30 that Det. Daigle was taking nude

25  photographs or partially nude photographs of volunteer

1    women?

2        A    No.

3        Q    As you sit here today are you aware of any

4    supervisory officer at the city of Norwich police

5    department that had any knowledge as to whether or not

6    before November 30 Det. Daigle was taking nude

7    photographs or partially nude photographs of volunteer

8    women?

9        A    No.

10       Q    Now, also in your Complaint you have a claim

11   that Chief Fusaro violated your equal protection

12   rights.  My question to you is do you have any

13   information -- strike that.  How were you treated

14   differently by Chief Fusaro than any other young woman

15   volunteer?

16       A    For a week he did nothing about it, Chief

17   Fusaro.

18       Q    And how do you know this?

19       A    Because we got a call from a police officer,

20   Warren Knight, the -- we made the original complaint on

21   a Monday.  On Friday he called and said, "Get the

22   papers, get an attorney, do whatever you have to do

23   because they're trying keep this under the carpet."

24   Daigle knew about it for a week and had ample time to

25   get rid of anything he might have had.  Chief Fusaro

1      A    Because up until I went to the papers and

2  went public with it, he was working.  Nobody -- the day

3  I went to the papers, the next day he was put on paid

4  leave.

5      Q    So it was a temporal relationship between the

6  time you went to the papers and then after he was put

7  on paid leave that leads you to believe that there was

8  nothing ongoing for an investigation from the time you

9  made the complaint until December 6; is that correct?

10      A    I had actually -- I also talked to Chief

11  Fusaro that night because he would not confirm that I

12  had put in -- that I had given a statement to the

13  papers.  He wouldn't confirm it because he didn't want

14  it in the papers.  And I had talked to him that Friday

15  night that I went to the papers.  And I told me that he

16  was questioning people.  That's what they were doing.

17  He had never checked his locker for any disks, or his,

18  you know, work space, his computer.  And he admitted

19  fully to me that he did not do any of that.

20      Q    So it wasn't that he was not doing an

21  investigation, it's that in your opinion he was not

22  doing a good enough investigation?

23      A    Fair.

24      Q    Yes?

25      A    That's fair, yeah.

1   Q  And I apologize, we kind of got off track,

2 but my original question was that you have an

3 allegation that you were treated differently by the

4 chief than other young women volunteers.  And then we

5 went into what investigation was or was not done after

6 your complaint.  Is it your understanding that that

7 somehow is different than how other young women

8 volunteers were treated by Chief Fusaro?

9   A  I don't know about volunteers.  I don't know

10 about that part.  The -- if he wasn't a lieutenant, is

11 what I'm saying, and I walked into a police department

12 and he was not connected to the chief, immediate action

13 would have been taken.

14   Q  Okay.

15   A  And it was not in this case.

16   Q  So you believe that because immediate

17 attention was not given, based on the understanding

18 that it was not given, that that is how you were

19 treated differently from other persons?

20   A  Yes.

21   Q  Do you know that at some point following your

22 complaint that Attorney Daigle was given an

23 administrative suspension?

24       MS. COX:  Try that again.

25       MR. DeMERCHANT:  Did I say that

1      A    I believe it was the same day that we

2  contacted the papers.

3      Q    You also have an allegation in your Complaint

4  that Det. Lounsbury violated your equal protection

5  rights.  How did -- what's your understanding as to how

6  Det. Lounsbury treated you differently than other young

7  women volunteers?

8                MS. COX:  Objection.

9      A    Again, I'm not sure.  That was drafted by my

10  lawyer.

11      Q    Okay.

12                (Discussion off the record.)

13      Q    Ms. Ejchorszt, am I saying that correctly?

14      A    Ejchorszt.

15      Q    I'm going to get it right, get rid of that

16  "I."  I don't mean to jump around but I did have

17  questions concerning Attorney Daigle's questioning that

18  I would just like to make some clarifications upon.  In

19  the beginning of testimony Attorney Daigle asked you

20  concerning whether or not you had your own personal

21  file concerning this incident.  My question to you is

22  that did you keep a diary of events that occurred after

23  November 30 yourself?

24      A    No.

25      Q    Okay.  Did your parents keep a personal file