UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
*****************************************
KRISTEN EJCHORSZT                    *
                                     *
                                     *
VS.                                  *
                                     *
                                     *   CASE NUMBER:
                                     *   3: 02CV1350(CFD)
JAMES F. DAIGLE, JR.;                *
LOUIS J. FUSARO, Chief of Police     *
MARK LOUNSBURY; POLICE               *
DEPARTMENT OF THE CITY OF            *
NORWICH, AND CITY OF NORWICH         *   September 21, 2006
*****************************************
```

*MEMORANDUM OF LAW IN OPPOSITION TO*
*<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>*

**I.   Statement of Facts.**

    **A.   Summary of Facts.**

This is an action arising out of the misconduct of a police officer, defendant James F. Daigle, Jr., a detective lieutenant with the defendant Norwich Police Department. Daigle recruited the plaintiff to assist the Norwich Police Department in an undercover, underage alcohol purchase "sting" operation. On the evening of the purported "sting" operation, Daigle required the plaintiff to pose for photographs in the nude from the waist up, under the pretext that such photographs were necessary police protocol in sting operations. When the plaintiff learned that Daigle had duped her into posing topless for him, she developed depression and anxiety, requiring medication that continues to the present time.

1

**B.    Facts.**

On or about November 30, 2001, the plaintiff, Kristen Ejchorszt, then age 20, volunteered, in response to a request from defendant James Daigle, to assist the City of Norwich Police Department in an undercover, underage alcohol "sting" operation, aimed at identifying liquor stores that were selling alcohol to minors. On the evening of the sting, Daigle took the plaintiff into a conference room and had her remove her shirt in order to attach a "body wire." He then removed her brassiere, leaving her nude from the waist up.

Daigle told the plaintiff that it was necessary for him to take photographs of her nude from the waist up in order to show that she was not concealing a counterfeit identification card in her clothing. He assured her that such photographs were standard police practice. He then photographed the plaintiff nude from the waist up several times. The plaintiff was uncomfortable, but believed Daigle's representations that the photographs were necessary and required as part of her voluntary participation in the sting operation. In the process of attaching the body wire, Daigle touched the plaintiff's breast.

Upon returning from the "sting" operation, Daigle told the plaintiff that he would have to retake the photographs because the first photographs had not turned out. He took additional photographs of the plaintiff nude from the waist up, again using a digital camera. Daigle intentionally misrepresented to the plaintiff that it was necessary for her to submit to the removal of her clothing, his unauthorized touching, and the taking of the photographs as standard police practice for the "sting" operation in order to induce the plaintiff to submit to his

2

unlawful conduct. Daigle cautioned the plaintiff not to tell anyone, including other police officers, about the photographs he had taken of her.

Ejchorszt saw Daigle showing the viewfinder of the digital camera used to take the photographs to at least one other member of the police department, Detective Mark Lounsbury. He may also have published the photographs of the plaintiff by preserving them on a computer disk or printed form, or both. The defendants have represented that they do not know what happened to the photographs. However, defendant Fusaro, the Chief of Police, allowed Daigle access to his computer and his desk before dismissing him from his position, thereby giving Daigle the opportunity to remove evidence of the photographs from the Police Department premises.

The plaintiff subsequently learned that the removal of her brassiere and the photographs Daigle took were not standard police procedure in sting operations. Her complaint to the Defendant Chief of Police resulted in an investigation that revealed similar misconduct with underage female volunteers in other alcohol compliance operations and led to Daigle's termination from the police force.  As a result of the defendant's misconduct, the plaintiff has suffered serious emotional injuries, including emotional distress, anxiety, depression, low self esteem, anger, rage, humiliation, and permanent psychological pain, requiring medication that continues to the present time.

Daigle was placed in charge of the underage alcohol compliance operations in 200 to 2001.  The Norwich Police Department did not have any written policies concerning the treatment of female volunteer undercover

operatives. The Chief was unaware whether police officers, including detectives, received any kind of training relating to the use of minors as undercover operatives or female operatives in particular. He was unaware of any policies concerning the selection of individuals to participate as undercover operatives in the alcohol compliance program and until Ejchorszt's complaint was unaware that all such operations had used female volunteer undercover operatives. There were no policies concerning the use of wire devices on the underage women volunteers used in the alcohol compliance program.

During the time that Daigle was in charge of the underage alcohol compliance program, he received no instruction from any of his supervisors in the conduct of the operations, and no instruction from anyone regarding utilizing underage volunteers. Daigle "had no problem" with requiring a female investigator, working in other contexts, to go into a room with him and take her shirt off so that he could install a body wire. In fact, in Daigle's mind, there was no difference in having Ejchorszt remove her clothing in his presence than in interviewing a female witness.

Daigle's superiors in the police department were aware that he took nude or partially nude photographs of women employed by the police department. In 1998, Daigle had shown a nude photograph of a police dispatcher, Kristen Vanase, to Robert Burnes, a captain or deputy chief and had a conversation about the photo with then deputy chief Fusaro. Daigle was known in the police department for having taken nude or partially nude photos.of Vanase and another police employee, Karen Valcourt. Daigles' prominently displayed nude

4

photos in his home and cigar shop were "quite the topic of conversation" in the department. In addition to superiors Burnes and Fusaro, Lt. Thomas Peterson also knew about Daigle's penchant for nude photos of women.

There are at least two other lawsuits pending in this district against these same defendants, based on virtually the same conduct by Daigle. Those cases are <u>Wilson v. Norwich</u>, No. 3:02-CV-01026 (CFD) and <u>Earl v. Daigle</u>, No. 3:03-CV-01323 (SRU). All three related cases were initiated in state court and removed by the municipal defendants to this Court on the basis of federal question jurisdiction. The Court may take judicial notice of the record in these other actions.

**II.     Legal Argument.**

   **A.     There exists a question of material fact as to whether Norwich policymakers delegated final policymaking authority for underage alcohol compliance operations to James Daigle.**

The City's assertion that its chief of police has final policymaking authority with respect to police activities does not defeat plaintiff's §1983 claim. The evidence in the record before the Court strongly supports an inference that police officials delegated final policymaking authority to James Daigle in the conduct of the underage alcohol compliance investigations. The City of Norwich may still be liable for Daigle's conduct in the alcohol compliance operations if plaintiff can establish that an official with final policymaking authority delegated that authority to a subordinate. City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988); Monistere v. Memphis, 115 Fed. Appx. 845, 852-53 (6th Cir. 2004); Ulrich v. City and County of San Francisco, 308 F.3d 968, 985 (9th Cir. 2002)(plaintiff may establish municipal liability by "showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of a subordinate"(emphasis added)).

Whether final policymaking authority with respect to the underage alcohol compliance operations was delegated to Daigle presents a question of material fact. Ulrich, 308 F.3d 985-86. The facts before this Court strongly support the conclusion that the Chief of Police delegated policymaking authority for the conduct of underage alcohol investigations to Daigle. Daigle and another officer were the only members of the police force to receive training for implementing the alcohol compliance program because they were in charge of implementing

the program in the Norwich Police Department.

Daigle was given unfettered discretion on how to conduct the alcohol compliance operations. Daigle's superiors were not familiar with the protocols associated with operations investigating sales of alcohol to minors, including the selection and participation of volunteer undercover operatives. During the time Daigle was involved in the underage alcohol compliance program, he received no instruction from any of his supervisors about the conduct of alcohol compliance operations.

Daigle conducted the undercover alcohol compliance operations unconstrained by any department policies concerning the selection and treatment of undercover operatives who, by necessity, were under the age of 21. Moreover, there were no department policies providing guidance with female volunteers working undercover for the police. Although the Police Department maintained written policies relating to strip searches of prisoners, there were no policies constraining Daigle from requiring Ejchorszt to remove her clothing as part of the undercover operation.

Daigle may be considered the final policymaker with respect to underage alcohol compliance operations if his decisions were final, unreviewable, and "not constrained by the official policies of superior officials." Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993 (citing Praprotnik, 485 U.S. 127)). Daigle's decisions in the conduct of alcohol compliance program were final. There is no evidence in this record that he received any direction from his supervisors about the specifics of the operation, including the use of the young

women involved in those operations. <u>Monistere</u>, 115 Fed. Appx. at 852-53. There is no evidence that any superior officer reviewed or challenged Daigle's decision-making authority. <u>Id.</u> Finally, there is no evidence that Daigle was constrained by any written or unwritten policies governing the alcohol compliance program that he was in charge of implementing. See <u>Id</u>. There is sufficient evidence in this record to demonstrate, or at least create a triable issue, that Daigle had the requisite policymaking authority over underage alcohol compliance operations, inasmuch as he had been delegated the authority to control his own investigations.

  **B.** **The City, Police Department and Chief of Police are liable for their failure to adequately train or supervise Daigle in the conduct of underage alcohol sales investigations.**

The evidence shows that Daigle was placed in charge of the underage alcohol program without sufficient training or supervision in respect to the volunteer operatives who were recruited to participate in investigations. Daigle received no or insufficient training with respect to selection and recruitment of volunteers, or the use of such volunteers during an investigation, especially in the practice of equipping the volunteers with audio monitoring devices, such as the "body mike," used on the plaintiff. The failure to adequately train Daigle in the conduct of alcohol investigations and the use of underage volunteers led to the violation of plaintiff's constitutional rights.

  In order to establish municipal liability for its failure to train or supervise, the plaintiff must satisfy three requirements: (1) The policymaker knows to a moral certainty that the employees will confront a given situation, (2) that the

situation presents the employees with a difficult choice of the sort that training will make less difficult or that there is a history of mishandling the situation, and (3) that the wrong choice by a city employee will frequently cause the deprivation of a citizen's constitutional rights.  Walker v. City of New York, 974 F.2d 293, 297-298 (2d Cir. 1992, cert. denied, 113 S.Ct. 1387 (1993)(citations omitted). "Where the plaintiff establishes all three elements, then we think it can be said with confidence that the policymaker should have known that inadequate training or supervision was 'so likely to result in a violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need.' " Id., 298, citing City of Canton v. Harris, 489 U.S. 378, 390 (1989).

      The failure of the police department to have any policy guiding police officers in the recruitment and use of underage female volunteers demonstrates its deliberate indifference. In Walker the Second Circuit opined that the failure of the police department to have any policy for the proper handling of exculpatory evidence, at issue in that case, could provide the basis for a deliberate indifference claim. Id.  The instant case differs from Walker in that the failure to have a policy with respect to underage female volunteers clearly led to the violation of Ejchorszt's constitutional right to privacy in her unclothed body. See Poe v. Leonard, 282 F.3d 123, 139 (2d Cir. 2002)(police officer violates constitutional right to bodily privacy by manipulating circumstances to view, photograph or otherwise record that person's unclothed or partially unclothed body without his or her consent and without proper law enforcement interest).

The Norwich Police Department did not have any written or unwritten policies concerning the treatment of female volunteer undercover operatives. The Chief was unaware whether police officers, including detectives, received any kind of training relating to the use of minors as undercover operatives or female operatives in particular. He was unaware of any policies concerning the selection of individuals to participate as undercover operatives in the alcohol compliance program and until Ejchorszt's complaint was unaware that all such operations had used female volunteer undercover operatives. There were no policies concerning the use of wire devices on the underage women volunteers used in the alcohol compliance program.

During the time that Daigle was involved with the underage alcohol compliance program, he received no instruction from any of his supervisors in the conduct of the operations, or utilizing female investigators or underage volunteers. Daigle saw "no problem" with requiring a female investigator to go into a room with him and take her shirt off so that he could install a body wire.

The Chief of Police, as the identified policymaker for police activities, certainly knew that his officers would be working with underage female volunteers in the conduct of alcohol compliance investigations. The investigations, by their very nature, required the participation of an underage volunteer, and it is reasonable to assume that some of those volunteers would be female. It was also expected that compliance operations would take place at night, on "overtime," and that the undercover operative would, for both evidentiary and safety reasons, be equipped with a listening device. The Chief

should be charged with knowledge that his officers would need to equip underage female volunteers with listening devices. Thus, this case satisfies the first element of a deliberate indifference claim.

Moreover, the evidence developed during the course of the internal investigation establishes that as early as 1990, Daigle's superiors in the police department knew of Daigle's fascination with photographing women in various stages of undress  His nude photos of a civil employee, Kristin Vanase, and a woman police employee Karen Valcourt were the subject of much discussion in the department.  In 1998 Daigle displayed a nude or partially nude photo of Kristin Vanase to the then Captain Burnes,  who had heard about the photo and asked Daigle to show it to him.  He also discussed the photo with then Deputy Chief *Fusaro.*

These facts are sufficient  to raise a triable issue as to whether Daigle's superiors "knew or should have known that there was a high degree of risk" that Daigle "would behave inappropriately with a woman during this assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [plaintiff]." Poe, 282 F.3d 142.  The nude photo incidents should have put Daigle's superiors on notice of his inappropriate sexual proclivities toward woman.   In placing Daigle in charge of the underage alcohol compliance program, utilizing underage female volunteers, Fusaro placed Daigle in a position where, given his known past sexually voyeuristic conduct, he would be able to subject young women, eager to be helpful, to similar

11

inappropriate conduct and a violation of their constitutionally protected privacy rights.

There is also a history that Daigle mishandled the underage alcohol investigations using young female volunteers. In each of the investigations that Daigle headed, he convinced the young operatives that they had to expose their breasts, and in two other cases, their entire unclothed bodies, ostensibly for evidentiary photographs. The evidence shows that Daigle misused his authority to view and photograph unclothed young women under the guise of legitimate police business.

The second prong of the Walker failure to train/supervise test is satisfied both by evidence that officers would be working with impressionable young women, eager to please the police and the evidence that Daigle had a history of mishandling that very situation.

The Chief should also have recognized the very real risk that the young female operatives would be exploited by officers involved with the compliance program, leading to the deprivation of their constitutional rights. Walker, 974 F.2d 297-98. There were no policies or practices in place to ensure that officers would not sexually exploit vulnerable young women. There was no effort to require female police officers to participate and no rules or policies to prevent an officer from being alone with a young female volunteer. It should have been plain to the Chief, or other supervisors, that the failure to safeguard the volunteer operatives would leave them at very real risk of being victimized sexually by officers' inappropriate conduct.

The record raises very substantial issues of material fact with respect to whether the Chief, or other of Daigle's supervisors, failed adequately to train or supervise Daigle in the conduct of the underage alcohol compliance program. Summary judgment may not be appropriately entered on plaintiff's training/supervision claim.

**C.    The evidence shows that there was a policy or custom of sexually exploiting young female volunteers in the alcohol compliance program.**

The evidence shows that Daigle instituted a policy or custom of sexually exploiting the young women he recruited to act as volunteers in the alcohol compliance program. In each of the investigations, after he was placed in charge, he convinced each of the young women that they had to expose all or part of their unclothed bodies to him based on false claims of legitimate police purposes.

Although the alcohol compliance program had been in existence only a year or so before Ejchorszt's participation, the evidence shows that each compliance operation under the program involved the sexual exploitation of the female operative. Thus, the facts show that there was a custom or usage of exploiting the underage volunteer operatives in the program.

**D.    The City is not entitled to qualified immunity for Daigle's conduct.**

The defendants have not established that they are entitled to qualified immunity.

> Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal roles that were "clearly established" at the time. . . . In evaluating a motion for summary judgment on the basis of qualified immunity, we must as a

>threshold matter inquire whether, construing the facts most favorably to the plaintiff "the facts alleged show the officer's conduct violated a constitutional right." . . . If so, we must determine whether the right in question was clearly established at the time the violations occurred, that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." . . .

Poe, 282 F.3d 132 (citations omitted). The evidence and the case law require that qualified immunity be denied in the instant case.

First, the facts in this record demonstrate that Ejchorszt has established a violation of a clearly established right. Id., 133-34. At the time of the acts complained of, Ejchorszt's right to bodily privacy in her unclothed body was clearly established. Id., 137-39. In Poe, the Second Circuit held that, as of 1992, there was a clearly established, right to privacy in one's unclothed or partially unclothed body, regardless whether the right is established through the auspices of the Fourth Amendment or the Fourteenth Amendment. Id., 138-39. Moreover, the Court went on to say that even in the absence of case law recognizing such a right, the sexual violations in that case would violate substantive due process rights because the officer's behavior, if proven, would shock the conscience as "arbitrary government action." Id. 139.

Under the second prong of the municipal immunity inquiry, it would have been clear to a reasonable officer that his conduct in viewing and photographing an underage female volunteer was unlawful in the situation he confronted. Id. 132. There can be no question that a reasonable officer would have realized that this conduct was unlawful. In Poe, the Second Circuit held that a police officer's videotaping an unsuspecting, unclothed volunteer in a police training video from

the waist up shocked the conscience, was intended to injure and was unjustified by any governmental interest.

> Let us be clear: a police officer violates a person's constitutional right to bodily privacy when that officer manipulates the circumstances to view, to photograph, to videotape or otherwise record that person's unclothed or partially unclothed body without his or her consent where, as here, there is no conceivable investigative or otherwise proper law enforcement interest advanced by such a viewing.

Id. 139. Thus, it is unquestionable that Daigle violated Ejchorszt's right to bodily privacy in the underage alcohol investigation.

Daigle's supervisors may also be held liable if, in supervising Daigle, they exhibited gross negligence or deliberate indifference to a high risk that Daigle would violate Ejchorszt's constitutional rights and that such neglect caused Daigle to violate her rights. Id. 140. As argued above, there is at least a question of material fact whether Daigle's supervisors, including Chief Fusaro, knew of Daigle's past fascination with photographing unclothed women. See §B supra. Daigle's exploitive past conduct should have alerted his supervisors that placing him in charge of unprotected young women placed them at great risk to similar exploitation. Placing Daigle in charge of the alcohol compliance program that necessarily utilized underage volunteers, demonstrates their deliberate indifference to the constitutional rights of the young female operatives.

In Poe, the Second Circuit held that supervisory liability would be established by

> sufficient facts to raise a triable issue a fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the officer] would behave inappropriate with a woman during his assignment, but either deliberately or recklessly

> disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the plaintiff].

Id. 142. Unlike the situation in Poe, however, the facts of the instant case demonstrate that Daigle's past conduct toward women, particularly his proclivity for nude photography, made him an inappropriate candidate to supervise investigations involving vulnerable young women volunteers. By turning a blind eye to Daigle's past conduct, the Chief and other supervisors either deliberately or recklessly disregarded that risk by failing to take action or institute protective measures that reasonable supervisors would have found necessary to prevent the exploitation of the young women under Daigle's control. The cavalier "boys will be boys" attitude of the department placed the proverbial fox in charge of the hen house and permitted the unchecked victimization of Ejchorszt and the other young women.

Department supervisors were at least on constructive notice of Daigle's problematic proclivities toward women. They should have known that there was a "high degree of risk that Daigle would exploit underage female operatives over whom he had control. The supervisors violated established law by placing Daigle, with his known history of exploiting women, in charge of vulnerable underage female volunteers.

Placing Daigle in charge of a program that used underage women as volunteers, was objectively unreasonable. Id. 146. Although supervisors knew that Daigle had photographed a police dispatcher (Kristen Vanase) and another officer (Karen Valcourt) in the nude, there appears to never have been any kind

16

of department inquiry into his conduct. Instead, the supervisors placed Daigle in charge of young women he could exploit in a similar fashion.

The evidence in this record sufficiently raises a triable issue regarding Fusaro and the department's gross negligence or deliberate indifference to the constitutional rights of the young female volunteers Daigle recruited for his alcohol compliance investigations. Based on his past history, there was a high risk that Daigle would exploit these young women as he had done with this co-workers. The supervisory inaction in this case should render Fusaro and the department ineligible for qualified immunity in this case. Accordingly, summary judgment should not enter on the issue of qualified immunity.

### E. Plaintiff's indemnification claims in Count Ten raise issues of material fact.

Plaintiff's claim for indemnification pursuant to CGS § 7-465 are supported by the facts in the record and, at least, present trialble issues, precluding summary judgment. Under § 7-465, a municipality is obligated to pay on behalf of any employee, all sums which the employee becomes obligated to pay by reason of the liability imposed upon such employee for infringement of any person's civil rights, if the employee was acting in the performance of his duties and within the scope of his employment and if the violation was not the result of any willful or wanted act of the employee of the discharge of his duties. Contrary to defendant's contention, Daigle was plainly acting in the performance of his duties when, during the course of an underage alcohol compliance investigation, utilizing the plaintiff as a volunteer operative, he required her to partially disrobe for photographs that were supposedly to be used as evidence. These facts

demonstrate that Daigle was acting in the performance of his duties during the course of the alcohol compliance operation. There is at least a question of material fact as to whether Daigle was operating in the performance of his duties and within the scope of his employment during the investigation.

Whether Daigle's conduct was willful or wanted presents a issue of material fact under Connecticut law. Eg, <u>Suffield Development Associates Ltd. Partnership v. National Loan Investers LP</u>, 97 Conn. App. 541 (September 19, 2006), slip op at * 17 (findings regarding recklessness, intent, or wantedness are factual findings.

Summary judgment may not properly enter on the indemnification claim pursuant to § 7-465, because there exists issues of material fact with respect to those claims.

### III. Conclusion

For all the foregoing reasons summary judgment may not properly enter against the City of Norwich, the Norwich Police Department or Louis Fusaro.

Respectfully submitted

THE PLAINTIFF,

KRISTEN EJCHORSZT

By:  ____/s/_____

Barbara L. Cox
Fed. Bar No. Ct08523
The Gallagher Law Firm
1377 Boulevard, P.O. Box 1925
New Haven, CT 06509-1925
(203) 624-4165
Her Attorney

**CERTIFICATION OF SERVICE**

    I hereby certify that on September 19, 2006, a copy of the foregoing Memorandum of Law in Opposition to Renewed Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____

BARBARA L. COX