UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
*****************************************
KRISTEN EJCHORSZT                    *
                                     *
                                     *
VS.                                  *
                                     *
                                     *   CASE NUMBER:
                                     *   3: 02CV1350(CFD)
                                     *
JAMES F. DAIGLE, JR.;                *
LOUIS J. FUSARO, Chief of Police     *
MARK LOUNSBURY; POLICE               *
DEPARTMENT OF THE CITY OF            *
NORWICH, AND CITY OF NORWICH         *   September 21, 2006
*****************************************
```

## **PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT**

**I.   Responses to Defendants' Rule 56(a)(1) Statement.**

1.      Objection: Statement does not comport with Local Rule 56(a)(3), in that it fails to cite specific paragraph or page. Without waiving the foregoing objection, the statement is admitted.

2.      Objection: Statement does not comport with Local Rule 56(a)(3), in that it fails to cite specific paragraph or page. Without waiving the foregoing objection, the statement is denied. Def. Ex. B, pp. 2, 4.

3.      Denied. However, it is admitted that on December 21, 2001, the plaintiff complained that Officers Daigle and Lounsbury had been drinking beer during the operation, among other things. Def. Ex. C, p. 2.

4.      Admitted.

5.      Admitted.

6.      Objection: Statement does not comport with Local Rule 56(a)(3), in that it fails to cite specific paragraph or page. Without waiving the foregoing

1

objection, the statement is admitted.

7. Admitted.

8. Denied. Ejchorszt dep., pp. 62.

9. Admitted.

10. Admitted that the plaintiff so testified.

11. Objection: Statement does not comport with Local Rule 56(a)(3), in that it fails to cite specific paragraph or page. Without waiving the foregoing objection, the statement is admitted.

12. Admitted.

13. Admitted.

14. Denied. Ejchorszt dep., pp. 62; Def. Ex. B pp. 2-4  It is admitted that on the evening of November 30, 2001 the plaintiff did not see any photographs and does not have specific personal knowledge that Daigle kept any photographs or showed nude photographs of her to others. It is denied that plaintiff did not discuss the photographs with anyone and that Daigle made a comment that the camera was not working. Ejchorszt dep., pp. 62, 71-75.

15. Admitted.

16. Denied. Ejchorszt dep., pp. 62.

17. Admitted.

18. Denied. Ejchorszt dep., pp. 62.

19. Objection: Evidence cited does not support assertion. Without waiving the foregoing objection, the statement is denied.

20. Denied. There is evidence that plaintiff was treated differently from

other volunteer operatives.; Def. Ex. B, C;  Ex. J pp 16-17   It is admitted that the investigation of her complaint began soon after her complaint.

   21.   Admitted that police department written policy requires same sex *prisoners* to be transported by officers of the same sex and further requires that searches of prisoners be conducted by officers of the same sex.

## II.   Disputed Issues of Material Fact.

   1.   In the 2000 to 2001 timeframe, James Daigle and another police officer, James Deveny, attended a half-day training program for implementing the program related to sales of alcohol to minors. Fusaro dep., pp. 16-18; Daigle dep. 22-23; Daigle dep. Ex. 1(Ex D)

   2.   Daigle and Deveny were selected to attend the training because they were in charge of implementing the program in the Norwich Police Department. Fusaro dep., p. 18.

   3.   The Police Chief delegated policy makers authority over the underage alcohol compliance program to James Daigle. Fusaro dep., 16-17, 27, 33.

   4.   The Norwich Police Chief and other policy makers permitted Daigle to make decisions as to how to conduct the operations under the underage alcohol program. Fusaro dep. pp. 16-17, 33; Ex. J, pp. 6-7.

   5.   The Police Chief, Louis Fusaro, did not attend the training. Fusaro dep., p. 17.

   6.   The underage alcohol sales was a new program in the Norwich

Police Department. Fusaro dep., p. 19.

7. Chief Fusaro was not familiar with the protocols associated with operations investigating the sales of alcohol to minors. Fusaro dep., p. 18.

8. The Norwich Police Department received grant funding to offset overtime costs involved in carrying out the program. Fusaro dep., pp. 19-20.

9. Chief Fusaro was unaware whether police officers, including detectives, received any kind of training relating to the use of minors as undercover operatives. Fusaro dep., pp. 21-22.

10. Fusaro could not identify any part of training that involved working with undercover female operatives. Fusaro dep., p. 22.

11. The grant, funding the alcohol sales to minors program became effective in early 2001. Fusaro dep., p. 23.

12. Chief Fusaro did not know who in his department maintained training materials related to the alcohol sales to minors program. Fusaro dep., pp. 23-24.

13. Chief Fusaro was unaware of the policies concerning selection of individuals to participate as undercover operatives in an investigation of liquor sales to minors. Fusaro dep., pp. 24-25.

14. Prior to Kristen Ejchorszt's complaint on December 3, 2001, Chief Fusaro was unaware that all of the alcohol "sting" operations conducted by the Norwich Police Department used female volunteer undercover operatives. Fusaro dep., pp. 25-26.

15. Chief Fusaro only became aware of the use of listening devices

placed on an undercover operative in connection with the alcohol "sting" investigations after December 3, 2001. Fusaro dep., p. 25.

16. Chief Fusaro had no conversations with supervisors in the department to ensure that officers in the department had had appropriate training in the use of wire devices prior to being involved in a situation where the use of a wire device was necessary. Fusaro dep., p. 27.

17. The Norwich Police does not have any written policies concerning the treatment of female volunteer undercover operatives. Fusaro dep. pp. 27-29. Prisoner Policy, Def. Ex. I, §F.

18. A "strip search" entails having a prisoner "remove or arrange some or all of his or her clothing . . . so as to permit a visual inspection of the genitals, buttocks, anus, *female breasts*, or undergarments used to cloth[sic] said anatomical parts of the body." (emphasis added) Def. Ex. I, §F(1).

19. The Police Department's written policies relating to strip searches of prisoners requires that "all strip searches shall be performed by a person of the same sex as the person being searched." Def. Ex. I, ¶F(2)(e).

20. Prior to November 30, 2001, Chief Fusaro was unaware of the number of underage alcohol investigations the Norwich Police Department had conducted. Fusaro dep., p. 30.

21. Chief Fusaro considered an underage alcohol investigation "minutiae." Fusaro dep., p. 31.

22. The only photographs that were supposed to be taken in connection with an underage alcohol investigation were photographs depicting

how the undercover operative appeared during the investigation. Fusaro dep., p. 32.

23.   The purpose of the photograph was to show that the police were not using someone who obviously looked older than 21, but was, in fact, younger. Fusaro dep., p. 32.

24.   James Daigle was in charge of the undercover alcohol investigations using Melanie Wilson, Theresa Earl and Kristen Ejchorszt as the undercover operatives. Fusaro dep., pp. 16-18, 33; Lounsbury dep. p. 35; Daigle dep. 32, 36, 39.

25.   Chief Fusaro waited until December 7, 2001 to place James Daigle on administrative leave. Fusaro dep., pp. 36-37.

26.   Chief Fusaro did not feel it necessary to take any steps to ensure that James Daigle did not destroy evidence of his conduct towards Kristen Ejchorszt between December 3 and December 7, when he placed Daigle on administrative leave. Fusaro dep., p. 37.

27.   Chief Fusaro did not know when the computer Daigle used was changed between December 3 and December 7, 2001. Fusaro dep., pp. 37-38.

28.   Chief Fusaro made no order prohibiting James Daigle from accessing his computer in the detective division after December 3, 2001. Fusaro dep., p. 40.

29.   On Thursday, November 29, 2001, Daigle called the Norwich Dairy Queen and asked to speak to Kristen Ejchorszt, who worked there. Def. Ex. B, p. 1.

30. When Ejchorszt returned Daigle's call the following day, he asked her to participate in an underage liquor buying "sting" that night. Id.

31. When Ejchorszt inquired as to what she should wear, Daigle suggested she wear something that revealed her breasts[1] or to go braless. Id.

32. In a later conversation, Daigle told Ejchorszt to be at the Police Department at 6 p.m. for the operation. Id.

33. Daigle decided that Ejchorszt would wear an electronic listening device known as a "body mike." Id.

34. Daigle took her into a conference room where they could be alone to affix the wire to Ejchorszt. Id., p. 2.

35. Daigle had Ejchorszt remove her shirt, and then he removed her bra, ostensibly in order to attach the listening device. Id.

36. Daigle informed Ejchorszt that he had to photograph her bare chest and back in order to prove that she had not been concealing an ID in her bra. He took several photographs of her bare chest. Id., pp. 2, 4.

37. As he was affixing the microphone to the strap of her bra, Daigle slipped his fingers down into the cup and touched her breast. Def. Ex. C, p. 4;[2] Ejchorszt dep. 110.

38. Daigle did not seek a female officer to be present during the wiring of Ms. Ejchorszt; nor did he consider that a female was necessary because Ms. Ejchorszt, as a volunteer, was "friendly" to the department and was unlikely to make a claim of impropriety.; Ex. C, pp 224-25.

---

[1] Daigle's words were "a little tit never hurt..
[2] Unpaginated exhibit.

39. After visiting a number of package stores in the area, Daigle returned to police headquarters and the conference room, where he again had Ejchorszt remove her shirt and bra, in order to remove the wire. At that time, he took more pictures of her bare chest and back. Def. Ex. B, p. 4; Ejchorszt dep., 71-74.

40. Before she left, Daigle gave Ejchorszt thirty dollars, explaining, "It's for your time, humiliation, and keeping your mouth shut." Id., p. 4; Ejchorszt dep. 75.

41. Daigle also told Ejchorszt not to discuss the sting operation with other police officers. Def. Ex. B., p. 4.

42. Prior to the alcohol sting investigation involving Kristen Ejchorszt, Daigle had been in charge of two prior operations using female undercover operatives. Fusaro dep., pp. 16-18, 33; Lounsbury dep. p. 35; Daigle dep. 32, 36, 39.

43. In each of the previous operations, Daigle had taken nude or semi-nude photographs of the undercover operatives on the pretext of needing the photographs for legitimate police purposes. Ex. F, pp. 1-2; Ex H, pp.13, - 15, 18.

44. Ejchorszt met with Daigle at his desk. Daigle explained that the investigation was a dry run and that she would not be buying any alcohol. Ejchorszt dep., p. 44.

45. Daigle explained to Ejchorszt that he had initially planned to use a pager, but it had no batteries. He decided to use a body wire. Ejchorszt dep., p. 45.

46. As of November 30, 2001, Daigle "would have no problem" with having a female investigator go into a room with him and take her shirt off so that he could install a body wire. Ex. C, Tr. 224-25.

47. Daigle viewed having Ejchorszt remove her clothing in his presence no different from interviewing a female witness. Ex. C. 224.

48. The purpose of the operation on November 30, 2001 was a "baseline" compliance check, with no anticipated hearings or enforcement. Ex. C pp.. 231-32.

49. During the time Daigle was involved with the underage alcohol compliance program, he received no instruction from any of his supervisors about procedure in the conduct of compliance operations. Daigle dep. 59-60.

50. Daigle never received any instruction from his superiors in the police department about utilizing volunteers in the alcohol compliance program. Daigle dep. 60.

51. Daigle received no instruction from his superiors regarding the alcohol compliance operation, utilizing Kristen Ejchorszt as the volunteer operative, on November 30, 2001. Daigle dep. 70-71.

52. Daigle's superiors in the police department were aware that he took nude or partially nude photographs of women employed by the City or police department. Daigle Statement April 3, 2002, 354-366.

53. Daigle showed a photograph of a civilian city employee, Kristen Vanase, to Robert Burnes, a captain or deputy chief of the Norwich Police Department. Id. 362-364.

54. Daigle had a conversation with then Deputy Chief Louis Fusaro about the photograph he took of Vanase. Id., 362.

55. Daigle was known in the Department for having taken nude or partially nude photographs of Vanase and another woman in the police department, Karen Valcourt. Id. 360-65.

56. The following officers in the Norwich Police Department knew about nude or partially nude photographs of women that Daigle had taken between 1987 and 1998: Deputy Chief Robert Burnes, Lt. Thomas Peterson (1990), Deputy Chief Louis Fusaro, Officer Peter Camp, Id. 360-365.

57. Daigle's photos of nude or partially nude employees of the City or the Police Department, which he displayed prominently in his home and cigar shop, where "quite the topic of conversation" in the Department. Id. 364-66.

Respectfully submitted

THE PLAINTIFF,
KRISTEN EJCHORSZT

By: _____
Barbara L. Cox
Fed. Bar No. Ct08523
The Gallagher Law Firm
1377 Boulevard, P.O. Box 1925
New Haven, CT 06509-1925
(203) 624-4165
Her Attorney

## CERTIFICATION OF SERVICE

I hereby certify that on September 21, 2006, a copy of the foregoing Plaintiff's Local Rule 56(a)(2) Statement was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
BARBARA L. COX