```
 1   you, correct?

 2       A    Yes.

 3       Q    Prior to the operation commencing and after

 4   the operation was complete, correct?

 5       A    Yes.

 6       Q    And that both of these sets of photographs

 7   were taken in the conference room of the police

 8   department?

 9       A    Yes.

10       Q    Does that encompass the photographs that were

11   taken of you that day?

12       A    Well, he had to take a picture of my license

13   and of me and what I was wearing in the detectives

14   division.

15       Q    When did that occur?

16       A    When I first walked in.

17       Q    Okay.

18       A    Before we ever went out on the sting.

19       Q    And who did that?

20       A    Daigle.

21                  (Defendant's Exhibits 2-4 marked for

22   identification.)

23       Q    Ms. Ejchorszt, I'm going to show you what's

24   been marked as Defendant's Exhibit 2.  Can you identify

25   that photograph for me?
```

```
 1        A      That's my driver's license.
 2        Q      Okay.  And in fact it reads driver's license,
 3   there's a photograph on it, and it reads Kristen
 4   Ejchorszt, 3 Hazelwood Drive, Sprague, Connecticut,
 5   license number 117196981.
 6        A      Correct.
 7        Q      Is this the license you had in your
 8   possession on the day of the alcohol sting?
 9        A      Yes.
10        Q      Okay.  And is this the license that you
11   provided to the police department?
12        A      Yes.
13        Q      And is this the license that you observed
14   them photograph?
15        A      Yes.
16        Q      Does this photograph appear to be the
17   photograph that was taken of your license?
18        A      Yes.
19        Q      And again, so I understand, at what point
20   were these photographs taken?
21        A      At the very beginning.
22        Q      When you first entered the detective bureau?
23        A      Yeah.  I sat down, he briefed me, and then
24   there was those pictures.
25        Q      And with what camera were these pictures
```

1    taken?

2         A    The same camera.

3         Q    Okay.  And after these pictures were taken

4    did you see him remove the disk from the camera?

5         A    I did see him open his desk, take another

6    disk out, and then ... my attention was gone.  It was

7    somewhere else, so I didn't actually see him putting a

8    new disk in the ...

9         Q    Just for clarification sake, when you say

10   "he," we're talking these photographs were taken by

11   who?

12        A    Daigle.

13        Q    And this was -- the photograph identified as

14   Defendant's Exhibit 2 was the first photograph?

15        A    Yes.

16        Q    Showing you a photograph identified as

17   Defendant's Exhibit 3 (handing), it appears to be a

18   photograph of you.  Do you recognize that photograph?

19        A    Yes.

20        Q    Could you describe it for me, please?

21        A    I'm standing next to the filing cabinet in

22   the detective division.

23        Q    Okay.  That is you?

24        A    Yes.

25        Q    And that is the clothing that you were

1   wearing on the day of the sting operation?

2       A    Yes.

3       Q    And this is one of the photographs that was

4   taken of you shortly after you entered the detective

5   division by Daigle?

6       A    I believe so.  He redid those pictures at the

7   end, too.

8       Q    Okay.  All right.  I'm getting confused

9   because there's a whole set of photographs and I'm

10  trying to identify when and how many were taken at one

11  time.  So in the initial -- when you first came into

12  the detective division you're saying that photographs

13  were taken of you, correct?

14      A    Yes.

15      Q    And are these -- do these represent the

16  photographs that were taken of you (indicating)?

17      A    Yes.

18      Q    What we've shown as Defendant's Exhibit 2,

19  Defendant's Exhibit 3, and what I will show you for

20  identification now Defendant's Exhibit 4 (handing).  Is

21  that correct?

22      A    Yes.

23      Q    Okay.  Defendant's Exhibit 4 is a photograph

24  that appears to be you; is that accurate?

25      A    Yes.

1      Q      And is that the clothing that you were

2    wearing on the night of the operation?

3          A      Yes.

4          Q      And what are you wearing there?

5          A      Jeans, a black V-neck shirt and a leather

6    black jacket.

7          Q      Okay.  And to your recollection these were

8    taken initially when you entered the detective bureau?

9          A      Yes.

10          Q      Are you sure of that?

11          A      Yes.

12          Q      Okay.  And then you went into the conference

13    room, there was a set of photographs taken involving

14    you taking off your shirt and your bra?

15          A      Yes.

16          Q      The operation occurred.  After the operation

17    was complete you're alleging that you were brought back

18    to the conference room, more photographs were taken of

19    you, yes?

20          A      Yes.

21          Q      And then now you're saying there was even

22    more than that?

23          A      Before we ever went into the conference room.

24    He redid these ones, too.

25          Q      Okay.  So let me back up in the time

1   continuum here.  Once you returned from the operation,

2   this is when you returned from the operation?

3        A    It was between sitting and talking -- yes,

4   between sitting and talking to him about the carjacking

5   and going into the room.

6        Q    Okay.  What occurred at that time?

7        A    I'm sorry, at what?

8        Q    This is another -- you're alleging there was

9   another set of photographs taken when you returned from

10  the operation, correct?

11       A    Yes.

12       Q    And what type of photographs?  Where were you

13  standing?  What occurred?

14       A    I was standing in the same exact place, next

15  to the filing cabinet in the detectives division, a

16  picture of my license and a picture of me standing.

17       Q    Okay.  And did Daigle tell you why he needed

18  those pictures again?

19       A    Well, he had said that the whole disk was --

20  had been formatted.

21       Q    So he was starting all over again?

22       A    Yes.

23       Q    That was your understanding?

24       A    Yes.

25       Q    Okay.  Which led to you then going into the

1    conference room for a second set of photographs taken

2    in there showing the wire and also with your shirt and

3    bra off?

4        A    Yes.

5        Q    Okay.  Do I have that down?  Is that

6    understandable?

7        A    Yes.

8        Q    Do you agree with that?

9        A    Yes.

10        Q    Other than all those photographs that we've

11    talked about, are there any other additional

12    photographs taken that you're aware of?

13        A    No.

14        Q    And other than these photographs which I have

15    showed you today marked as Defendant's Exhibits 2, 3

16    and 4, have you ever viewed any of the photographs

17    taken of you that evening?

18        A    No.

19        Q.    Okay.  You said that you had left the police

20    department and gone out to the dispatch and you talked

21    to Officer Lamantini again?

22        A    Yes.

23        Q    What did you talk to Officer Lamantini about?

24        A    I don't really remember.  He asked how

25    everything went and I said "Good."

```
 1        Q     Okay.  At that point would you have

 2   volunteered to participate in the sting operation a

 3   second time if asked?

 4        A     No.

 5        Q     How come?

 6        A     Because while I thought it was part -- the

 7   topless pictures were part of the standard operating

 8   procedure, I wasn't really that comfortable with it.

 9        Q     Okay.  And at some point you left the police

10   department?

11        A     Yes.

12        Q     And what did you do after that?

13        A     Actually, one of my girlfriends saw my car at

14   the police department and came and met me there, pulled

15   in and ... I don't know if I went somewhere with her.

16   I went up to Dairy Queen.  To see my father.

17        Q     Okay.  What's her name?

18        A     Tina Rivera.

19        Q     And how do you know Tina?

20        A     We work together.

21        Q     Does she still work for you?

22        A     Yes.

23        Q     Then you went to see your father?

24        A     Yes.

25        Q     And what did you tell your father?
```

```
 1    Saturday and my uncle got back to him on Sunday.

 2         Q    Okay.  And then what happened from there?

 3         A    We went in on Monday and made the statement.

 4         Q    Okay.  You went in to talk to the chief?

 5         A    Yes.

 6         Q    Did you actually talk to the chief?

 7         A    Yes.

 8         Q    The deputy chief or the actual chief?

 9         A    Both.

10         Q    Okay.  Tell me about that, how did that go?

11         A    It went fine.

12         Q    Who made the appointment?

13         A    My father.

14         Q    What time did you go in on Monday, do you

15    know?

16         A    I don't remember.

17         Q    Morning, afternoon?

18         A    I believe it was afternoon.

19         Q    And you're saying at that time a statement

20    was taken?

21         A    Yes.

22                   (Defendant's Exhibit 5 marked for

23    identification.)

24         Q    I'm showing you what's been marked as

25    Defendant's Exhibit 5 and it's a statement, it appears
```

1    to be four pages in length.  It has your name at the

2    top, Kristen Ejchorszt, taken on December 2, 2001, from

3    4:32 p.m. until 5:40 p.m.  And that's shown on page

4    four.  Would you review this document, please

5    (handing).

6                    (Pause.)

7        Q    Have you had a chance to review the

8    statement?

9        A    Not recently.

10       Q    No, right now, today.

11       A    Yes.

12       Q    Is that the statement that you recall giving?

13       A    Yes.

14       Q    Okay.  I saw that you read through it.  Is

15   there anything in the statement that you read that you

16   don't agree with as we sit here today?

17       A    No.

18       Q    I'm just going to leave the statement for one

19   second, and I apologize, I have to go back to the photo

20   issue.  We've already got it well-organized as to the

21   four different photo events.  Can you recall when each

22   of those were taken?  When you first came into the DB

23   do you know how many were taken?

24       A    I have no idea.

25       Q    In the conference room do you know how many

```
1    were taken?

2         A    No idea.

3         Q    Okay.  After the incident in the PD, DB, do

4    you know how many were taken?

5         A    No.

6         Q    Subsequently in the conference room do you

7    know how many were taken?

8         A    No.

9         Q    Regarding the statement, where were you when

10   the statement was taken?  Where were you physically

11   when the statement was taken?

12        A    In the police department.

13        Q    Okay.  And in a specific room?

14        A    Yes.  Chief's briefing room.

15        Q    Okay.  And who was with you when the

16   statement was taken?

17        A    My father.

18        Q    And just your father?

19        A    And the chief and the deputy chief.

20        Q    Okay.  And in what manner was the statement

21   taken from you?  Did you write this yourself?

22        A    No.

23        Q    Who wrote the statement?

24        A    As far as I remember the chief and deputy

25   chief were both writing, and then the deputy chief
```

```
 1        Q     What damages have you suffered as a result of

 2   these allegations?

 3        A     Depression.  I have some anxiety.

 4              (Pause.)

 5        A     I didn't finish school.

 6        Q     Okay.  Let's start with the depression.  Can

 7   you describe to me as much as possible the depression

 8   that you've suffered as a result of this incident?

 9        A     I would have mood swings towards my parents.

10        Q     And is that unusual?

11        A     Yes.

12        Q     You've never had mood swings towards your

13   parents prior to November of 2001?

14        A     I'm not saying that.  I'm saying they were

15   extreme.

16        Q     Like how?

17        A     To the point where I would ... scream and

18   yell and swear and leave the house driving crazy and

19   ... that kind of stuff.

20        Q     And that demeanor was outside of the scope of

21   how you would have responded prior to November of 2001?

22        A     Yes.

23        Q     And as a result of that, did somebody suggest

24   that you go and speak with someone?

25        A     Yes.
```

```
1        Q      And who was that person?

2        A      The person who I spoke with or the person

3   ...?

4        Q      The person who suggested that you go speak to

5   somebody.

6        A      My mother.

7        Q      And who did you go speak with as a result of

8   that?

9        A      Carol Lahan, L-A-H-A-N.

10        Q      Tell me about the anxiety that you suffer.

11        A      I'm very afraid to run into him.  I'm very

12   afraid of him.  I went to pick up my little brother and

13   my niece at school one day and he was there.

14        Q      Who is he?

15        A      Daigle.

16        Q      Okay.

17        A      And I had the office check to see if he had

18   checked any child out.  And originally they said he

19   hadn't.  Which come to find out he did.  It was chicken

20   scratch and they overlooked it.  But that gave me a

21   lot -- like I thought he was going to come get the kids

22   to try to get to me.

23        Q      Has there ever been any action in the past

24   that would make you believe that way?

25        A      I have heard stories.
```

1      Q      What kind of stories?

2      A      Of things that he's done or maybe could have

3   done to other people.

4      Q      Who is telling you these stories?

5      A      One of my mother's friends, I don't even

6   remember her name at this point, had come in and said

7   that there was a girl that was doing drug stings with

8   him, working with him doing that, and something had

9   happened and all of a sudden she disappeared.  They

10  found her in the Thames River.  He investigated and

11  ruled it a homicide.

12     Q      Okay.  So allegations that he was causing

13  physical harm to people?

14     A      Yes.

15     Q      Has he ever threatened you?

16     A      No.

17     Q      Has he ever contacted you?

18     A      No.

19     Q      Has he ever talked to you at all?

20     A      Absolutely not.

21     Q      Has he ever been to the Dairy Queen since you

22  set forth these allegations?

23     A      No.

24     Q      Has he ever talked to any member of your

25  family?

1       A       Yes.

2       Q       Okay.  Who prescribes your medication?

3       A       My physician.

4       Q       And is that Dr. Wagdy Habashy?

5       A       Yes.

6       Q       And how long has he been your physician?

7       A       Since I was 18 I believe.

8       Q       And is he a medical physician, medical

9   doctor?

10      A       Yes.

11      Q       And he doesn't specialize as a psychiatrist

12  or psychologist?

13      A       No.

14      Q       He has the ability to prescribe medicine to

15  you?

16      A       Yes.

17      Q       And in fact, you went to see him under the

18  direction of Ms. Lahan for the prescription of

19  medicine?

20      A       Yes.

21      Q       Because Ms. Lahan was not capable to

22  prescribe you medicine?

23      A       Yes.

24      Q       Okay.  And he did prescribe you some

25  medication?

1       Q      That last question was permanent

2    psychological pain.

3       A      I'm still dealing with the depression,

4    anxiety and humiliation and ...

5       Q      Okay, tell me about the assault and battery

6    that you allege against Mr. Daigle.

7                    MS. COX:  Objection.

8                    MR. DAIGLE:  Okay?

9                    MS. COX:  Yeah.

10                   MR. DAIGLE:  Okay.

11                   MS. COX:  You know, you're reading

12          from a legal document and asking her about

13          legal terms.

14      Q      Let me put it to you to another way.  You

15   have alleged that Mr. Daigle touched you?

16      A      Yes.

17      Q      In what way did Mr. Daigle touch you?

18      A      When he was putting the microphone, he was

19   putting it on my bra strap and his pinky slid down into

20   my bra cup and he touched my breast.

21      Q      Okay.  And who did you talk with about this?

22      A      Nobody.

23      Q      Who did you tell about that?

24      A      Nobody.

25      Q      Did you ever make a complaint to the police

1    department regarding that?

2        A    I don't think so.

3        Q    Would you need to look at your two statements

4    again to see if it's in there?

5        A    No.  I don't think I did because it was very

6    nonchalant.  It was almost nonchalant to the point

7    where he would say "I don't even know what she's

8    talking about."

9        Q    You're making an allegation that somebody

10   sexually touched you.  Don't you believe that that's

11   important?

12       A    Yes.

13       Q    Do you believe it's criminal in nature?

14       A    Yes.

15       Q    Do you believe that if that incident occurred

16   that you should report it to the authorities?

17       A    A lot happened at the time.  He was very

18   swift, very quick about it.  That's all I can say.

19       Q    But the bottom line is on December 2 and on

20   December 21 when you met with the deputy chief and the

21   chief of the Norwich police department you did not file

22   a complaint or provide information that Mr. Daigle had

23   touched you inappropriately; isn't that correct?

24       A    Yes.

25       Q    Is there any reason why you had not?

1   women?

2       A    No.

3       Q    As you sit here today are you aware of any

4   supervisory officer at the city of Norwich police

5   department that had any knowledge as to whether or not

6   before November 30 Det. Daigle was taking nude

7   photographs or partially nude photographs of volunteer

8   women?

9       A    No.

10      Q    Now, also in your Complaint you have a claim

11  that Chief Fusaro violated your equal protection

12  rights.  My question to you is do you have any

13  information -- strike that.  How were you treated

14  differently by Chief Fusaro than any other young woman

15  volunteer?

16      A    For a week he did nothing about it, Chief

17  Fusaro.

18      Q    And how do you know this?

19      A    Because we got a call from a police officer,

20  Warren Knight, the -- we made the original complaint on

21  a Monday.  On Friday he called and said, "Get the

22  papers, get an attorney, do whatever you have to do

23  because they're trying keep this under the carpet."

24  Daigle knew about it for a week and had ample time to

25  get rid of anything he might have had.  Chief Fusaro

1    did not check his computer at work, did not check his

2    locker at work, did not check anything.

3         Q    Warren Knight, he is an officer at the city

4    of Norwich police department?

5         A    Yes.

6         Q    Does he hold rank at the city of Norwich

7    police department?

8         A    I have no idea.

9         Q    Did you know Officer Knight before

10   November 30?

11        A    Yeah.

12        Q    Okay.  How did you know Officer Knight before

13   November 30?

14        A    He came into Dairy Queen.

15        Q    I'm beginning to believe lot of officers come

16   into Dairy Queen.

17        A    They all come in.

18        Q    How would you characterize your relationship

19   with Officer Knight before November 30?

20        A    Acquaintances.

21        Q    All right.  Before November 30 did you have

22   his home phone number?

23        A    Warren Knight?

24        Q    Yeah.

25        A    No.

1          A     I believe what went on is the second I walked

2    in Daigle heard about it, and when I left the police

3    department was talking, because I had -- I think it was

4    actually Lamantini who called and said, "Were you just

5    here?  Everybody's talking, everybody knows you were

6    here."  And he was still working fine, doing everything

7    fine, until that Friday when we called the cops.  Or

8    I'm sorry, the paper.

9          Q     Okay.  So after you gave your complaint, it's

10   your understanding that the police department was

11   talking?

12         A     Yes.

13         Q     Meaning that officers within the department

14   were gossiping concerning the complaint that you made?

15         A     Yes.

16         Q     Okay.  But you agree that interoffice gossip

17   is separate from any investigation that might have been

18   occurring that the chief or deputy chief had ongoing

19   from December 2 until December 6; is that correct?

20                    MS. COX:  Objection.

21         A     I don't believe they did have an

22   investigation going on.

23         Q     And what knowledge or information do you have

24   that there was no investigation ongoing until

25   December 6?

1        A        Because up until I went to the papers and

2   went public with it, he was working.  Nobody -- the day

3   I went to the papers, the next day he was put on paid

4   leave.

5        Q        So it was a temporal relationship between the

6   time you went to the papers and then after he was put

7   on paid leave that leads you to believe that there was

8   nothing ongoing for an investigation from the time you

9   made the complaint until December 6; is that correct?

10       A        I had actually -- I also talked to Chief

11  Fusaro that night because he would not confirm that I

12  had put in -- that I had given a statement to the

13  papers.  He wouldn't confirm it because he didn't want

14  it in the papers.  And I had talked to him that Friday

15  night that I went to the papers.  And I told me that he

16  was questioning people.  That's what they were doing.

17  He had never checked his locker for any disks, or his,

18  you know, work space, his computer.  And he admitted

19  fully to me that he did not do any of that.

20       Q        So it wasn't that he was not doing an

21  investigation, it's that in your opinion he was not

22  doing a good enough investigation?

23       A        Fair.

24       Q        Yes?

25       A        That's fair, yeah.

```
 1        Q    And I apologize, we kind of got off track,
 2    but my original question was that you have an
 3    allegation that you were treated differently by the
 4    chief than other young women volunteers.  And then we
 5    went into what investigation was or was not done after
 6    your complaint.  Is it your understanding that that
 7    somehow is different than how other young women
 8    volunteers were treated by Chief Fusaro?
 9        A    I don't know about volunteers.  I don't know
10    about that part.  The -- if he wasn't a lieutenant, is
11    what I'm saying, and I walked into a police department
12    and he was not connected to the chief, immediate action
13    would have been taken.
14        Q    Okay.
15        A    And it was not in this case.
16        Q    So you believe that because immediate
17    attention was not given, based on the understanding
18    that it was not given, that that is how you were
19    treated differently from other persons?
20        A    Yes.
21        Q    Do you know that at some point following your
22    complaint that Attorney Daigle was given an
23    administrative suspension?
24                  MS. COX:  Try that again.
25                  MR. DeMERCHANT:  Did I say that
```

1        again?  Can we just like completely take that

2        off the record?  Is that an objection to form?

3                MR. DAIGLE:  It's an objection,

4        period.

5                MR. DeMERCHANT:  Sorry about that.

6        You get tired at the end of the day.

7        Q    I'm sorry, let me ask that question better.

8    Are you aware that Det. Daigle was given an

9    administrative leave at some point following your

10   complaint of December 2, 2001?

11       A    Yes.  Do you know the date?

12       Q    I'm sorry, let me ask the question, that was

13   my follow-up.  What is your understanding as to when he

14   was given that administrative leave?

15       A    I believe it was either the night of

16   December 6 or the next day.

17       Q    Okay.  And what do you base that

18   understanding on?

19       A    What was in the papers.

20       Q    And you're absolutely certain that Officer

21   Knight contacted your father on December 6, that

22   Friday; is that correct?

23       A    I believe it was that Friday.  I believe --

24       Q    I'm sorry, I didn't know you were still

25   going.

1    C E R T I F I C A T E   O F   D E P O N E N T

2

3              I, KRISTEN EJCHORSZT, have

4    read the foregoing transcript of the testimony

5    given, and it is true and accurate to the best

6    of my knowledge as originally transcribed

7    and/or noted on the attached Errata Sheet.

8

9                    KRISTEN EJCHORSZT

10

11         Subscribed to and sworn to before me on

12    this *14th* day of *March*              , 2005.

13

14                    Notary Public
                       Claire B. Glaude

15

16    My Commission expires:

17    *4/30/2005*

18

19

20

21

22    USDC 3:02-CV-1350 (CFD)
      Kristen Ejchorszt vs. James F. Daigle, Jr., et al.
23    KRISTEN EJCHORSZT - February 7, 2005
      (djd)

24

25

# EXHIBIT B

1

1            UNITED STATES DISTRICT COURT
2               DISTRICT OF CONNECTICUT

3  - - - - - - - - - - x
   KRISTEN EJCHORSZT,
4           Plaintiff,              CASE NO.
                                    3:02CV1350(CFD)
5        vs.

6  JAMES F. DAIGLE, JR.;
   LOUIS J. FUSARO, CHIEF of        May 17, 2006
   POLICE; MARK LOUNSBURY,
7  POLICE DEPARTMENT OF THE
   CITY OF NORWICH, AND CITY
8  OF NORWICH.
           Defendants.
9  - - - - - - - - - - x

10

11

12

13        DEPOSITION of JAMES DAIGLE, JR.

14

15     Taken before Cindy J. Carone, LSR 383,
   a Court Reporter and Notary Public, within
16 and for the State of Connecticut, pursuant
   to Re-Notice and the Federal Rules of Civil
17 Procedure, at The Gallagher Law Firm, 1377
   Ella Grasso Boulevard, New Haven, Connecticut,
18 on May 17, 2006, commencing at 10:18 a.m.

19

20

21

22

23
            Falzarano Court Reporters
24             117 N. Saddle Ridge
            West Simsbury, CT  06092
25               860.651.0258

```
 1                  (Deposition commenced:  10:18 a.m.)
 2
 3                  JAMES DAIGLE, JR., Deponent, of
 4             9 Shady Lane, Norwich, Connecticut, having
 5             been first duly sworn by the Notary Public
 6             was examined and testified, on his oath, as
 7             follows:
 8
 9                  DIRECT EXAMINATION
10
11   BY MS. COX:
12        Q    Morning, Mr. Daigle.  My name is
13   Barbara Cox, and I represent Kristen Ejchorszt in the
14   case that is pending in the Federal District Court
15   here in Connecticut against you and other individuals
16   and the municipality of Norwich.
17             Have you ever had your deposition taken
18   before?
19        A    Not in this particular case.
20        Q    In any case?
21        A    Yes, I have.
22        Q    Have many times have you been deposed?
23        A    Once.
24        Q    How would you like me to address you?  Are
25   you Mr. Daigle?
```

1    officer to you?

2        A        No.  He was a detective assigned to crime

3    prevention at some point in 2001.

4        Q        As lieutenant, you were superior to him, am

5    I correct, when were you promoted to lieutenant?

6        A        November of 2001.  It was, like, the day

7    before Thanksgiving, so late-November.

8        Q        Was that lieutenant patrol or lieutenant

9    detective?

10       A        Patrol.

11       Q        Were you ever a lieutenant detective?

12       A        No.

13       Q        At some point you became involved in

14   so-called sting operations involving underage sales of

15   alcohol to minors; is that correct?

16       A        Yes, it is.

17       Q        When was that?

18       A        The first time I was a patrol sergeant.  So

19   it would have to be sometime in 1999.

20       Q        1999?

21       A        Yes.

22       Q        How did you become involved in that sting

23   operation in 1999?

24       A        I was there briefly to help the patrolmen,

25   support the detective division in the operation at the

```
1    next one is the sting operation in 1999?
2         A      That would be in 2000.
3         Q      What was your involvement in that sting
4    operation?
5         A      At that point, I was a sergeant assigned to
6    the detective division, and I assisted Det. Deveny in
7    planning that one.
8         Q      You say you assisted Det. Deveny in planning
9    that sting operation in 2000.  Was Det. Deveny in
10   charge of the sting operation?
11        A      Normally as his position is detective in the
12   crime prevention unit, that particular unit was
13   responsible for setting up contacts with the
14   Department of Liquor Control and actually planning the
15   event.
16        Q      I'm trying to figure out who was the
17   superior officer.
18        A      That would be myself.
19        Q      Did that sting operation utilize an underage
20   volunteer?
21        A      Yes.
22        Q      Who was that?
23        A      I'm confusing which three.  I believe that
24   was Wilson.
25        Q      Who set up the 2000 sting operation?
```

1      A      Myself and Det. Deveny.

2      Q      What did you have to do to set up the

3   operation?

4      A      It's not a terribly involved process.  We

5   contacted Liquor Control.  I believe I made the

6   contract with a gentleman named Stan Burke

7   Liquor Control agent at the time.  And we had a good

8   working relationship with them.

9              We had to call and set up something long in

10  advance so they would have individuals available, or

11  vice-versa, they would have to contact us and ask us

12  to have something going on.

13             They call their operations "specials."  It

14  involves contacting them, working out dates pretty far

15  in advance, locating someone to go in and try to

16  purchase alcohol, and arranging for the proper

17  personnel to be working.

18     Q      In general, how far in advance did you have

19  to set up the sting operation with Liquor Control?

20     A      With Liquor Control, usually the minimum was

21  something like 15 days because they had contractual

22  obligations to their agents.  Normally it was several

23  months, at least a couple months in advance.

24     Q      What kind of training did you have to

25  participate in the sting operations?