1          A      Myself and Det. Deveny attended one-half day

2     seminar put on by Liquor Control probably in

3     early-2000, maybe the winter months.  I'm really fuzzy

4     on the dates.  I apologize.

5          Q      Who assigned you to attend the training

6     sessions concerning underage sting operations?

7          A      That would have been Lt. Ward at the time.

8          Q      What's Lt. Ward's first name?

9          A      Franklyn, F-r-a-n-k-l-y-n.

10         Q      You said that was in early-2000?

11         A      I believe maybe late-1999.

12         Q      I'll show you materials that have been

13    produced by the City.  These are a number of

14    materials.  I'd like to have you look through those

15    and see if those are familiar to you.

16         A      The only document that I recognize from that

17    day of training would actually be the outline of the

18    agenda for the day in which we attended, the Retail

19    Compliance Check, Section B.

20              My best recollection of the documentation,

21    the only time I've seen that or something similar was

22    during the internal investigation that I was subjected

23    to as part of those complaints.

24         Q      We can pull it apart and mark it.  This

25    particular document that you showed me is the only

1    document in this package that you recognize?

2         A    Yes.  Unfortunately I was shown all of this

3    during the internal investigation.  But I do recall

4    that schedule as we chose from the schedule when we

5    arrived which one to go to.

6         Q    Let's mark that one.

7         A    Can I check it again make sure it's B.  Yes,

8    Retail Compliance Checks.

9         Q    Before we mark that one, you'll notice at

10   the top there's an indication this was part of a faxed

11   document?

12        A    Yes.

13        Q    I'm going to show you the other two pages

14   that appear to be the other two pages of the

15   three-page fax and ask you if this refreshes your

16   recollection as to when you attended this plan

17   training.

18        A    Obviously it was in 2001.  So I'm way off on

19   the date.  Yes.  If this date is correct, then my

20   recollection is incorrect as to the date of the

21   training.  It was a half-day seminar.

22

23                   (Plaintiff's Exhibit 1:

24                    Marked for Identification.)

25

```
1              MS. COX:  So this predates, April of

2         2001.  That satisfies your concern?

3              MR. DAIGLE:  Yes.

4    BY MS. COX:

5         Q    As part of the training that's shown in

6    Plaintiff's Exhibit 1, did you receive any materials

7    that day?

8         A    Unfortunately I can barely remember the

9    date, never mind the materials.  Typically you receive

10   materials.  If I was with Det. Deveny, he would have

11   taken them with him and grabbed them.

12        Q    Do you recall ever reviewing materials that

13   outlined protocols on practices and procedures

14   involving underage alcohol stings?

15        A    Other than the internal investigation at

16   that point in time, no.

17        Q    I take it you have a fairly hazy

18   recollection of this training?

19        A    Yes, I do.

20        Q    Do you recall if you took any notes?

21        A    I wouldn't have.

22        Q    You said you attended Session B?

23        A    Yes.

24        Q    Session B covers a number of areas, correct?

25        A    Retail compliance checks.
```

```
 1        Q       Showing you some of those --
 2        A       Some of those were addressed.
 3        Q       Which of the areas do you recall being
 4   addressed in Session B that's on the list?
 5        A       All I recall specifically, one individual
 6   speaker.  We did not cover -- there was no overview,
 7   simply got into it talking about false IDs, planning,
 8   notifying the media; that was basically it.
 9        Q       What did the speaker say about dealing with
10   false identification?
11        A       All I recall is he -- and I don't know who
12   he was -- went on about stings that he conducted in
13   the past.  I believe he was a police in college and
14   spent the entire time talking about his previous
15   experience with liquor stings, how many things he had
16   done, how it happened.  It was not instructional by
17   any means at all, which is why I have a hazy
18   recollection of it.
19        Q       My question dealt with what did he say about
20   dealing with false identification?
21        A       Simply that he had come across false
22   identifications in the past and that there was a book
23   available which we had seen before through the patrol
24   division that showed the actual identification through
25   different states, motor vehicle licenses, military
```

1    IDs; that kind of thing.  It was a quick, you check it

2    in this reference.  That's about the extent of it.

3         Q    Had you been aware of this resource before,

4    the booklet?

5         A    Yes.

6         Q    This was not new information?

7         A    No.

8         Q    Do you recall what the speaker said about

9    working with youth?

10        A    Only his own experiences of using college

11   students, had used college students in the past to

12   effectuate the liquor stings.

13        Q    Do remember specifically what he said about

14   using college students?

15        A    No.

16        Q    Was there any discussion at this seminar

17   about the steps one would go through to conduct an

18   underage alcohol sting?

19        A    There was a brief mention about planning,

20   about contacting, getting a volunteer, having enough

21   personnel, working with Liquor Control, and then

22   having a sergeant list made out ahead of time.

23        Q    What did the speaker say about recruiting

24   volunteers to participate in underage stings?

25        A    Nothing.

```
 1        Q      Nothing?

 2        A      No.  Just that he recruited his from -- I

 3    believe he was a college cop.

 4                     MS. COX:  We'll mark the remaining

 5                sections of the packet.

 6

 7                (Plaintiff's Exhibit 2:

 8                     Marked for Identification.)

 9

10    BY MS. COX:

11        Q      After you attended the training session that

12    we've been discussing, did you report back to Lt. Ward

13    or any other superior officer in the police department

14    about your training session?

15        A      No.

16        Q      Did Lt. Ward attend this training session as

17    well?

18        A      No.

19        Q      Did any superior officer in the Norwich

20    Police Department give you any training information or

21    written materials that I've shown you in Plaintiff's

22    Exhibit 2?

23        A      Only during the internal investigation.

24    That wasn't given to me.

25        Q      While you were involved in underage alcohol
```

1    stings, is your testimony that you did not, were not
2    given any of those materials in Plaintiff's Exhibit 2?
3        A    I didn't have the materials that you're
4    showing me.
5        Q    Did you have any materials outlining the
6    protocol for conducting an underage alcohol sting?
7        A    No.
8        Q    How did you know what to do?
9        A    On the job from other police officers that
10   had done it before.  It's sort of -- most stuff in the
11   bureaus are institutional.  If you come in, someone
12   has already done it.  You don't have a wholesale
13   change.
14           They do most of the planning.  If you have a
15   contact, you take over where someone else didn't have
16   a contact.  You take over from there.  It's something
17   I don't do with any great frequency whatsoever.
18       Q    Let me show you a page from Plaintiff's
19   Exhibit 2 called Questions to Ask.  I take it from
20   your previous testimony that you've never seen that
21   page called Question to Ask?
22       A    Other than during the internal
23   investigation, yes.
24       Q    Right.  So am I correct in understanding
25   that you never gave this document to any of the

```
 1    underage volunteer operatives in the sting operations
 2    that you conducted?
 3         A    No.
 4         Q    That means you never gave it to
 5    Kristen Ejchorszt; is that correct?
 6         A    That's correct.
 7         Q    Let's go back to the sting operations that
 8    you conducted.  After the sting operation in 2000,
 9    remind me again who that involved.  Was that
10    Ms. Wilson?
11         A    I believe Wilson, yes.
12         Q    When was the next time you conducted an
13    underage sting operation?
14         A    That would have been I believe early-2001.
15         Q    I'm going to back up for a minute.  The 2000
16    sting operation involving Melanie Wilson occurred
17    before you had any training at all in conducting an
18    underage sting operation; isn't that true?
19         A    Before I attended the seminar, yes.
20         Q    What other training had you had prior to the
21    sting operations that you conducted in 1999 and 2000?
22         A    Simply conversations with Liquor Control as
23    to how they did things.  Any kind of institutional
24    knowledge that maybe Det. Deveny had because he was
25    familiar with these, and whatever Lt. Franklyn Ward
```

1    their request that we do a special.

2              Just during conversation with the gentleman

3    from Liquor Control, we set up a date.  They provided

4    one supervisory agent and a handful of liquor agents

5    that we paired up with our personnel.

6              We sat down with them when they arrived and

7    chose locations arbitrarily picking spots to go to to

8    do a random compliance check.

9        Q      The next underage sting, who was the

10   supervisor?  Who supervised the sting operation in

11   2000 involving Melanie Wilson?

12       A      I was the direct supervisor.

13       Q      I guess I'm a little confused about how it's

14   decided to conduct one of those sting operations.  In

15   2000, how did you know?  Did someone tell you?

16       A      The one regarding Wilson?

17       Q      Yes.

18       A      We have frequent contact with Liquor Control

19   over a variety of things.  They look through police

20   reports.  Through that contact, we discussed having

21   what they call running a special at some point in the

22   future.

23              At some point, I contacted Stan Burke or he

24   contracted me.  We picked a date.  It's arbitrary, not

25   a lot of planning as far as dates, just they think

1    it's time to go, and we work with them and do it from

2    that perspective.

3            We plan those also on our own.  If you want

4    to go ahead and forward something just for review.  Or

5    we did receive a grant regarding underage drinking.

6            I think this training may have been the

7    result of that, but I don't recall.  And we had X

8    amount of time to utilize the funds for alcohol

9    compliance.

10       Q    To clarify the 2000 operation, did someone

11   -- who was the individual that you spoke with at

12   Liquor Control, your contact?

13       A    Stan Burke.

14       Q    Did Stan Burke contact you about conducting

15   an underage sting?

16       A    I don't recall.  We spoke frequently.  It

17   could have been a conversation, and we have to do it.

18   Okay, fine.  Then it would have been set.

19       Q    Did any supervisory officer in the police

20   department direct you to conduct an underage alcohol

21   sting in 2000?

22       A    No.

23       Q    Is it fair to say that you were the member

24   of the Norwich Police Department who implemented the

25   2000 underage alcohol sting operation?

1       A       Yes.

2       Q       I think you explained that you then chose a

3   date along with Mr. Burke and the Liquor Control?

4       A       Right.  They would have done that.  He and I

5   would have spoke regarding a date.  Once he came up

6   with a date, we were a lot more flexible than they

7   were because of their contractual obligations.

8               Then I take the date, go to Lt. Ward, relay

9   the conversation, make sure that the date was okay

10  with him.  If it was okay with him, I would then

11  commence planning it with the rest of the detective

12  division.

13      Q       Did Lt. Ward give you any instruction about

14  how to conduct the sting operation other than the

15  date?

16      A       No.  The input he would have had would have

17  been immediate to the operation, which would have been

18  who he wanted to work it, didn't want to work it, who

19  to utilize from patrol, which day, which hours during

20  the day he'd like to start.

21      Q       So it is fair to say that Lt. Ward selected

22  the date and told you who to work with?

23      A       He would have approved the date and selected

24  who was going to work that evening, yes, not that far

25  in advance.  It would have been within days of the

1      A     I may even have the wrong year.  All of this

2    -- I apologize -- kind of runs together.

3      Q     Sure.  Let's call it the next alcohol

4    underage alcohol sting in this series of four that

5    you've described.  Fair to say you were involved in

6    four?

7      A     Yes, that I recall.

8      Q     The next one after the 2000 sting operation

9    involving Melanie Wilson, was there an underage

10   operative in the next sting operation?

11      A     Yes.

12      Q     Who was that?

13      A     Earl, Theresa Earl.

14      Q     Who decided to conduct that sting operation?

15      A     I did.

16      Q     Why?

17      A     There's a food vendor at the Norwich

18   Navigators which is no longer called -- I can't

19   remember the name of the company.  They run all the

20   vending operations at the stadium.

21        The gentleman in charge of that company

22   indicated that his services had undergone training as

23   far as checking IDs before receiving alcohol.

24        He indicated that he would welcome a check

25   sometime in the future.  I indicated we would plan

1    something without telling him in the future and see

2    how it worked out.

3        Q    Did you then select a date to conduct the

4    sting?

5        A    Yes.

6        Q    Was Lt. Ward involved in any of the planning

7    or discussions about this alcohol sting prior to its

8    happening?

9        A    Yes.

10       Q    What was his involvement?

11       A    Running by the scenario that I had spoken

12   with a gentleman named Rich, that we were going to

13   choose a date when the team was at home on a Saturday

14   when they supposedly sold the most tickets, had the

15   largest crowd.  He and I looked at the calendar and

16   picked out a date on a Saturday.

17       Q    You and Lt. Ward?

18       A    Yes.  We looked at the baseball schedule.

19       Q    Other than selecting a date, what else was

20   Lt. Ward's involvement in this whole sting involving

21   the Norwich Navigators?

22       A    I believe that was it.

23       Q    Did he assign individuals from the

24   department to work on this sting?

25       A    Not in that one, no.

1     Q    Who selected the individuals to work on the

2  sting?

3     A    I put the word out in the bureau that we

4  were going to be working on a Saturday and asked for

5  volunteers with the exception of Deveny that had to be

6  there.  He's crime prevention.

7     Q    Who was there on the sting?

8     A    Det. Christopher Ladd.

9     Q    Anyone else?

10     A    Myself and Deveny.

11     Q    Was there anyone from the Liquor Control

12  Authority in that sting?

13     A    No, there was not.

14     Q    Did you contact the Liquor Control Authority

15  to advise them you were going to conduct a sting at

16  the Navigators stadium?

17     A    No, we did not.

18     Q    Why not?

19     A    We had no intention of involving them

20  because of their contractual obligations.  It would

21  have been a nightmare to work out a Saturday.  They

22  were very reluctant to work any weekend shifts at all.

23     Our intent was to do this for test

24  compliance and then report back to the department to

25  report to the manager of the facility up there, and if

1    there was violations, we could forward a copy of the

2    report to them and they could decide if they were

3    interested in it.

4        Q      Was there a report created?

5        A      Yes.

6        Q      Were you the person responsible for making

7    the report?

8        A      No.

9        Q      Who was?

10       A      Det. Deveny I believe.

11       Q      Who about the sting operation in 2000?  Was

12   there a report made of that operation?

13       A      With Wilson?

14       Q      Yes.

15       A      Yes, there was.

16       Q      The three prior sting operations that you've

17   talked to me about, was there a dry run in any of

18   those sting operations, a practice session?

19       A      No.  I wouldn't know about the first.

20       Q      Okay.

21       A      But in the subsequent two, no.

22       Q      Were you a supervisor in the sting operation

23   involving Theresa Earl?

24       A      Yes.

25       Q      Were you the supervisor involved in the

1     sting operation in Melanie Wilson's case?

2          A     Yes.

3          Q     How did you go about selecting the underage

4     volunteers in the sting operations that you set up?

5          A     I knew them personally.

6          Q     Were you aware of any guidelines for

7     recruiting volunteer operatives for sting operations?

8          A     Although not specific guidelines, it was

9     mentioned from I think Bob Aldi, the captain at the

10    time, that they prefer using women because it was

11    possibly an easier sale.

12              They had to be of course under the age of 21

13    and they weren't obviously out there purchasing

14    alcohol on their own, not a problematic individual

15    that you knew was purchasing alcohol underage.

16         Q     How did you determine whether or not

17    volunteers you chose purchased alcohol for themselves?

18         A     Asked.

19         Q     Relied on their word?

20         A     Yes.

21         Q     Was there any other guidelines?

22         A     Nothing specific, no.  No guidelines

23    provided about this is how you do it.  It was more of

24    an institutional knowledge.

25         Q     How about selection of volunteers that lived

1   I don't know.

2       Q     How about narcotics?  Were you ever involved

3   in a sting operation involving narcotics?

4       A     I mean, I've been involved in narcotics

5   operations.  I wouldn't call them stings; controlled

6   buys, raids, reverse buys.  I wouldn't characterize

7   that as a sting.  I think we borrowed that term from

8   Alcohol.

9       Q     When we discuss a sting, it means underage

10  alcohol?

11      A     Yes, for me yes.  That's how I use it.

12      Q     Did the police department ever conduct any

13  kind of meeting or training sessions for these

14  underage alcohol stings that you attended?

15      A     No.

16      Q     Did you know of any such training sessions

17  conducted by the department?

18      A     No.

19      Q     After the alcohol sting involving

20  Theresa Earl, that was another sting that you set up?

21      A     Yes.

22      Q     That was on November 30, 2001?

23      A     Yes.

24      Q     Can you tell me how you set that up?

25      A     I worked with Det. Deveny and Lt. Ward on

1    choosing a date to do a soft compliance check.

2        Q     What do you mean by soft compliance check?

3        A     We had a federal grant in effect to utilize

4    to work with Liquor Control to help address compliance

5    issues, checking IDs.

6              A soft compliance check means we engage an

7    individual to go in, ask to purchase alcohol and then

8    claim they didn't have any money.  We would use that

9    data in the future as a basis if we go back and check

10   compliance.

11             It's almost the same as a seatbelt

12   compliance.  You watch cars go by for hours, take data

13   and go back and stop cars.  So it's trying to set a

14   baseline for possible future operations with liquor.

15       Q     Who worked with you in setting that up?

16       A     Lt. Ward, myself, and Det. Lounsbury.  I

17   think Jim Deveny was patrol sergeant.  If I said

18   Det. Deveny earlier, I was incorrect.

19       Q     For the November 30, 2001 operation, that

20   operation didn't include Det. Deveny?

21       A     No, it didn't.

22       Q     Okay.  What role did Lt. Ward play in

23   setting up this soft compliance check?

24       A     In approving the date, personnel, who we

25   were going to utilize as the underage participant, and

1    A    He was.

2    Q    Through the same restaurant?

3    A    I could only presume.  She was a frequent

4    visitor to the police department and knew a lot of

5    police officers.  It's possible he met her that way.

6    Q    What's the difference between a soft

7    compliance and hard compliance operation?

8    A    Again, that's my designation.

9    Q    Okay.

10    A    I use soft compliance not to go, not going

11    to make a purchase, not going to put anyone in the

12    position of having to be fined by Liquor Control.

13    It's more of an educational process for us.

14         We take the information and go back to the

15    liquor store owner and say that we came in on this

16    date, this time, and this is who we had.  You or your

17    employee agreed to serve alcohol, so basically this is

18    a warning to let you know what's going on.

19         On hard compliance, we make a purchase of

20    alcohol, seize it as evidence and forward it to

21    Liquor Control or have Liquor Control involved with us

22    and then they seize it as evidence and conduct their

23    own thing, their own hearings or whatnot; completely

24    regulatory, nothing criminal.

25    Q    Am I correct in understanding that what you

```
 1    I got her at work.  I don't recall -- and confirmed
 2    that she was still on for that Friday, and she said
 3    yes.
 4         Q     That phone call happened before
 5    November 30th, correct?
 6         A     Yes.
 7         Q     What did you do next?
 8         A     Nothing regarding that until the day of the
 9    30th.
10         Q     All right.  What did you do on the 30th?
11         A     Other than planning who was going to be
12    working, contacted her again to make sure she was
13    still willing to do this and outline what time I'd
14    like her to be there.  I talked about scheduling, work
15    or school.  I think she was there until 3:30;
16    something like that.
17         Q     What kind of planning did you do with
18    Det. Lounsbury about what you would actually do as
19    part of this operation?
20         A     We discussed it was going to be soft
21    compliance, not utilize any kind of buy money, just go
22    in there, have her show her ID, attempt to make a
23    purchase and then come out; very light planning.
24         Q     When did you do that planning with the
25    Det. Lounsbury?
```

```
 1      A      It would be a couple meetings here and there
 2   over the course of days.  There was so much stuff
 3   going on back there, any conversation I had with him
 4   wouldn't be dedicated to that until the time of the
 5   operation because he had numerous things going on.
 6      Q      I'm trying to get a sense of how far in
 7   advance from the beginning of the operation you
 8   planned the various steps that you were going to go
 9   through.
10      A      I would be incremental over the period of a
11   week.  We sit, have lunch, and talk about it.  It was
12   much less important than some things they were working
13   on.
14             They're working on criminal investigations,
15   so we didn't dedicate a lot of time to planning or
16   specifics until the time it was ready to go because we
17   could put this together in a half-hour or 45 minutes.
18      Q      What did Det. Lounsbury say about your
19   selection of Kristen Ejchorszt to act as the
20   operative?
21      A      He liked the idea because he was familiar
22   with her.
23      Q      Did he say anything else about her?
24      A      No.
25      Q      Comment on her appearance?
```

58

1      A      Not in this day and age, no.  Phones,

2   pagers.  Back then they were a lot more common.  Cell

3   phones are more common now.

4           It was a larger pages than they had recently

5   come out with but it wasn't so large like 15, 20 years

6   ago like one of those old ones they had.  We used it

7   for narcotics.  It was adequate for that purpose.

8      Q      It wasn't something that would call

9   attention to it in your opinion?

10     A      No.

11     Q      What was the next thing after planning and

12  deciding to use the pager mic?  Did you discuss in

13  your planning with Det. Lounsbury and did you come up

14  with a list of actual establishments to visit?

15     A      I instructed him to come up with a list that

16  morning.

17     Q      What else did you instruct Det. Lounsbury to

18  do?

19     A      That morning that was about it other than

20  his normal other duties which I wanted to have him

21  complete.  He did not want to continue with the

22  operation that night.  He had plans that came up,

23  didn't want to work.  He was busy trying to find

24  someone to work for him.  I was kind of frustrated

25  with him that day.

1       Q      Is it fair to say you were in charge of this

2   operation?

3       A      Yes.  Can I ask for a bathroom break?

4       Q      Sure.

5

6                     (Recess:  11:46 to 11:50.)

7

8   BY MS. COX:

9       Q      Mr. Daigle, before setting up the soft

10  compliance check for November 30th that we've been

11  discussing, had you received from the department any

12  flyers, information about how these alcohol sting

13  operations were to be conducted?

14      A      No.

15      Q      During the course of your employment with

16  the police department, would you from time to time get

17  memos or memos from the chief or any supervisors about

18  how any part of your job was to be conducted?

19      A      Certainly.

20      Q      Can you give me an example of such a memo?

21      A      There was hundreds over the years.

22      Q      Okay.

23      A      From things such as uniform standards to

24  report findings on certain types of incidents, changes

25  in procedures or changes on a regulation or something.

1        I mean, when domestic violence laws came

2    into effect in '85, they posted information about the

3    new laws and what our responsibilities were where

4    previously it was basically you go away for the night,

5    you go away for the night, and everything will be

6    okay.  Now we're compelled to take some kind of

7    action.  That was done in memo form.

8        Q     Is it your testimony that during the time

9    you were involved in the whole sting operations, you

10   never received any kind of memo from your supervisors

11   in the police department about the procedure to be

12   conducted in conducting those operations?

13       A     That is my testimony, yes.

14       Q     Do you know if anyone else in the department

15   received a memo about alcohol sting operations?

16       A     The only memos that I ever would be privy to

17   were addressed to me or as a whole, in other words,

18   all members.  I don't ever recall ever seeing anything

19   regarding alcohol compliance.

20       Q     How about utilizing volunteers to work with

21   the department?

22       A     No.

23       Q     I think we left off where you had only

24   talked to Kristen Ejchorszt to firm up the date for

25   the soft compliance check?

```
 1        A     Yes.

 2        Q     Was it your decision to reassign him to the

 3    alleged carjacking?

 4        A     Yes.

 5        Q     Was anyone else involved in reassigning him

 6    from the compliance check to carjacking?

 7        A     No.  Well, that's not exactly true.  It was

 8    requested that I assign somebody by a patrol

 9    lieutenant, so I was contacted by the patrol

10    lieutenant and advised of an alleged carjacking.  They

11    asked for assistance, so I simply chose Dolan.

12        Q     You instructed Det. Lounsbury to come up

13    with the list of establishments to be visited that

14    night?

15        A     Yes.

16        Q     Did he come up with that list?

17        A     No.

18        Q     He did not?

19        A     Not until later.

20        Q     Did he come up with list before the

21    operation started?

22        A     Yes.

23        Q     What were the establishments that you were

24    going to visit?

25        A     I don't specifically recall.  All liquor
```

1    A    Yes.  He's the detective assigned to the

2    juvenile unit.

3    Q    At that time, I think I said 6 o'clock on

4    November 30th?

5    A    Right around 6 p.m.

6    Q    Was the chief in the precinct at the time?

7    A    I don't know.

8    Q    How about the captain?

9    A    No, I don't think so.

10    Q    What happened after you introduced

11    Kristen Ejchorszt to various individuals?

12    A    I also introduced her to Lt. Ward as he was

13    there.  As far as the chief and deputy, no one else

14    was there.

15    Q    Where is Lt. Ward's office?

16    A    Indicated as "DET LT," a little square off

17    to the side in the detective division area.

18    Q    What did you say to Lt. Ward about

19    Kristen Ejchorszt?

20    A    Just an introduction.  This is Kris.  We're

21    going to be using her tonight for the sting.

22    Everything would be very polite trying to get her

23    comfortable because sometimes she looked a little bit

24    nervous or apprehensive.

25    Q    Did Lt. Ward give you any instruction about

1  what you should be doing in connection with this soft

2  compliance check at the time or at any time on

3  November 30th?

4      A    No.  The only instruction was let me know

5  when you get going because he was getting ready to

6  head out the door.

7      Q    After you made the introduction, what

8  happened?

9      A    I had her sit in the chair next to my desk,

10 and Lounsbury and I went over what we expected of her

11 when she went in, that she would only have an ID, ask

12 to purchase I believe Coors Light in every single

13 place.  If they said let me have the ID, gave her any

14 problems, to walk out the door.  When it came time to

15 pay, to say, Oh, I forgot my money, try to remember

16 who she spoke to, male, female, specific age, and

17 report back later on who we thought failed the

18 compliance spot.

19     Q    What happened next?

20     A    We then discussed how we were going to

21 visually surveille her, how the officers were going to

22 be set up, where situated, close by.  If there were

23 any problems inside of the store, have an eyeball on

24 her and wire her up with the pager mic to be monitored

25 audibly as well if anything went wrong or she starting

1    digital camera and something else?

2         A     Body mic system.

3         Q     Did you have anything else with you?

4         A     Other that what was in my pockets, no.

5         Q     Did you consider the advisability of getting

6    a female to assist Kristen Ejchorszt with this body

7    mic?

8         A     No.

9         Q     Why not?

10        A     We didn't have any females working.

11        Q     Okay.  What happened next?

12        A     I asked her to remove her shirt, which she

13   did, and then I went around behind her and inserted

14   the transmitter with her help into her left back

15   pocket of her jeans.

16        Q     What kind of a shirt was she wearing?

17        A     A dark-colored pullover almost like not a

18   deep V but sort of like a V-neck.  I don't know much

19   about fashion.

20        Q     Wasn't a button-down shirt?

21        A     No, pullover.  She took that off.  I put the

22   transmitter in her pocket along with her help,

23   connected the wires, two clips that go in, one for the

24   antennae and one for the microphone, and put the other

25   over her shoulders.  I fidgeted with the wires, began

```
 1        Q      Why were photographs taken of

 2    Kristen Ejchorszt?

 3        A      They were taken to show what she was wearing

 4    when she went in in the event we did anything further,

 5    that we didn't try to make her look older than 21 or

 6    seductive or someone completely -- could be someone

 7    18, 19, 20 that looks 40.

 8            We wanted to show someone you could look at

 9    and reasonably come to the conclusion she was under

10    age and still going to sell to her, that there wasn't

11    something on her clothing like from a beer

12    manufacturer that would lead someone to believe she

13    had bought before, like wearing a Miller shirt or

14    Budweiser jacket other pack of cigarettes in her

15    pocket.  We try to present the volunteer in the actual

16    light in their actual age.

17        Q      Was there any kind of written protocol of

18    practice of photographing volunteers?

19        A      As far as I know, they've always been

20    photographed.  Liquor photographs them.  We photograph

21    them.

22            Apparently there was a complaint one time by

23    a liquor establishment to Liquor which they related to

24    us and others which we weren't involved in.  They said

25    they sent in a woman that looked 30 years old all made
```

1    BY MS. COX:

2        Q    Mr. Daigle, I'll show you what's been marked

3    Exhibit 6.  I'll ask you if you've ever seen that

4    document before.

5        A    Yes.

6        Q    Have you reviewed that document before?

7        A    Yes.

8        Q    Could you tell us what it is?

9        A    A transcript of one of the interviews I had

10   during the internal investigation.  This one says

11   March 22, 2002.

12       Q    You were investigated in connection with

13   Kristen Ejchorszt's complaint and the complaint of

14   some other woman, correct?

15       A    Yes.

16       Q    Fair to say?

17       A    Yes.

18       Q    This transcript is one of those interviews,

19   correct?

20       A    Yes.

21       Q    Did you tell the truth at the interviews

22   conducted during the investigation of you?

23       A    Yes, I did.

24       Q    You weren't put under oath for that

25   particular interview, correct?