1      A      No.

2      Q      But your testimony was subject to penal

3   action if you didn't tell the truth, was it not?

4      A      Yes.

5      Q      Do you need some time to go through that

6   transcript to tell me whether or not your testimony

7   during the interview was truthful?

8      A      No, no, it was truthful.  I mean other than

9   actual times and dates which I'm always verify sketchy

10  on, but everything is truthful as best as I can be.

11     Q      Did you have a conversation with

12  Kristen Ejchorszt after you returned to precinct about

13  potential use of the photographs that had been taken

14  of her that night?

15     A      Yes.

16     Q      What was that conversation?

17     A      She asked who's going to see those

18  photographs, and in a very joking way, Who are you

19  going to show those to?  I laughed and said, All the

20  guys in the back room want to see your photographs.

21  They all know you.  She said, You better not.

22             I said that after we've taken any

23  photographs, they disappear into a case file and are

24  used at hearing.  But there is no hearing because we

25  didn't do anything.

STATE OF CONNECTICUT

1

2    I, Cindy J. Carone, LSR 383, a Notary Public, duly

3  commissioned and qualified in and for the State of

4  Connecticut, do hereby certify that pursuant to Notice

5  there came before me on the 17th day of May, 2006, the

6  following named person, to wit:  JAMES DAIGLE, JR., who

7  was by me duly sworn to testify to the truth and

8  nothing but the truth; that he was thereupon carefully

9  examined upon his oath and his examination reduced to

10  writing under my supervision; that this deposition is a

11  true record of the testimony given by the witness.

12    I further certify that I am neither attorney nor

13  counsel for, nor related to, nor employed by any of the

14  parties to the action in which this deposition is

15  taken, and further, that I am not a relative or

16  employee of any attorney or counsel employed by the

17  parties hereto, or financially interested in this

18  action.

19    IN WITNESS THEREOF, I have hereunto
   set my hand this 4th day of June, 2006.

20

21    Cindy J. Carone, LSR 383
             Notary Public

22

   My Commission Expires:
23    May 31, 2008

24

25

# EXHIBIT C

COPY 165

STATE OF CONNECTICUT

CITY OF NORWICH

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

PROCEEDINGS AT HEARING
IN RE:

CONFIDENTIAL INVESTIGATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

DATE:   MARCH 20, 2002
TIME:   10:00 A.M.
PLACE:  NORWICH POLICE DEPT.
        NORWICH, CT

BEFORE:   DEPUTY CHIEF WARREN MOCEK

APPEARANCES:

FOR THE UNION............LICARI & WALSH, LLC
                   BY:  JOHN M. WALSH, JR., ESQUIRE

FOR THE DEPARTMENT.......SUISMAN, SHAPIRO, WOOL,
                         BRENNAN, GRAY & GREENBERG,
                         P.C.
                   BY:  EILEEN C. DUGGAN, ESQUIRE

ALSO PRESENT:

CAPTAIN ROBERT DROZYNSKI, NORWICH POLICE DEPARTMENT

Jane M. Gingerella, LSR, RPR
Licensed Shorthand Reporter #00392
Shea & Driscoll, L.L.C.
16 Seabreeze Drive
Waterford, CT  06385

SHEA & DRISCOLL (860) 443-3592
-1244-

166

I N D E X

WITNESS:   James Daigle    (VOLUME III)

PAGE

Examination by Deputy Chief Mocek            167

E X H I B I T S

There were no exhibits offered at this time.

167

1          (HEARING COMMENCED AT 10:15 A.M.)

2                    JAMES DAIGLE

3      Previously sworn, testifies as follows:

4              EXAMINATION BY DEPUTY CHIEF MOCEK

5              DEPUTY CHIEF MOCEK:  Today is March 20,

6      Wednesday.  We will begin at 10:15 A.M.  Present are

7      myself, Deputy Chief Warren Mocek, Norwich Police

8      Department; Captain Ron Drozynski, Attorney

9      Eileen Duggan for the City, Lieutenant James Daigle

10     and his union representative.  Sir, would you identify

11     yourself for the record, please?

12              MR. WALSH;  John Walsh.

13     Q.   The nature of this proceeding is a mandatory

14     reinterview as part of an internal investigation of

15     work performance deficiencies and/or misconduct of you

16     and/or members of the Norwich Police Department.  Are

17     you currently under the influence of any substance or

18     taking any medication or suffering from any condition

19     that might interfere with your ability to hear my

20     questions, understand my questions and answer my

21     questions?

22     A.   No, sir.

23     Q.   At the beginning of a prior interview you

24     were issued a notice of garrity warnings which you

25     indicated you understood and signed, and would you

205

 1    would happen.  You know, this is what you have do, you

 2    can't tell anybody, you know, ahead of time.  Don't

 3    tell anybody, blah, blah, blah, because it gets

 4    around; just basic conversation.  She said oh, yes,

 5    I'm very, very interested, I will do it, I will do it.

 6        Q.  How did she seem?

 7        A.  Fine.  I mean, she seemed to be very

 8    interested in doing it.

 9        Q.  Was anything else ever discussed besides the

10    sting?

11        A.  No.

12        Q.  This conversation, this contact took place

13    how long before the actual sting?

14        A.  I don't know, maybe a week.

15        Q.  Were there contacts or conversations

16    subsequent to that but prior to the sting?

17        A.  Just one.

18        Q.  And what happened then?

19        A.  It was just a confirmation call.  In other

20    words, to be here at whatever time, we will start here

21    and there.

22        Q.  Who made that?

23        A.  I did.

24        Q.  And when was that?

25        A.  It was during the day at work because I

207

1    Q.   At what point did the decision get made to

2    conduct this particular operation?

3    A.   The week before Thanksgiving I came back from

4    vacation.   It was a couple of days after that but

5    before the Thanksgiving holiday to conduct a

6    compliance check.

7    Q.   How did that come about?

8    A.   Jim, Detective Jim Deveny and I were just

9    talking about it, that we should do a compliance check

10   before we get rolling.   We had just hired for the

11   coordinator's position.   We were finally allowed to

12   fill that position, and we wanted to do a compliance

13   check to bring back that committee to see where, like

14   a baseline kind of thing.

15   Q.   So the decision to do a compliance check was

16   made approximately what date?

17   A.   I was back on a Friday.   I believe the Monday

18   of the week of Easter -- Thanksgiving.   Easter; Easter

19   is coming up.   Yes, because I remember that afternoon

20   we were notified we were going to get promoted so we

21   were thinking, oh, we are not going to be able to do

22   it so I believe it was that Monday.

23   Q.   Who was considered for the role besides

24   Kristen Ejchorszt?

25   A.   One.   I just remembered that it was -- he had

222

1   room?

2       A.   Because at that point I thought it would be

3   easier if I had Costa there with me because I had not

4   applied this before and Rankowitz was already going

5   into an interview.

6       Q.   This was about what time?

7       A.   It's all contemporaneous to the conversation.

8   It's just ongoing.  As I am walking in behind her, I

9   came out to get the tape, I see Lounsbury, because I

10  knew Lounsbury was busy.  I had him do a list.

11                  (OFF THE RECORD)

12      (PREVIOUS TWO QUESTIONS AND ANSWERS READ)

13      Q.   Did Costa have any knowledge of how to apply

14  this thing?

15      A.   No, about as much as I did I would imagine.

16  I was concerned with just getting it done right and

17  the fact that I had not used it before.  I had got

18  enough from Rankowitz but I thought that the process

19  of putting one this way and one that way may

20  take -- it would be easier with two people.  That was

21  the only reason.

22      Q.   Did you consider asking a female to come into

23  the room?

24      A.   There were none working that I was aware of

25  but no, I did not.

224

1    A.   No.  It was just a quick decision.  I was on

2    the move.  I just told him to have Costa meet me so he

3    could wire her up.

4    Q.   And insofar as using dispatchers, one of the

5    female dispatchers was concerned, your thoughts at

6    that time were that you couldn't because there may

7    have been some sort of issue?

8    A.   No, not at that time.  I am just talking now

9    that, when you mentioned them, I was aware previous to

10   that that there were job description concerns or

11   whatever.  I didn't feel any need for a female because

12   we interviewed female suspects, interviewed female

13   witnesses, interviewed female CI's.  Everyone in this

14   department does it, male, interview females without

15   any other persons present.  I treated this woman as a

16   CI.  She was a friendly and I didn't see any reason

17   whatsoever to look at it as like a strip search or a

18   search or anything like that because it was nothing

19   like that at all.

20   Q.   But she is, in fact, a volunteer, not a

21   CI, correct?

22   A.   Right, but she is functioning as an

23   informant.  I mean, even informants are volunteering

24   their time for some kind of a -- some reason, whether

25   it's consideration, cash, favor.  I mean, she is

225
1    functioning as an informant.  She is willing to go in

2    acting as our agent to attempt to purchase alcohol.  I

3    consider her to be a friendly.  I certainly wouldn't

4    consider her to be a risk of this type of basis,

5    allegation.

6        Q.  Would you go in and ask a female CI to remove

7    her shirt to put a body mike on?

8        A.  I had not.  I have never done that.  What's

9    the question?  I'm sorry.

10       Q.  Would you have a female CI go into a room

11   with you by yourself and take her shirt off so that

12   you could install a body wire?

13       A.  Would I have prior to this?  I would have no

14   problem with that.  Subsequent to this, no.

15       Q.  At what point did you first call Costa or

16   send for Costa?

17       A.  I walked her to the room, into the room, put

18   stuff down and exited to get the tape and that's when

19   I ran into Lounsbury spinning through the room putting

20   together the list.  I thought of it.  The thought

21   occurred to me in the room when I looked at all this,

22   the wires and everything else, and knowing that I have

23   the capability of messing up things that are

24   mechanical, I said I better get somebody in here to

25   help me out.  I thought of asking Lounsbury but I know

228

1    thought ever given to canceling the operation?

2        A.   No.

3        Q.   Okay, so we do the installation, the body

4    mike gets installed, taped into place.  What was the

5    purpose of photographing her?

6        A.   I intended to photograph the body mike to

7    show that we had it.  The reason for that was we had

8    been on liquor stings with liquor agents who

9    physically followed in the CI's, who visually observed

10   the sale, who audibly heard the sale and then come

11   time for the hearing, would actually contest their own

12   knowledge.  Their own attorneys, their own supervisors

13   say well, that's not enough, we need the CI here to

14   testify, which you have heard and seen was not enough.

15       So what I wanted to do was document that we had a

16   wire so that we had in fact heard what occurred and

17   that was being listened to by Detective Costa and

18   Detective Dolan, so they too would be able to say yes,

19   they heard something.

20       Liquor has historically been difficult to deal

21   with when it comes to that.  Even their own agents

22   don't remember what they have heard.

23       Q.   What's the range of this transmitter?

24       A.   The new one I think, and maybe the Captain

25   would know better, I think is one half of a mile.  I

230

1    agents being accurate witnesses?

2        A.   I don't know about accurate, maybe just not

3    comfortable witnesses.

4        Q.   On what occasions have we had such a problem?

5        A.   The liquor sting involving Miss Wilson

6    because when the hearings came up, they wanted her to

7    come up from school.  They contacted her, she was

8    unable to except for a certain date.  They contacted

9    us to put the arm on her to come up, and we mentioned

10   to them that, you know, your liquor agent was right

11   there standing with her and witnessed everything.  It

12   was your operation, you know, they heard everything.

13   Well, you know, our hearing officers don't think

14   that's good enough or something to that effect.

15       Q.   Is that why you didn't invite Liquor to come

16   down on this occasion?

17       A.   No.  In order to get Liquor, you have to

18   schedule well in advance because they have a

19   requirement in their contract that requires I think a

20   minimum of ten days notice to actually appear.  The

21   specifics of that, I don't know.

22           It's like the one that we did use, the date was

23   set months in advance on the event they would be

24   available.  For this, no, there was no consideration

25   to that at all.  It was strictly done with the idea of

231

1   checking compliance rates.

2       Q.   So if we are just checking compliance rates,

3   then how much concern was there over what was heard

4   and said and why didn't we send somebody in with her

5   or preceding her?

6       A.   We didn't want to send anyone in preceding

7   her or with her because the cops that I know frequent

8   these locations, they buy booze in town, beer in town

9   or whatever.   They have seen us all before, and I

10  can't think of any indication where for a situation

11  like this a body mike is harmful by any means.   It

12  provides for a level of comfort for her, provides us

13  with not only information regarding the operation but

14  also safety information regarding what's happening and

15  also control over what she is saying.   Regardless of

16  the outcome, if she is not saying what we want her to

17  say, she could be doing something improper which would

18  jeopardize our results.

19      Q.   So these compliance checks you said earlier

20  were to establish a baseline.

21      A.   Yes, we wanted to see how many retail

22  operations would attempt to sell before we brought

23  that back to the committee.   In other words, it was

24  just part of a larger scale of educational programs.

25  We anticipated using cops and shops in the future and

232

1    that kind of thing.

2        Q.   So there weren't going to be any hearings

3    resulting from this and there was going to be no

4    problems with Liquor Control or anything like that?

5        A.   None were anticipated.  It didn't mean it

6    wouldn't happen.  Something could have occurred that

7    would require us to involve Liquor.  You have to

8    prepare for any eventuality, and also, normally a copy

9    of those reports are forwarded to the Liquor Control

10   as well and they may elect on their own to enforce or

11   investigate as a follow up.

12       Q.   And if they were to do that, then what they

13   would find is what they would find and what they had

14   in our report is what they would have in our report,

15   and if they regarded it as insufficient or incorrect

16   somehow, they would know that going upfront or going

17   in, correct?  In other words, you are doing this

18   operation for compliance and for no other purpose.  If

19   Liquor Control decides to jump in later on, that's

20   their business, and they know full well what they are

21   starting out with because they have got our report as

22   you say, correct?  So if the girl had said something

23   incorrect, they would know that going upfront.

24       A.   Yes.

25       Q.   So then it would be fair to say that knowing

234

1    Q.   We had no intent of involving Liquor Control.

2    A.   Other than providing them with reports.

3    Q.   Okay.  You have indicated that Liquor Control

4    sometimes becomes involved subsequently on their own.

5    A.   They may, yes.

6    Q.   And if they were to do so, having read our

7    reports, and if having read those reports they saw

8    things in there that they may not have cared for, in

9    other words, the girl said something improper or

10   whatever, then they certainly would have the choice

11   not to continue to pursue the issue, correct?

12   A.   Yes.

13   Q.   And if they continued to pursue a bad

14   position, shame on them.

15        MR. WALSH:  Can I ask a question?  Does

16   your hypothetical assume the presence of the mike or

17   not?  For example, you said if they thought the girl

18   said something inappropriate.  If there is no one in

19   the store with the girl and they don't have a body

20   mike on her, they won't know what the girl said

21   necessarily.  If she comes out and says yes, I went in

22   and the guy offered to sell me liquor and then I

23   walked out, they wouldn't know she said something

24   inappropriate.  She comes back -- depending on what

25   she says to the police officers.

235

1        DEPUTY CHIEF MOCEK:  I am trying to get

2   to the bottom of why we used the body mike, in the

3   particular manner in which we used the body mike, and

4   if there is questions over the Liquor Control hearing

5   officers not believing or not considering their own

6   people to be sufficient at a hearing, then why didn't

7   we record what was said and eliminate all questions,

8   should Liquor Control decide to become involved in the

9   future?

10        THE WITNESS:  Okay.

11        Q.  We have the capacity to record.

12        A.  We have the capacity to record.  A recorder

13  picks up everything, including squelch, scratch,

14  walking, if you walk, (witness made scraping noise)

15  Sorry.  It will pick up the scratch of clothing.

16        Also, working with police officers for many years

17  I am sure that you have heard comments before that are

18  not appropriate to a taped conversation or that are

19  not appropriate for a record.  When I have two police

20  detectives that are listening that can testify to

21  their knowledge of that of what transpired, I am

22  perfectly comfortable with that, without having to

23  force someone to listen to scratching, screeching,

24  squealing.

25        As everyone here is, I mean, as you are well

236

1   aware, that the body mike systems, these microphone

2   systems are not infallible.  They don't always

3   function properly.

4       It was raining that night.  We did have problems

5   with the body mike system and it's not germane to the

6   report that these things occurred.  What's germane is

7   that my detectives were able to listen to the

8   conversations when possible and they can testify to

9   those conversations if necessary.

10      Q.  So because the detectives could overhear the

11  conversations, listen to the conversations, their

12  testimony was sufficient and we don't need to record.

13  Wouldn't the same reasoning apply then to the

14  installation of the body mike on this girl?  You could

15  go to the Liquor Commission if need be and say I

16  installed the body mike on this girl.  Why did we have

17  to take a picture?

18      A.  Just to record that it happened.  We record

19  the fact of what she is wearing, we record the fact of

20  her identification, and I would prefer to record the

21  fact that she was wearing an actual wire.  It gives

22  more credibility to my detectives if they have to

23  testify.

24      Q.  If they had less without the photo?

25          THE WITNESS:  I'm sorry, sir.

238

1  in the event that they would become involved at some

2  point in time or review these things at some point in

3  time.  The documentation consideration of the

4  photograph comes from when, in my experience, when

5  liquor agents have been called to testify before the

6  Liquor Board without the CI present, their testimony

7  has either been questioned or has not been sufficient

8  to go forward with regulatory fines or penalties.

9  That's my understanding of how that works with them.

10        So from the liquor standpoint, I would have

11  police officers testify at a liquor hearing, if it

12  ever came to that, who I believe are inherently given

13  more credibility based upon the fact that they are

14  police officers and they are sworn to conduct

15  themselves as such.  Therefore, they would have more

16  credibility up there.

17    If the CI was not present, I could testify that the

18  wire was placed on her by myself, the police officers

19  could testify that she was wearing a wire and they

20  heard it and the photograph would simply be to have

21  more backup on my statement that she was wired.  It

22  would provide, you know, additional substance to our

23  testimony, if need be.

24                DEPUTY CHIEF MOCEK:  Okay.

25                THE WITNESS:  I hope that clarifies it.

265

1    people when we do this, we don't tell them how we do

2    it, and if you were to tell somebody about this, you

3    know, we could never do this again in the future and

4    this is the beginning of an entire program for us,

5    blah, blah, blah.

6        She said she wouldn't.  She assured me there

7    wouldn't be any problem because I presumed from her

8    comments before that she purchased in package stores.

9    My concern is that they would go and tell these

10   package store owners.  I know she was very friendly

11   with a lot of cops here.  I just don't need her

12   sitting there telling the story, carrying on with the

13   cops and then running the mouths and the package

14   stores finding out who we use and when.

15       At that point I gave her $30 from the special

16   investigations fund which I had taken out earlier and

17   told her this was for her time and her effort and her

18   inconvenience, and she thanked me, took the money and

19   I walked her down the hallway and she exited, and I

20   actually gave her a hug on the way out and I said, "If

21   you ever need anything, let me know.  Thank you for

22   your help," blah, blah, blah, and Officer Lamantini

23   was standing there at the time.

24       Q.   Then what happened?

25       A.   I went back to the bureau, put away all the

269

1  they been taken.

2      I think in my attempts to make her feel more

3  comfortable, as is my nature, I joke around, I tend to

4  be a little loose, and forgetting that a woman of that

5  age looks at a police lieutenant as some kind of very

6  important figure, as it was my history of crime

7  prevention and social outreach in this department, I

8  have always managed to keep myself on a much more

9  approachable level.  I think my joking with her and

10  carrying on in such a manner contributed to her belief

11  that there were photos being taken because I joked

12  about it, I said I was going to do it and I certainly

13  manipulated the camera enough that someone that does

14  not know would think that they were taken.

15      Bearing that in mind, I was approached about

16  three weeks after this occurred by a woman named -- it

17  will come to me.  I will get right back to her.  She

18  approached me and said that she is friends with

19  Officer Peter Casey's wife who is a hairdresser.

20  Officer Casey's wife is the hairdresser of

21  Miss Ejchorszt.

22      Supposedly Miss Ejchorszt and a friend came in to

23  get their haircut by Officer Casey's wife, not knowing

24  who Officer Casey's wife was or the relationship with

25  him in the department.  During the haircut procedure,

286

1    attention, hey, you messed up of the amounts and that

2    kind of thing.  I mean, I am very capable of doing

3    that.  I have expressed that to you personally many

4    times about my lack of mathematical abilities, and I

5    just -- if I put something in that didn't belong

6    there, it's a screw-up.  It's an honest screw-up on my

7    part, and I don't remember specifically what I put in

8    there.

9                 THE WITNESS:  Can we have caucus briefly?

10                DEPUTY CHIEF MOCEK:  Yes, go ahead.

11        (Witness conferring with his attorney)

12                THE WITNESS:  Chief, can I ask you what I

13   put in the log?  I don't specifically remember other

14   than what I told you.  Maybe I can answer --

15        Q.   I was just looking for what your recollection

16   was.  You mentioned that Kristen knew a bunch of the

17   guys here.

18        A.   Yes.

19        Q.   Can you expound on that at all?

20        A.   She talked about Camp, how she was obsessed

21   with Camp.  She has been obsessed with other cops

22   here.  She wanted to date a cop, go out with a cop,

23   that kind of thing.  She mentioned she was friends

24   with Lamantini, friends with Morello, friends with

25   Petrides; you know, I love cops, cops are cute.  I

288

1

2

3    STATE OF CONNECTICUT    :
     COUNTY OF NEW LONDON    :
4

5

6         I, Jane M. Gingerella, LSR, RPR, a Notary Public
     duly commissioned and qualified within and for the
7    State of Connecticut, do hereby certify:
              that JAMES DAIGLE was previously sworn in
8    the within-entitled cause;
              that said statement was reported by me, a
9    Licensed Shorthand Reporter, was transcribed by me and
     is a true and complete transcription of all testimony
10   given by said witness.
          I further certify that I am not a relative,
11   counsel or attorney of any party or otherwise
     interested in this action.
12        IN WITNESS WHEREOF, I have hereunto set my hand
     and seal this _____ day of _____,
13   2002.

14

15

16   _____
         Jane M. Gingerella, LSR, RPR
17       Licensed Shorthand Reporter #00392
         Court Reporter - Notary Public
18       My commission expires December 31, 2005.

19

20

21

22

23

24

25

1    C O N F I D E N T I A L   I N T E R V I E W

2    N O R W I C H   P O L I C E   D E P A R T M E N T

3

4

5

6    INTERVIEW OF LT. JAMES DAIGLE, JR

7    VOLUME V

8

9    HELD AT:   Norwich Police Department
              70 Thames Street
10             Norwich, CT   06360

11

        CONDUCTED ON:  APRIL 3, 2002
12

        CONDUCTED BY:  DEPUTY CHIEF WARREN MOCEK
13

14   ALSO PRESENT:   CAPTAIN ROBERT DROZYNSKI
                     HARRY E. CALMAR, ESQ.
15
                     JOHN M. WALSH, Jr., ESQ.
16                   UNION REPRESENTATIVE

17

18

19
                              Reported By:
20                            Susan M. Webb
     ⒸⓄⓅⓎ                    Licensed Shorthand Reporter
21                            License Number 00313

22

23

24             Shea & Driscoll, LLC
             Court Reporting Associates
25             16 Seabreeze Drive
               Waterford, CT   06385

1          MOCEK:  Yes.  The question is other than
2     Ms. Wilson and Ms. Earl, when is the last time you took
3     a nude or partially nude photo or image of an
4     individual?
5          DAIGLE:  Pardon me.  Quick conference.
6          (A conference was taken with union
7     representative.)
8          DAIGLE:  With reluctance, because I do not want to
9     harm the reputation of other individuals who are not
10     privy or party to this, I will answer your questions as
11     ordered.  I am uncomfortable doing this.  Again, it
12     places me at great personal risk, and it also will
13     potentially cause personal problems for other
14     individuals that are not here or currently the subject
15     of the investigation.  That is my reluctance that I
16     don't want to cause that and make this into a witch
17     hunt for other individuals.
18          I recollect taking photos of two women in the past
19     in addition to Wilson and Earl.  Once was I believe in
20     1997, or '98, and the other incident was 1987,
21     approximately 1987.
22          MOCEK:  Have you ever using department cameras
23     and/or property taken any nude or partially nude photo
24     or image of an individual?
25          DAIGLE:  No.

355

1           MOCEK:  Have you ever on department premises taken

2       a nude or partially nude photo or image of an

3       individual?

4           DAIGLE:  No.

5           MOCEK:  Have you ever on department time taken a

6       nude or partially nude photo or image of an individual?

7           DAIGLE:  No.

8           MOCEK:  Have you ever taken --

9           DAIGLE:  Excuse me, sir.  That's with the

10      exception any kind of investigations of deceased or

11      injured persons.  I have in the past taken pictures of

12      decedents who are partially nude or nude.

13          MOCEK:  Okay.  Have you ever taken any nude or

14      partially nude photo or image of an individual then

15      employed by the city or police department?

16          DAIGLE:  Yes.

17          MOCEK:  When?

18          DAIGLE:  Both of those occasions I indicated.

19          MOCEK:  Why?

20          DAIGLE:  Want them addressed individually?

21          MOCEK:  Yes, please.

22          DAIGLE:  The pictures in -- again, the year is

23      approximate.  I'm basing this on my cigar store, which

24      we opened in '97.  There were pictures taken of a -- it

25      could have been a past employee at that point.  It

1    could have been '98.  I don't know what her status was

2    at that point.  Pictures were taken of her semiclothed

3    for a cigar calender which was never produced,

4    basically art shots of her smoking various cigars,

5    wearing baseball caps, or wearing a white shirt.

6         MOCEK:  And of whom are we speaking?

7         DAIGLE:  A former civilian employee.

8         MOCEK:  Her name is?  What is her name?

9         DAIGLE:  Her name is Kristen Vanase.

10        MOCEK:  What happened to the film or disk or

11   photos?

12        DAIGLE:  They were shots taken of color.  They

13   were color shots and black and white shots.  Somebody

14   else had the black and white shots.  I never saw them.

15   I took -- I don't know what happened to those.  I had

16   the negatives.  I gave them to somebody to get them

17   developed.  I don't remember.  The color ones are at

18   the cigar shop.  The black and white ones did not come

19   out very well.  The color ones must be with the cigar

20   store stuff we have stretched out all over the place.

21   We closed back in '99.

22        MOCEK:  Was there anybody else present during the

23   taking of the photos?

24        DAIGLE:  No.

25        MOCEK:  You said you gave the negatives to

1    somebody to have developed?

2         DAIGLE:  The color negatives were done right at

3    Wal-Mart or something, but the black and white

4    negatives, I think the only person that could do black

5    and white was Coopers.  I think I had somebody drop

6    them off for me, but I really I don't know.  I don't

7    remember.  I don't think I've seen them since -- I

8    don't think I ever saw the pictures of them.  I

9    think -- I can recall the color photographs.  I don't

10   recall seeing the black and white photographs, but I

11   know that I took some.

12        (A conference was taken with union

13   representative.)

14        MOCEK:  The color photographs are where?

15        DAIGLE:  They've got to be with the cigar store

16   stuff spread between different houses.  I'll recollect

17   where they are.  The top of my head, I don't know.

18        MOCEK:  And the black and white photos?

19        DAIGLE:  I don't know.  I remember giving them to

20   somebody to get developed.  I don't recall if I ever

21   saw them or not or even got them back.  I just don't.

22        MOCEK:  Okay.  You indicated there were two

23   individuals.  When was the second?

24        DAIGLE:  The second was in approximately 1987.

25        MOCEK:  Of whom?

1      DAIGLE:  Can we caucus briefly, Chief, so I can

2  talk to you off the record?

3      MOCEK:  Okay.

4      (Discussion off the record.)

5      MOCEK:  Lt. Daigle has given me a name on a piece

6  of legal paper that I'd like to identify as an exhibit.

7  That would be -- we'll call this Exhibit 1.

8  Lieutenant, is this name in response to my last

9  question?

10      DAIGLE:  Yes, sir, it is.

11      MOCEK:  Thank you.

12      (Exhibit 1, piece of paper with name on it, was

13  marked.)

14      MOCEK:  Was the photo black and white or color?

15      DAIGLE:  I'm sorry.  I just ripped something.  I'm

16  sorry, sir.

17      WALSH:  The question was if the photograph was

18  black and white or color.

19      DAIGLE:  The photo was color.

20      MOCEK:  Where was the film processed or developed?

21      DAIGLE:  I don't know.  I don't recall.

22      MOCEK:  What happened to the film, disk, or

23  photos?

24      DAIGLE:  It was a single photo.  There was no

25  disk.  It was developed at a commercial place back in

1    '87.  I don't know, and I have the photo.  That

2    wouldn't be presently, but I am in possession of the

3    photo.

4         MOCEK:  Would you describe the photograph?

5         DAIGLE:  Yes.  Color photograph, 3x5.  Again, I've

6    never measured it, but I'm making an approximate guess.

7    It would be a measurement.  It's of the female facing

8    the camera nude.

9         MOCEK:  What type of pose is depicted?  Was she

10   just standing there?

11        DAIGLE:  She's standing facing the camera with her

12   hands on her hips like this smiling.  She was actually

13   laughing at the time.

14        MOCEK:  You said you still have possession of that

15   photo?

16        DAIGLE:  Yes, I do.

17        MOCEK:  What is its current location?

18        DAIGLE:  Somewhere in my basement.

19        MOCEK:  Is the subject in the photo identifiable

20   by means of facial features?

21        DAIGLE:  Yes.  She had a necklace.  She had on her

22   wedding band.  It's a full -- not full.  I think it

23   goes from the knee up perhaps.  I haven't observed it

24   in a while, but --

25        MOCEK:  Other than photos contained in a