1    particular police file, have you ever kept or

2    maintained on department premises or property nude or

3    partially nude photos or images of individuals?

4        DAIGLE:  Back when I was a patrolman, I may have

5    had some in my locker, but I don't -- that would have

6    been years and years ago.  Deputy Chief Burnes asked me

7    about one of the photographs of Vanase.  He asked to

8    see one.  I displayed it to him in his office.  It was

9    regarding his -- he was going through an investigation

10   at the time, and the black and white negatives from

11   Vanase I gave to somebody here and asked him to get

12   them developed.  I think they were going to the photo

13   shop, but I don't recall who it was.

14       MOCEK:  That stuff that would have been in your

15   locker, what happened to that?

16       DAIGLE:  I can't specifically recall.  There may

17   have been one or two photos in the locker from back in

18   the early '80's that would be Polaroids or whatever of

19   like strip clubs or something like that, then they

20   would be thrown away.  They weren't pasted to the

21   locker or anything like that.  They were usually just

22   stuck up in the corner or somebody would have one in

23   the locker room and say take a look at this.  That was

24   about it.  That was back in the early '80's.

25       MOCEK:  Have you ever shown or circulated nude or

1  partially nude photos or images of individuals on

2  department premises or property or on department time

3  or to department personnel?

4      DAIGLE:  On department premises or property, yes,

5  to Deputy Chief Burnes.  What was the second part of

6  that?

7      MOCEK:  Or on department property or on department

8  time?

9      DAIGLE:  That would have been on department time.

10  The supplying of the negatives to whoever would have

11  been.  I don't remember, but I'm presuming I would have

12  done it when I was working, just hand it to him, and

13  what was the third, or to --

14      MOCEK:  Or to department personnel.

15      DAIGLE:  Yes, Deputy Chief Burnes, and the photos

16  of Vanase which were kept at the cigar store were

17  observed by several people who would come in and out of

18  the cigar store.  I don't recall specifically who.  It

19  could just be a handful of people going in there,

20  because we were talking about doing a calender so --

21  and the picture of the other woman, that's been kept

22  always at my residence.  I changed residence after the

23  picture was taken, changed again in '92.

24      Let me see, it was shown then to an employee who

25  wasn't an employee then.  I don't know of anyone else

1    seeing it.  I know there was a rumor about it, because

2    when Thomas Peterson was a lieutenant at that time, he

3    had a personal interest in this woman.  He summoned me

4    in his office and started screaming and yelling about

5    the presence of it.  I denied it.  I told him I didn't

6    know what was talking about, and that was back in '90

7    maybe, 1990.  I don't remember when he left.

8        MOCEK:  Was that photo ever on police premises?

9        DAIGLE:  No.

10        MOCEK:  So we understand, we're talking about the

11    woman whose name is on Exhibit 1?

12        DAIGLE:  That being the name I supplied?

13        MOCEK:  Yes.

14        DAIGLE:  Yes, sir.

15        MOCEK:  Explain how the interaction with then

16    Deputy Chief Burnes came about.

17        DAIGLE:  I don't specifically recall the reason I

18    was in there or the conversation.  It led into him

19    being investigated for some kind of conduct involving

20    that employee, and during my interview as part of that

21    investigation, I related to then Deputy Chief Louis

22    Fusaro that I would be very surprised -- I'm sorry.  He

23    was captain then.  He was then Captain Robert Burnes.

24        In my conversation with Deputy Chief Fusaro at the

25    time, I told him I'd be very surprised if that employee

1   was shocked by any kind of activity or approach or

2   anything involving any kind of sexual connotation, that

3   she would not find that shocking.  She more or less

4   would be involved in such a thing, and then Captain

5   Burnes had said oh, I heard you took some photos of

6   her.  I heard you were having a relationship with her.

7   You know how Captain Robert Burnes used to be, and I

8   stated that I took some pictures for the cigar store,

9   for a calender I was going to do, which we never did,

10  that I obviously never had a relationship with her, and

11  he asked that I produce one of the photos because he

12  didn't believe me.

13          MOCEK:  Then what happened.

14          DAIGLE:  I produced to him one of the photos.  I

15  don't know if it was days later, a week later.  I don't

16  recall, but I subsequently gave him a photograph.

17          MOCEK:  That took place where?

18          DAIGLE:  It was in his office.  I don't remember

19  if he was deputy chief then or captain.  I don't recall

20  where the time frame fell.  He was investigated when he

21  was captain.  He got promoted after that.  He was

22  concerned about it because of some issue with his

23  investigation.  It may have even been concluded and he

24  was worried about a lawsuit.  I don't specifically

25  recall his interest in that.  I know he asked me to

1    bring it to him.

2        MOCEK:  Who was present at that time?

3        DAIGLE:  Just he and I.

4        MOCEK:  Just so we're clear, the person in the

5    photo that you gave to Burnes is not the name on

6    Exhibit 1?

7        DAIGLE:  No.  This is the other employee.

8        MOCEK:  Do you know what he did with the photo?

9        DAIGLE:  No, because I wanted it back.  He said

10   he'd get it back to me and I never got it back.

11       MOCEK:  Do you know what he intended to do with

12   the photo?

13       DAIGLE:  No.  He only indicated he was interested

14   in it because of what was going on with his

15   investigation, and I didn't ask.  I just -- whatever.

16       MOCEK:  Is that the extent of that interaction?

17       DAIGLE:  I believe so.

18       MOCEK:  Is that the extent, total extent of

19   showing or circulating nude or partially nude photos or

20   images of individuals on department premises, property,

21   or on department time or to department personnel?

22       DAIGLE:  Time, premises, duty, not personnel.  As

23   I alluded to before, several people saw the pictures of

24   Ms. Vanase at the cigar shop and a couple of people may

25   have seen the photo of the individual in Exhibit 1 back

1      in the early '90's or late '80's.

2          MOCEK:  Who would those folks be?

3          DAIGLE:  Specifically, I know Officer Camp before

4      he was employed here saw it when I first moved into my

5      house in '92.  My roommate at the time, Mark Chenette,

6      because he was obviously living with me was aware of

7      her coming up frequently and visiting.  Others may have

8      seen it in my apartment, but I don't recall who.

9          It was quite the topic of conversation which is

10     why Peterson was all hot over it and some others who

11     were involved with her at the same time, but I don't

12     recall specifically producing it for anyone, but I

13     can't refute the fact that I may have.  I just don't

14     recall.  If it was shown, it would be at my residence

15     or one of my residences.

16         MOCEK:  Have you ever held nude or partially nude

17     photos out as depicting Ms. Earl or Ms. Wilson?

18         DAIGLE:  Held out?

19         MOCEK:  Have you ever held out any photos of nude

20     or partially nude people and held it out as to be

21     depicting Ms. Wilson?

22         DAIGLE:  No.

23         MOCEK:  If a department member indicated that you

24     held out such an image to be Ms. Earl or Ms. Wilson,

25     would that department member be untruthful?

1          DAIGLE:  Yes.

2          MOCEK:  Have you ever held nude or partially nude

3     photos out as depicting any then present employees of

4     the city or the police department; in other words, any

5     photos that you may have displayed and alleged that

6     they represented an image of a person who was at that

7     time an employee of the city or the police department?

8          DAIGLE:  As I indicated, yeah.

9          WALSH:  For clarification, do you mean if someone

10    looked at it, they wouldn't be able to tell from --

11    there was no facial -- there was no way to tell it was

12    someone, that I'd have to look at it and say this body

13    is so and so?

14         MOCEK:  Yes.  That's correct, facial features

15    would not be clearly identifiable on a picture.

16         WALSH:  He would hold it out and say this is Joe

17    Blow?

18         MOCEK:  Correct.

19         DAIGLE:  With Vanase maybe because all the

20    pictures, some of them were just of a cigar down around

21    the body, but they were included with other photographs

22    so it wouldn't be like who is this?  Not all of them.

23    This was sort of a futile attempt at being artsy so

24    it's possible with Vanase's pictures, because not all

25    of them included her face, just by the nature of them.

1    With the individual indicated in Exhibit 1, it's a

2    single picture that depicts other than below the knees

3    or mid-thigh or whatever.  Unless you don't know the

4    subject, I think you can't presume it's anyone but.

5        MOCEK:  You indicated that you no longer have nude

6    or partially nude photos or images Ms. Wilson and

7    Ms. Earl because you deleted or formatted the disk that

8    contained those images.  Have you destroyed any other

9    nude or partially nude photos or images under your

10   control or in your possession in the last two years?

11       DAIGLE:  No.

12       MOCEK:  Have you ever had sexual relations

13   inclusive of receiving oral sex while on duty?

14       DAIGLE:  No.

15       MOCEK:  Have you ever had sexual relations

16   inclusive of receiving oral sex while in a department

17   vehicle?

18       DAIGLE:  No.

19       MOCEK:  Is there any reason or set of

20   circumstances that you can identify that might have led

21   someone to believe that a witness saw you receives oral

22   sex while in a department vehicle?

23       DAIGLE:  No.  Can I make a comment about that?

24       MOCEK:  Yes.

25       DAIGLE:  Daniel Malchman was in Norwich Superior

```
1    STATE OF CONNECTICUT  )
                           )  ss.
2    COUNTY OF NEW LONDON  )

3

4            I, Susan M. Webb, a Notary Public duly

5    commissioned and qualified within and for the State of

6    Connecticut, do hereby certify that I took the confidential

7    interview of LT. JAMES DAIGLE on the 3rd day of April 2002 at

8    the Norwich Police Department, 70 Thames Street, Norwich,

9    Connecticut, commencing at 10:33 a.m.

10           I further certify that the following testimony was

11   taken by me stenographically and thereafter reduced to writing

12   under my supervision.

13           I further certify that I am not an attorney,

14   relative, or employee of any party hereto nor otherwise

15   interested in the event of this cause.

16           In witness whereof, I have hereunto set my hand

17   and affixed my seal this 8th day of April 2002.

18                              Susan M. Webb

19                              Susan M. Webb
                                Notary Public
20
     My Commission Expires August 30, 2003
21

22

23

24

25
```

SHEA & DRISCOLL, LLC   (860) 443-3592

2

1    APPEARANCES:

2                DEPUTY CHIEF WARREN MOCEK

3                and CAPTAIN ROBERT DROZYNSKI

4                Norwich Police Department

5                70 Thames Street

6                Norwich, Connecticut 06360

7

8        LICARI & WALSH, LLC

9          Attorneys at Law

10         105 Court Street

11         New Haven, Connecticut 06511

12       BY:  JOHN M. WALSH, JR., ESQ.

13

14

15       SUISMAN, SHAPIRO, WOOL, BRENNAN,

16         GRAY & GREENBERG, P.C.

17         Attorneys at Law

18         Two Union Plaza, Suite 200

19         P.O. Box 1591

20         New London, Connecticut 06320

21       BY:  HARRY E. CALMAR, ESQ.

22

23

24

25

SHEA & DRISCOLL COURT REPORTING ASSOCIATES

3

1           Sworn Statement of LIEUTENANT JAMES DAIGLE, continued,

2    in the above-entitled cause of action; taken at the request of

3    the Norwich Police Department; before Victoria L. Germani, a

4    Notary Public within and for the State of Connecticut; at the

5    Norwich Police Department, 70 Thames Street, Norwich,

6    Connecticut, commencing at 1:13 p.m.

7

8                           ---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D



## CONNECTICUT COALITION
## TO STOP UNDERAGE DRINKING



Funded by the Office of Policy and Management and the Robert Wood Johnson Foundation through grants to The Governor's
Prevention Partnership

30 Arbor Street, Hartford, CT 06106  PHONE: (860) 523-8042 • FAX  (860) 236-9412

# *Facsimile*

**TO:**   Det. James Davery

**FAX #:**   860 656 4552

EXHIBIT
Plff's 1
cc 5/17/06

**FROM:**   *Donna R. Williams - Administrative Assistant*

**DATE:**   4/19/01

**PAGES (including cover):**   (3)
*If you do not receive legible copies of all pages, please notify us immediately.*

**RE:**



PLAINTIFF'S
EXHIBIT
JCP 6/20/06

*\*Prevention Tip: Parents who talk with their kids about drugs have kids who are half as likely to use drugs.*

# CT Coalition To Stop Underage Drinking
# Annual Law Enforcement Conference
# Agenda

**8:00-9:00 Police Chief's Breakfast (Chief's only)**

**8:30-9:00 Registration**

**9:00-9:30  Keynote Presentation**

**9:30-10:00 Overview of media advocacy and media relations**

**10:00-10:15 Break**

**10:15-12:15 Concurrent sessions (Please choose one)**

### Session A:  Party Prevention and Controlled Disposal
o Overview and research background
o Techniques for party prevention
o Working with parents
o Developing community support and political will
o Party containment and dispersal
o Strategic use of planning and media

### Session B: Retail Compliance Checks
o Overview and research background
o Working with merchants
o Dealing with false identification
o Strategic use and planning of media
o Developing community support and political will
o Working with youth
o On-premise and off-premise establishments

### Session C:  Enforcing Impaired Driving Laws for Youth
o Impaired driving issues as they relate to young drivers
o Effectiveness of Zero Tolerance laws to prevent youth from driving
o Need for more emphasis on impaired driving laws among youth
o Barriers to enforcement of impaired driving laws among youth
o Strategies for overcoming these barriers

**12:15-1:00 Lunch**

**1:00-2:00 Strategies for Preventing Third Party Transactions**
Overview and research background
Developing community support and political will
"Shoulder tap" operations
Preventing purchases by older siblings and friends
Preventing purchases by parents
Keg registration
Strategic use and planning of media

**2:00-3:00 Creating and Supporting a Health Community Environment:
The importance of coordination and cooperation**
A panel of local prosecutors, liquor control agents, and community leaders will
discuss coordination of their efforts.

**ACES/SDA Building**
**205 Skiff Street**
**Hamden, CT**

**From I-91 (North or South):**

Take Exit 10. Proceed to first exit off connector and take a left at bottom of ramp. Go to traffic light and take a left onto Hartford Turnpike. Follow to your second traffic light and take a right onto Skiff Street. Travel past the second traffic light on Skiff Street and ACES will be on your left - **across from Dante's Restaurant (not IHOP).** The Staff Development/ Administration Building is behind the Academy.

**From I-95 (Southbound):**

As you go over the Quinnipiac Bridge, stay in the right-hand lane and get off Exit 48. That will put you on 91 northbound - follow directions above.

**Southbound on Route 15:**

Take Exit 61 and turn right onto Whitney Avenue. Follow Whitney Avenue to second traffic light and take a right onto Skiff Street. ACES will be on your left - **across from Dante's Restaurant.** The Staff Development/Administration Building is behind the Academy.

**Northbound on Route 15:**

Take Exit 61 and turn left onto Whitney Avenue. Follow Whitney Avenue to first traffic light and take a right onto Skiff Street. ACES will be on your left - **across from Dante's Restaurant.** The Staff Development/Administration Building is behind the Academy.

**From Route 63 (Waterbury):**

Take Route 63 into Woodbridge and turn left onto Lucy Street. Continue approximately two blocks to Route 69 and turn right. At your next traffic light, take a left and get on the Parkway. Proceed with directions "Northbound on Route 15."

**From Route 69:**

Continue on Route 69 through Woodbridge. Take your first left after passing the Merritt Parkway/Route 15 overpass. Proceed onto the Parkway and follow directions above "Northbound on Route 15."

# EXHIBIT E

Norwich Police Department

## *Internal Investigation*

TO:       Chief Louis J. Fusaro
FROM:   Deputy Chief Warren L. Mocek
RE:       **Melanie Wilson**


After receiving the Ejchorszt complaint, in which Ms. Ejchorszt stated that Lt.

Daigle had taken semi-nude photos of her in preparation for an underage liquor

sales operation, I researched previous underage liquor sales operations. In so

doing, I reviewed case number 00-29461. This was an operation conducted on

September 15, 2000, in conjunction with Connecticut Liquor Control. Supervisor

was (then Sergeant) Daigle and case officer was Detective Lounsbury. The

underage operative was one Melanie Wilson.


I reviewed the photographs on disk of Ms. Wilson that existed in the case file. I

noted that one photo showed Ms. Wilson wearing an open jacket over a gold

halter-type top. Another photo showed Ms. Wilson wearing the same jacket, but

now over a bulky turtleneck-type sweater. The background of both these photos

shows that they were taken from the vicinity of Sgt. Daigle's desk, as the Crime

Prevention Officer's desk is visible behind Ms. Wilson. Another photo shows a

nearly full-length view of Ms. Wilson standing in front of the windows of the

# EXHIBIT F



# City of Norwich
## Connecticut
## Police Department

Case#

Date 1/4/02

Time started 11:45pm
Time ended

Statement of        Melanie  S. Wilson

I,     Melanie S. Wilson                    date of birth        5/20/82
Of      115 North 32nd St. 317 B-2 Philadelphia, PA  19104
Make the following statement, without fear, threat, or promise.  I have been advised that any statement(s)
made herein which I do not believe to be true and which is intended to mislead a public servant in the
performance of his/her official function, is a crime under C.G.S. section 53a-157.

     During my junior and senior high school years (98-99 & 99-2000) I worked at Bess Eaton on the West Side, and during the summer or 1999, I worked at the Marina as a bus person.  During that time I met a number of officers, including Tim Paige and Peter Camp.  During that summer, Camp asked me to go to the beach with him and a friend of his.  The friend was Jim Daigle.  We went to Rocky Neck.

     A friendship developed between Daigle and I, and on occasion, one of us would call the other, and we would talk.  I would see Daigle around on occasion, and we would talk, or he would stop at Bess Eaton to get a coffee.

     In September of 2000, before the start of my first college year at Drexel University in Philadelphia, Daigle called me at home and asked me if I was interested in doing an underage liquor sales sting.  I told him sure.  That was about a week before it was supposed to happen.

     On the day it was supposed to happen (I think he may have called again a day or two earlier) he showed up at my house, 34 Will Road.  The time was about 3 or 4pm.  It was before my mom got out of work at 4:30pm.  He was driving his Cadillac.  I let him in, and we probably hugged, because we usually hugged when we saw each other.  We probably exchanged a brief peck on the lips, which was also a part of our usual greeting.  I was wearing a black jacket, and a gold blouse.  I also had brought a turtleneck sweater.

     Daigle had a digital camera with him.  He told me that he needed to photograph me without any clothing or underwear at all on, saying that he had to prove that I wasn't wearing a body microphone.  He told me that it was normal procedure -- that they even did it with hookers -- implying that the taking of nude photos was a completely normal procedure.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____    Signed___*Melanie S. Wilson*_____
Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters
contained therein.

I notarized, endorse here__*D/C with R peck*_____This 5th day of  Jan ,
2002



# City of Norwich
## Connecticut
## Police Department

Case#

Date 1/4/02

Time started 11:45pm
Time ended

Statement of    Melanie  S. Wilson

I,    Melanie S. Wilson                    date of birth    5/20/82
Of    115 North 32nd St. 317 B-2 Philadelphia, PA  19104
Make the following statement, without fear, threat, or promise.  I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

He said that in response to my questions concerning it.  I asked him if he was serious, and he said yes, and some other small talk to put me at ease.  He then took one photograph of the front of me, and one of the back of me, while I was not wearing any clothing.  The photos were taken in the front hallway of my house. He told me to raise my hands behind my head.

After I re-dressed, we came to police headquarters in his Cadillac.  In the detective Division room, Daigle used the same camera he had used at my house to take a couple of photos of me wearing my coat and blouse, and my coat and sweater.  I asked Daigle what would happen to all those photos, and he told me that if no one claimed that I had a microphone, they would be erased immediately. I believe that he took all of the photographs on the same disk.  I did see the disk out of the camera at one time -- it was a grey color disk.

Then we went out on the sting, visiting the package stores.  I went with Daigle in a black car with blacked out windows.  There was no one else in the car with us.  At one of the stores, the guy said I was underage, and took my license and was going to cut it up.  I left the store and started flailing my arms outside the door to get everybody's attention.  Everybody came in and got my license back from the guy.  Daigle later told me that the guy was a former state trooper who was let go on a medical discharge.

After the package stores, we went to the bars, including Foxwoods Casino. All the Liquor Commission people went into some restaurant there, and Daigle, Dunesbury, the tall guy, and I played football in one of the Foxwoods parking lots; I think it was a commuter parking lot.  It was not near the Casino.  After that, we went to Chelsea Landing, and to Pinstripes, where I was turned away.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____    Signed _____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_____ This _____ day of _____, 200__



# City of Norwich
## Connecticut
## Police Department

Case#

Date 1/4/02

Time started 11:45pm

Time ended

Statement of     Melanie  S. Wilson

I,     Melanie S. Wilson                    date of birth        5/20/82
Of     115 North 32nd St. 317 B-2 Philadelphia, PA  19104
Make the following statement, without fear, threat, or promise.  I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

   After the operation was over, we got back to the police department around midnight or 1am.  Daigle told me that they had a case of beer, and he asked me if I wanted to hang out for a little while before he took me home.  We left the police department and drove downriver on route 32 about two to five minutes to a gravel lot near the river.   There was a case of Coors Lite in a pickup truck, possibly green in color, well-kept.  Everybody got a beer, and I think Daigle asked me if I wanted one.  I think I said OK.  He handed me a can and said "You never got it from me." We stayed there about 20 minutes, and then Daigle brought me home in his Cadillac.  Nothing out of the ordinary happened on the way home.  Daigle was telling me how I impressed the Liquor Commission people.
   I then left for college in Philadelphia.  We kept in touch by E-mail.  His E-mails were always very short, one or two lines, always signed "Love, Jim."  His E-mail address is cigarjim@AOL.com
   About 1 or 1&1/2 months later, sometime around October, Daigle contacted me by phone, starting out with normal conversation.  He then told me he was investigating a pornographer in Bozrah, and asked me if I was willing to pose for nude photos as part of that investigation, claiming that this guy was victimizing young kids.  I refused, but after I thought about it, I felt that if I did it, I would be helping some kid, even if it was embarrassing and against my self interest.  I then told Daigle that I would only be willing to do topless, not full nude, and Daigle said OK.
   A month or two later, in December of 2000, I came home for Winter break.  I think it was I who called Daigle, after I had made the decision to do it.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____          Signed _(Melanie S. Wilson)_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _D/C W.R. Apruch_____ This _5th_ day of _Jan_ , 2003.



# City of Norwich
### Connecticut
### Police Department

Case#

Date 1/4/02

Time started 11:45pm
Time ended

Statement of     Melanie S. Wilson

I,     Melanie S. Wilson                    date of birth     5/20/82
Of     115 North 32nd St. 317 B-2 Philadelphia, PA 19104
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

He either picked me up at my house or I met him somewhere, I'm not sure. He brought me to his house in his Cadillac. His house is off exit 83 across from a gas station, up a big hill. It was early evening, and he had a digital camera like before. He wasn't rushed, but did a few odds and ends around the house. I don't remember the conversation, but eventually I took off my shirt and bra. He remarked about my pants. I told him I didn't agree to do that--topless only--and he acted like he forgot. We were in the living room, where he has black leather puffy couches. He took somewhere around 16 or 17 photos--I think he filled the disk. There were various poses, around the sofa, and the dining room table set, with most being from the chin down. There were some of my face, with my hair covering my face. He had me take my ring off, because it has my initials on it. I was at his house for about forty-five minutes. I remember his kitchen has a lot of Coca-Cola type stuff in it, and there is no wall between the kitchen and living room. Daigle then drove me home.

During that winter break, Daigle and I went to the Providence Place Mall, with another guy whose name I don't know. I think someone said he worked the phones out front at the police department, but he might have been a patrolman. He was a white male, short, stocky, and a little balding; he was soft-spoken. Daigle bought me big light blue and white puffy "Happy Feet" slippers for Christmas, from one of the vendors in the center of the Mall. We also ate dinner at Dave & Busters.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____     Signed _Melanie S. Wilson_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _D/c w# R peck_____ This _5th_ day of _Jan_,
2002



# City of Norwich
## Connecticut
## Police Department

Case#

Date 1/4/02

Time started 11:45pm

Time ended

Statement of       Melanie S. Wilson

I,       Melanie S. Wilson                    date of birth       5/20/82
Of       115 North 32nd St. 317 B-2 Philadelphia, PA  19104
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

I then went back to college and don't believe I have seen Daigle since. There have been several phone calls between us to just keep in touch -- I would generally call his pager - 588-8450, and he would call me on my cell phone, 215-704-3768, shortly after. There were also some E-mails.

Shortly before the newspaper article came out, but before he was on paid leave, Daigle called my dorm room number and left a message on the machine for me to call him. That was bizarre, because he never left messages. I paged him, and he called me back. He told me that another officer was being investigated for taking a topless picture during a sting, and he wasn't supposed to. He said that he had made a mistake, like an honest error, by doing that to me. I told him that I wasn't going to get him into trouble.

Brian, the sports editor from the Norwich Bulletin, called me when this all started coming out, and he asked me if it happened to me; I told him no, but asked him to E-mail me the articles. After I read the first article, I paged Daigle that night -- he called me back -- and I asked him what was going on, because he had said it was some other officer being investigated, not him. He said that he was wrong, and that it didn't happen (with the other girl); that they were never in the room alone.

When the 2nd article about the girl being paid the $30 came out, I had called Daigle and read the article to him. He told me that he had to call his attorney.

Early on my winter vacation (I got home on the Decemberv 16th, 2001) I paged Daigle. Peter Camp called me back, and told me that Daigle said that I had paged him, but he couldn't talk to me because of the investigation; that Daigle was going through a lot right now; and that if I ever needed anything, to give him (Peter) a call.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____       Signed _Melanie S. Wilson_____
Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_____This 5th day of Jan,
2002.



# City of Norwich
## Connecticut
## Police Department

Case# 

Date 1/4/02

Time started 11:45pm
Time ended 3:00AM

Statement of      Melanie S. Wilson

I,    Melanie S. Wilson                      date of birth      5/20/82
Of     115 North 32nd St. 317 B-2 Philadelphia, PA  19104
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

I began to get upset over the building stress this was causing me , and called Peter Camp at his house (334-1860) at about 2 Or 3 am and told him that I wanted to talk to Daigle, because the thing in the paper had also happened to me. He said that Daigle turns off his pager and phone. Peter said he would call him first thing in the morning and call me back.

Camp called me around 9am, and told me Daigle was going to New Haven to talk to his attorney. I called again around noon. Around 7pm, I was able to reach Daigle, and I talked to him for about an hour. I was furious at him about the photos. . He said that the photos were not necessarily outside of protocol, but "unneeded," because different situations were handled differently.

Daigle told me he had just learned that this other girl was stalking Peter Camp and that he wouldn't have been in the room alone with her if he had known. He also said, "Do you want the truth? The more I learned about the Internet, the more I realized that the pictures wouldn't be under my control, and I didn't want to hurt you." He said that he felt like an uncle to me, and that he did not tell me the truth because I had felt so proud about helping him with his job. He was crying, and he was talking about his friend having a heart attack, and he felt guilty; he kept saying that he was sorry.

He asked if he could call me the next day, but there has not been any communication between us since. Peter Camp called sometime after Christmas, asking how I was doing. It was a short conversation; I told him I was doing OK.

After the article about the second girl today, I spoke with Brian at about 1:45pm and told him it had happened to me. I packed my stuff, got a train, and came right home. I told my mom what happened, and we came to the police department. The reason that I hadn't mentioned any of this to Deputy Chief Mocek when he called me in Philadelphia was that I was hoping the first girl was not truthful and I was an isolated incident me. I was also concerned about the stress it would bring to my family, my mom in particular.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____    Signed _Melanie S. Wilson_____
Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.
I notarized, endorse here _D/C WX Mpuk_____This _5th_ day of _Jan_,
200🇿

# EXHIBIT G



# City of Norwich
## Connecticut
## Police Department

Case#

Date 01/17/02

Time started 10:26am
Time ended

Statement of        Mark Lounsbury

I,              Mark Lounsbury                    date of birth
Of          Norwich Police Department
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

I have come to the Deputy Chief voluntarily and of my own accord. I am aware, and have been told, that I may have Union representation if I so wish; I decline. Having read the most recent newspaper articles about the Wilson girl and giving her beer, I wanted to present my side of the issue.

Sometime during the underage liquor sales operation where Wilson was the operative, Ladd mentioned to me that he had some beer in his car (a white Chevy Lumina), and asked if I wanted to have some after work. I agreed. During the operation, Ladd, Sully, and I were in an unmarked car, the two Liquor Control people were in their own car, and the Wilson girl and Daigle were in the black Accura. We didn't have any wire for the girl. The Liquor people would go in with her, and if she made a purchase, the Liquor people would immediately make their approach.

We did a number of package stores, and at one point we were waiting for more Liquor agents to arrive. We were waiting in the Foxwoods commuter lot on Route #2, and we were throwing around a small football while we were waiting. I think Sully was just sitting in the car having a cigarette. After they arrived, I remember that we were waiting for it to get later in the evening, and spent some time in the Ten Pin bowling alley lot. Wilson went to Pinstripes, and they wouldn't serve her. I recall that Pinstripes was the only bar or club that we went to.

After Pinstripes we returned to the station, and I completed the report on the operation. I may have started the report earlier, but I finished it when I returned to headquarters that night. I don't recall Wilson being in the office at all while I was doing the report, but I recall Daigle was there. I think he might have already brought her home.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____        Signed _Mla._____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_D/c u/k March_____This_17th_day of _Jan_____,
2002



# City of Norwich
## Connecticut
## Police Department

Case#

Date 01/17/02

Time started 10:26am

Time ended

### Statement of    Mark Lounsbury

I,        Mark Lounsbury                         date of birth
Of        Norwich Police Department

Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

After that, I left the station and drove down to the Connecticut Beverage lot, and met Ladd, who was already there. I don't recall the time. I had my green truck. We were there for somewhere between ten and thirty minutes, I remember playing Elvis on my CD player and Ladd was doing Elvis impressions, when Daigle arrived with Wilson in his Cadillac. During the evening their activity was such that I wasn't surprised that they were there now -- like her hanging on his shoulder, or her making some kind of comment, like flirting. Whatever it was, the thought occurred to me when they arrived that "Oh, he's on a date with her." They were standing at the front of Daigle's car, talking. I didn't see any physical contact, but noted that they appeared to be within each other's personal space.

I said "Hi' to her, and made some small talk about doing a good job. I never offered or gave her a beer, nor did I see anyone else do so. I never saw her with a beer in her hand. I didn't see Daigle with a beer either. Maybe 15-20 minutes later, Ladd packed up and left, and I left right after him. I don't recall what Daigle and Wilson did after that, but I don't remember them looking like they were leaving.

The next week, I was in the Detective Division office, when Daigle told me that Wilson had taken him home. I presumed it had been that night. Daigle had one of our Sony Mavika digital cameras in his hands, and he showed the display to me. On the display was a photo of a pair of women's breasts that nearly filled the

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____        Signed_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _D/c u# Moreh_____        This _17th_ day of _Jan_,
2002



# City of Norwich
## Connecticut
## Police Department

Case#

Date 01/17/02

Time started 10:26am
Time ended    11:52am

Statement of    Mark Lounsbury

I,        Mark Lounsbury                    date of birth
Of        Norwich Police Department

Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

screen. The view was from the shoulders down to just below the breasts. In the background, I saw what looked like a kitchen -- I remember that it was poorly lit, but there were counters or countertops. Daigle told me that the picture was of Wilson, the girl from the underage liquor sales operation the other night. I did not see him ever put a disk into the camera or remove one.

The conversation that went along with that was that she had taken him home, and the picture was at her house. Daigle made mention that she had asked, or had offered, for him to take a picture of his penis on her breasts, but he had declined. He inferred, but didn't specifically say, that they had engaged in sexual relations. He also mentioned that she had asked him to go to her college in Pennsylvania for a weekend.

Sometime around this time frame, I got a page on my Nextel. I wasn't familiar with how to retrieve the information, so I asked Daigle. He took my Nextel, cleared it, told me it was for him, and gave me back the Nextel. For some reason I got the impression it might have been Wilson, so I called her and asked if she had paged me, and she said no.

Daigle has not shown me any other photos of a like nature.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____ _____    Signed _____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _D/c wK March_____ This _17th_ day of _Jan___,
2002

# EXHIBIT H

1

2

3        STATEMENT UNDER OATH OF THERESA EARL

4

5

6

7

8

9        DATE TAKEN:  FEBRUARY 21, 2002

10

11       LOCATION:   TRAYSTMAN, CORIC & KERAMIDAS

12                   45 Channing Street

13                   New London, CT  06320

14

15       TAKEN BY:   DRZISLAV (DADO) CORIC, ESQ.

16

17

18

19

20                                  Reported By:
                                     Susan M. Webb
21                                  Licenced Shorthand Reporter
                                     Licence Number 00313
22

23

24              Shea & Driscoll, LLC
              Court Reporting Associates
25                16 Seabreeze Drive
                Waterford, CT  06385
                  (860) 443-3592