1    It was my senior year and I wasn't doing so well. I

2    needed to focus on my grades and studying.

3        MR. CORIC:  It was sometime in the fall of 2000

4    that Lt. Daigle first approached you about doing some

5    work for the Norwich Police Department?

6        MS. EARL:  He actually approached my mom while I

7    was at college.  He went to my house and he had said

8    that he was interested in having me do some undercover

9    work for him doing some under age liquor stings.  He

10   gave her his business card.  She said she would contact

11   me at school to see if I would be interested.

12       MR. CORIC:  You don't recall exactly when,

13   sometime in the fall; September, October?

14       MS. EARL:  It was probably the end of October,

15   beginning of November.

16       MR. CORIC:  Of 2000?

17       MS. EARL:  Yes.

18       MR. CORIC:  I take it that your mother called you

19   at some point with this information?

20       MS. EARL:  Yes.

21       MR. CORIC:  What did you do after she relayed the

22   information to you?

23       MS. EARL:  I sent him an e-mail saying yes, I

24   would be interested and just to let me know when and to

25   give me an idea of what I would be doing.  He e-mailed

1   me back and said I had to go out to dinner with him

2   first, and that's when he would tell me what would go

3   on.

4        MR. CORIC:  What was your response to that?

5        MS. EARL:  I didn't want to go out to dinner with

6   him so I conveniently made myself unavailable.

7        MR. CORIC:  Did he continue to approach you about

8   doing some work and going out to dinner with him?

9        MS. EARL:  Going out to dinner, yes, but not so

10  much the going to work.

11       MR. CORIC:  When is the next time that he

12  approached you about doing some work as an undercover

13  operative for the Norwich Police Department?

14       MS. EARL:  When I came home from school in May of

15  2001.

16       MR. CORIC:  Can you just tell us what happened at

17  that point?

18       MS. EARL:  He had e-mailed me asking if I was back

19  from school yet.  I said yes, and he wanted to know if

20  I was still interested in doing any of the jobs for the

21  stings.  I said yes, I was.  He said I still have to go

22  out to dinner with him first, and he talked about

23  taking a trip to New York, going to see a show and

24  getting drunk and taking the two o'clock, three o'clock

25  train back home; and I didn't want to do that so I

1    He explained to me he wasn't going to be there for the

2    full portion of it.  He would make sure that I was

3    comfortable with the other officers.  If I wasn't

4    comfortable with them, I didn't have to do it.

5         MR. CORIC:  Why don't you bring us to what

6    happened after you left work when you first got to the

7    Norwich Police Department.

8         MS. EARL:  He was waiting for me outside in his

9    car.

10        MR. CORIC:  Before you go any further, did you

11   drive yourself?

12        MS. EARL:  Yes, I drove myself.

13        MR. CORIC:  Where did you park?

14        MS. EARL:  I parked in the front parking lot next

15   to the police station.

16        MR. CORIC:  As you're facing the police station,

17   the lot on the right, the paved lot on the top of the

18   hill?

19        MS. EARL:  Yes.

20        MR. CORIC:  You got out of your car?

21        MS. EARL:  I got out of my car.  He didn't get out

22   of his car.

23        MR. CORIC:  He was in the car?

24        MS. EARL:  Yes.  He was sitting in his car

25   already.

1      MR. CORIC:  Can you describe the car?

2      MS. EARL:  It was a black Mercedes.  It has a sun

3   roof, leather interior.  I believe the leather interior

4   was gray.  He had unlocked the door for me to get in.

5   I figured we were just going to wait until the other

6   officers were coming.  He said he had to take pictures

7   of me to show I wasn't wearing a microphone or

8   concealing any false identification before we did the

9   sting, and he said he didn't want to do it at the

10   station.  He didn't want the other officers to get the

11   wrong idea about it so he took me to his mistress'

12   house.

13      MR. CORIC:  You knew her?

14      MS. EARL:  I knew her.  I've seen her.  I didn't

15   have a physical relationship.  I didn't hang out with

16   her or anything like that.

17      MR. CORIC:  How is it that you knew who she was?

18      MS. EARL:  She used to come into the Liberty Tree

19   and meet him.

20      MR. CORIC:  He made no secret of the fact he was

21   having a relationship with her?

22      MS. EARL:  No.  When I first saw her, she was

23   coming in and meeting him for lunch.  I thought she was

24   his wife.  Everyone else told me that she wasn't, that

25   she was his mistress.

14

1          MR. CORIC:  What was her name to your knowledge?

2          MS. EARL:  Kate.  I don't know her last name.

3          MR. CORIC:  So then he told you he had to take you

4      to take these pictures.  Why don't you go on from

5      there.

6          MS. EARL:  We went to Kate's place.  He had said

7      it wasn't going to take that long.

8          MR. CORIC:  Where is Kate's place?

9          MS. EARL:  In Norwich, the Thermos apartment

10     buildings.

11         MR. CORIC:  Thermos on the Thames?

12         MS. EARL:  Yes.

13         MR. CORIC:  Had you ever been to that apartment

14     before?

15         MS. EARL:  No.

16         MR. CORIC:  Other than the one time you went back

17     with an attorney from our office to show him which

18     apartment, have you ever been back since?

19         MS. EARL:  No.  We went in.  She had a cat running

20     around there.  It was a little messy.  For the most

21     part it was clean.  We went into the living room area.

22     He told me to take off my clothes, and I thought he

23     meant go down to my underwear.  He told me that I had

24     to take it all off.  I said, Are you sure?  He's like,

25     Yeah.  We need to show that you're not concealing

15

1   anything anywhere.  He took pictures, about six to

2   eight.  He took front and back then he also took

3   pictures when I was allowed to get back dressed.  He

4   took pictures of the outfit that I was wearing.

5       MR. CORIC:  Was anyone else present when these

6   pictures were being taken?

7       MS. EARL:  No.

8       MR. CORIC:  The camera that he used to take the

9   pictures, can you describe the camera?

10      MS. EARL:  It was a digital camera that he said he

11  didn't know how to work it very well.  That's why he

12  had to take so many of the pictures.  He said some of

13  them come out fuzzy sometimes.  It said "Property of

14  Norwich Police Department" on it, one of those sticker

15  kind of things.

16      MR. CORIC:  That was on the camera case?

17      MS. EARL:  It was on the camera and also on the

18  camera case, the carrying case.

19      MR. CORIC:  Do you recall how many -- he used some

20  kind of floppy disks or something in the camera.  Do

21  you recall how many there were?

22      MS. EARL:  Two floppy disks, one for the naked

23  photos.  He also used the other disk for the clothed.

24      MR. CORIC:  What else, if anything, transpired at

25  the apartment?

1   wasn't anything big.  There weren't a lot of people

2   there.

3       MR. CORIC:  It wasn't a baseball game.  It was a

4   concert of some type?

5       MS. EARL:  Yes.  We sat down.  I was looking -- I

6   commented on the view, because I'd never been in the

7   police department before.  It's right by the water.  I

8   was like wow, this is really cool.  You can see all the

9   boats coming in and out.  It looked really pretty.  We

10  were sitting down and he told me that the naked

11  pictures weren't going to be used unless absolutely

12  necessary.  They were just for their protection.  He

13  said that it was a liability thing for them.  That way

14  if they were accused of entrapment, they can prove that

15  they weren't doing anything like that.  He said it was

16  part of protocol to do that.

17      Then we were sitting down and we were just

18  talking.  I was telling him about what had lately gone

19  on in my life and just giving him the update from the

20  last couple of weeks and then he was talking about this

21  murder case that had just recently happened, and he

22  showed me a picture of the suspect and asked if I knew

23  him.  I said no.  The face looked a little familiar,

24  but I didn't have a name to go with the photo.  He was

25  like, okay.  I was just wondering.  This guy we think

1    killed this old man.  He explained the whole thing.

2          He said that the suspect was into child

3    pornography and he said they were going to have to try

4    and get in some way to try to reel him in through that

5    to get him for the murder case.  He asked me if I would

6    ever be interested in taking photos to kind of get to

7    reel the guy in for the murder case.  I said sure,

8    because I didn't think he would ever call me.  Then the

9    other officers came in.

10          MR. CORIC:  When you guys were talking about all

11    these things, there were no other officers present?

12          MS. EARL:  None.  The office was empty.  The other

13    two officers showed up.

14          MR. CORIC:  The office that you were in, can you

15    describe it?  Was it one office with a one desk?  Was

16    there a lot of desks?

17          MS. EARL:  There were a lot of desks.

18          MR. CORIC:  It was a bigger room?

19          MS. EARL:  Yes.  It was a good-sized room.  There

20    were probably six to eight disks in there.  When the

21    other officers arrived, they were both in casual dress.

22          MR. CORIC:  Do you recall their names?

23          MS. EARL:  No.

24          MR. CORIC:  Okay.

25          MS. EARL:  I know one of them was at the same

1   would call me if they needed anything further.  I was

2   like okay, so I went home.

3        MR. CORIC:  Okay.  Did then Lt. Daigle follow up

4   in any way?

5        MS. EARL:  Yes.  He called me the next day to see

6   how everything went.  I told him everything went fine.

7   I was all excited that I got two out of the four.  He

8   was like if we need you again, we'll give you a call.

9   I was like, okay.

10        MR. CORIC:  This was in July of 2001 that that

11   occurred?

12        MS. EARL:  Yes.

13        MR. CORIC:  You're not exactly sure.  It was a

14   Saturday in mid-July?

15        MS. EARL:  Definitely a Saturday sometime in

16   mid-July.

17        MR. CORIC:  When is the next time that Lt. Daigle

18   asked you in his official capacity as a Norwich police

19   officer to do some work for the department?

20        MS. EARL:  He called me again in August.

21        MR. CORIC:  Within a month?

22        MS. EARL:  Yes.

23        MR. CORIC:  Okay.

24        MS. EARL:  He said that he wanted to do the

25   photos, child pornography photos, and he asked me if I

1    was going to be available.  The day that he asked me to

2    do it, I wasn't; and he called me again another day,

3    and I'm not sure exactly what day it was, but it was in

4    the evening.  It was around four, five, maybe six, and

5    he -- it was probably five or six actually, because he

6    was just getting off; and he asked me if I would be

7    able to do it.  I was like I'm already on my way home.

8    I've already passed the police station.  He said we

9    wouldn't be taking them there.  Why don't you meet me

10   in Preston at the firehouse?  I was like, okay.  I'm

11   like, I don't have anything.  I'm just in the work

12   clothes.  He said that's fine.  You don't need

13   anything.  I was like, all right, so I met him about

14   twenty minutes later at the Preston Firehouse.

15        MR. CORIC:  Do you recall what car he was driving

16   at the time?

17        MS. EARL:  He was driving the same car.

18        MR. CORIC:  The Mercedes you described earlier?

19        MS. EARL:  Yes, black Mercedes.  He was like, just

20   follow me.  It's right up the street.  He didn't get

21   out of his car or anything.  We didn't switch cars.  I

22   followed him up.  We drove about a mile and a half, I'd

23   say, maybe two, and we went into this long driveway

24   that was on the right side of the road; and we went up

25   this big hill.

1        MR. CORIC:  Right side of the road since you were

2    coming from the firehouse?

3        MS. EARL:  Yes.

4        MR. CORIC:  Had you been to this location prior to

5    that date?

6        MS. EARL:  Yes.  One of my best friends lives

7    right on that road.

8        MR. CORIC:  On the same road or on the main road?

9        MS. EARL:  On the main road.

10       MR. CORIC:  Which was --

11       MS. EARL:  164, I believe.

12       MR. CORIC:  But the house that he ended up taking

13   you to, had you ever been to that house previously?

14       MS. EARL:  No.

15       MR. CORIC:  Other than the one time that you

16   showed me where it was -- actually, you didn't show me

17   the house.  You just showed me the road that it was on

18   and described the house to me.  Had you ever been back

19   to that house?

20       MS. EARL:  No.

21       MR. CORIC:  Why don't you tell us what happened

22   after you drove to the house.

23       MS. EARL:  When we got to the house, there was

24   some other guy there.  I think he was the one that was

25   actually watching the house.  Jim had said it was a

1    friend of his who lived there and they were out of

2    town, and he comes up and checks on the house every

3    once in a while.  The other person who -- I don't know

4    if he was living in a van, but -- or I don't know the

5    whole exact situation towards that, but Jim knew the

6    guy.

7              MR. CORIC:  Did he stop and talk to the guy?

8              MS. EARL:  Yeah.

9              MR. CORIC:  Was this as you were driving in or

10   after you parked the car?

11             MS. EARL:  We parked the cars.

12             MR. CORIC:  Jim went to the van?

13             MS. EARL:  The guy was coming out of the house and

14   he was going to his van.

15             MR. CORIC:  Do you recall what the guy looked

16   like?

17             MS. EARL:  I remember a tie-dye shirt and I think

18   blond or reddish hair, but it's really a blur.  I don't

19   remember him very well.

20             MR. CORIC:  Do you know if he was younger, older?

21             MS. EARL:  If anything he was anywhere from 20 to

22   30, 35.

23             MR. CORIC:  Jim spoke with him briefly?

24             MS. EARL:  Yes.  Jim said we had to be quiet

25   because the guy was going to take a nap.

1          MR. CORIC:  The guy was heading out into the van

2      to take a nap?

3          MS. EARL:  Mmm-hmm.

4          MR. CORIC:  He lived in the van?

5          MS. EARL:  That's what I'm assuming.  I don't know

6      for sure.  I don't remember.

7          MR. CORIC:  Do you remember seeing that person

8      before or after?

9          MS. EARL:  No.

10         MR. CORIC:  Did you ever go into the house?

11         MS. EARL:  No.

12         MR. CORIC:  What happened after Jim spoke with

13     that individual?

14         MS. EARL:  We walked on a pathway to the pool.

15         MR. CORIC:  By the way, do you recall what the van

16     looked like?

17         MS. EARL:  (Shakes head).

18         MR. CORIC:  No?

19         MS. EARL:  No.  I just remember it was a van.

20         MR. CORIC:  A van with windows like a Volkswagon

21     van or a van with no windows like a panel van or you

22     just don't recall?

23         MS. EARL:  I really don't remember.

24         MR. CORIC:  Now, you were going somewhere?

25         MS. EARL:  We were heading toward the pool on the

1     walkway.  We had to go through the gate to get to the

2     pool.  Then he had me sit on one of the lawn chairs.

3     It was like one of the ones you can have your feet on

4     and lay on it.  He was setting up the camera again.

5          MR. CORIC:  Which camera?

6          MS. EARL:  It was the same digital camera.

7          MR. CORIC:  Did it have the Property of Norwich

8     Police Department --

9          MS. EARL:  Yes.  He told me to take off my

10    jewelry, because he didn't want to have anything that

11    was going to be notable to pick out me on the street or

12    anything like that.  I have a tattoo on my leg and he

13    told me that we had to take pictures so they would

14    never show that.  I also have hip scars.

15         MR. CORIC:  From some surgery?

16         MS. EARL:  From surgery I've had twice.  He said

17    that we wouldn't take pictures on that angle either

18    there on the sides.

19         MR. CORIC:  He told you the reason he didn't want

20    any of these things is so you wouldn't be identifiable?

21         MS. EARL:  Right.

22         MR. CORIC:  Okay.

23         MS. EARL:  Then he said we were going to start off

24    mainly clothed.  I was wearing a little plaid green

25    skirt and I had a white tank top, and he had me take

1   off my bra so it was kind of see through a little bit,

2   but not too much.  He took a couple pictures like that.

3   He had me take off my underwear and like take a couple

4   pictures with me in just like the skirt and the tank

5   top, do a couple poses where you could kind of get the

6   idea that I wasn't wearing anything underneath.

7       He had me take off my shirt and I was just in the

8   skirt.  He took a couple pictures, then he had me do a

9   couple different poses.  Then he had me take off my

10  skirt, then he did a couple poses that way.  He had me

11  put my hand down in the area so that it gave the idea

12  that I was going to be touching myself.  Then we took a

13  couple more pictures.

14      MR. CORIC:  Do you recall approximately how many

15  pictures he took?

16      MS. EARL:  There had to be like fifteen probably,

17  maybe a little bit more.  I don't remember the exact

18  number.

19      MR. CORIC:  But more than just a couple?

20      MS. EARL:  Yeah.

21      MR. CORIC:  Do you recall floppy disks or other

22  storage media he might have used?

23      MS. EARL:  I think it was just one, but I can't be

24  certain honestly.

25      MR. CORIC:  It wasn't like at his girlfriend's

1    house where you noticed he had two there?

2         MS. EARL:  Mmm-hmm.

3         MR. CORIC:  This time you think it was just one?

4         MS. EARL:  I think it was just one.

5         MR. CORIC:  Okay.

6         MS. EARL:  We were talking about -- he was saying

7    that I was turning him on.  At that point I was like I

8    have to go.  He said he was just joking around with me,

9    that he didn't really mean it.  I got back dressed

10   and --

11        MR. CORIC:  Let me ask you a question in terms

12   of -- you've never gone out on a date with Lt. Daigle?

13        MS. EARL:  No.

14        MR. CORIC:  You've never gone out to lunch with

15   him?

16        MS. EARL:  No.

17        MR. CORIC:  You've never gone out to dinner with

18   him?

19        MS. EARL:  No.

20        MR. CORIC:  Have you ever met him at any places to

21   have a drink or coffee or anything?

22        MS. EARL:  Yes.

23        MR. CORIC:  Where have you met him to have a drink

24   of coffee.

25        MS. EARL:  I met him at Bess Eaton in Norwich

1          MR. CORIC:  After he took the pictures at the

2     place in Preston, you went home?

3          MS. EARL:  Yes.

4          MR. CORIC:  Did he subsequent to that contact you

5     about either the pictures that he took there or the

6     ones that he took previously?

7          MS. EARL:  Not until about I'd say November.

8          MR. CORIC:  Of 2001?

9          MS. EARL:  Yes.

10          MR. CORIC:  Between when he took these pictures

11     and you first read in the paper about the other girl

12     who complained about similar behavior, did you have any

13     reason to believe that anything that he had told you

14     wasn't true?

15          MS. EARL:  No.

16          MR. CORIC:  You took him at his word?

17          MS. EARL:  Yes.

18          MR. CORIC:  I take it then in November of 2001 he

19     called you, you said?

20          MS. EARL:  Mmm-hmm.

21          MR. CORIC:  What did he call you about?  What did

22     he say?

23          MS. EARL:  He was calling to tell me someone from

24     the department might be calling me to check up on the

25     photos that were taken and the whole sting that I did

1    for Dodd Stadium, and at that time he told me that he

2    needed to apologize to me, because he wasn't supposed

3    to take the photos and they changed protocol.  They

4    weren't supposed to do that so he asked me that if

5    anyone asked about it that I don't say anything.

6         MR. CORIC:  Do you recall when in November; early

7    November, late November?  Do you recall in relation to

8    Thanksgiving, before or after Thanksgiving?

9         MS. EARL:  It was before Thanksgiving, I believe.

10        MR. CORIC:  Okay.  Just to be clear, he told you

11   if you were contacted by the Norwich Police Department,

12   not to talk about the nude photos that were taken in

13   the Dodd Stadium sting?

14        MS. EARL:  Yes.

15        MR. CORIC:  Did he talk about the other photos at

16   all?

17        MS. EARL:  No.

18        MR. CORIC:  Were you subsequently contacted by

19   anybody from the Norwich Police Department?

20        MS. EARL:  Yes.  They called my mother's house.

21   At that time I had moved out.  They just asked me to

22   call them back, and when I did call them back --

23        MR. CORIC:  Do you recall who it is that you spoke

24   with?

25        MS. EARL:  It was Mocek.

1           MR. CORIC:  Deputy Chief Mocek?

2           MS. EARL:  Deputy Chief Mocek.

3           MR. CORIC:  M-O-C-E-K?

4           MS. EARL:  I don't know the spelling of it.  He

5       had given me a cell phone number.  He had given my

6       mother a cell phone number for me to call and also the

7       office phone number, but I wasn't able to get a hold of

8       him and then I just kind of blew it off.  Then I read

9       the article in the paper then and I called Jim.

10          MR. CORIC:  He had called you prior to the article

11      being in the paper?

12          MS. EARL:  Yes.

13          MR. CORIC:  How soon after your conversation with

14      him, if you recall, did you call him?  Did you see the

15      article in the paper?

16          MS. EARL:  It was probably two, three weeks after

17      that I saw the article.

18          MR. CORIC:  Okay.  You called him?

19          MS. EARL:  I called him.  I was really upset.  I

20      wanted to know if that had really happened and if he

21      had done the same thing to me basically, and he told me

22      that he was under the impression that it was part of

23      protocol; and he said that basically what was in the

24      paper was true.  He then went on to tell me that the

25      other pictures, the child pornography pictures that I

1    had taken, he used them for another case and was able

2    to get this other person, but he made no comment about

3    the murder case as to whether or not he used them for

4    that.   Then he asked me if everything was all right.   I

5    was in shock, and I just didn't know whether or not to

6    believe him anymore.

7        MR. CORIC:   When he said he used them in another

8    case, I take it initially he told you he was going to

9    use them to catch somebody who was involved in a murder

10   investigation who was into child pornography?

11       MS. EARL:   Yes.

12       MR. CORIC:   He said he actually ended up catching

13   a different child pornographer with those pictures, not

14   this person?

15       MS. EARL:   Correct.

16       MR. CORIC:   Subsequent to this telephone

17   conversation -- the first one he initiated then you

18   initiated after reading in the paper -- did you have

19   any other contact with him --

20       MS. EARL:   No.

21       MR. CORIC:   -- after that?

22       MS. EARL:   No.

23       MR. CORIC:   Since that time you've had no contact

24   with him?

25       MS. EARL:   No.

```
 1   STATE OF CONNECTICUT  )
                           )  ss.
 2   COUNTY OF NEW LONDON  )

 3

 4              I, Susan M. Webb, a Notary Public duly

 5   commissioned and qualified within and for the State of

 6   Connecticut, do hereby certify that I took a statement under

 7   oath of THERESA A. EARL on the 21st day of February, 2002, at

 8   the law offices of Traystman, Coric and Keramidas, 45 Channing

 9   Street, New London, Connecticut, commencing at 4:34 p.m.

10              I further certify that Theresa Earl was by me duly

11   sworn to testify to the truth, and that the following statement

12   was taken by me stenographically and thereafter reduced to

13   writing under my supervision.

14              I further certify that I am not an attorney,

15   relative, or employee of any party hereto nor otherwise

16   interested in the event of this cause.

17              In witness whereof, I have hereunto set my hand

18   and affixed my seal this 23rd day of February, 2002.

19                            Susan M Webb

20                                 Susan M. Webb
                                   Notary Public
21
     My Commission Expires August 30, 2003
22

23

24

25
```



# City of Norwich
## Connecticut
## Police Department

Case#

Date 12/13/01

Time started *11:10A*

Time ended

### Statement of        Mark Lounsbury

I,      Mark Lounsbury                                    date of birth

Of      Norwich Police Department, 70 Thames Street, Norwich, CT

Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

On Thursday, December, 13, 2001, I spoke with Deputy Chief Warren Mocek regarding an investigation he is conducting. I am doing so voluntarily, and have not been ordered or directed to do so. My intention is to provide correct information to refute the account appearing in today's paper.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness _____        Signed _____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _____ This *13th* day of *Dec.*, 2001



# City of Norwich
## Connecticut
## Police Department

Case#

Date 12/13/01

Time started 11:20am
Time ended

Statement of      Mark Lounsbury

I,          Mark Lounsbury                    date of birth 03/13/61
Of          Norwich Police Department, 70 Thames Street, Norwich, CT
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

On Friday, November 30, 2001, sometime during the day, Lt. Daigle was talking about doing a liquor sales compliance operation that night. I told him that I had worked enough overtime that week--I wanted some family time--so I didn't want to go, but he kept coaxing, "It'll be easy money," so I finally said yes. During the early evening, I was cleaning out my old desk, and moving into my new one at the Crime Prevention spot, and doing a number of other things. Sometime around 6pm, I noticed the girl (Kristin) sitting in the chair at Lt. Daigle's desk. I recognized her and said "Hi," with some small talk. I went back to my desk and continued to work.

I happened to look up, and saw her sitting near Daigle's desk alone. Daigle came back, and was talking with Kristen, then he told me to make a list of stores. I stopped what I was doing and started on the list. While I was getting the list together, Daigle told me that we had to get going, and to "Go and get Al [Costa]". While he said that, he and Kristen were heading out of the office towards the conference room hallway. I was maybe 10 feet behind them. My impression is that he was going to wire the girl in the conference room, but I don't recall anything being done or said specifically. I went into the Juvenile office and told Al Costa, who was on the telephone, that the Lt. wanted him in the briefing room. He made some comment like "What for'" and I said, "We gotta get going." I left Juvenile and went back to my desk. Al was still on the telephone as I left his room.

I went back to my desk and completed the list of liquor establishments, and printed it out on the office printer. I took that to the hall copy machine and made copies. I came back in the office, and noted Kristen and Daigle standing in the Narcotics cubicle. I stapled up the pages of the list, went over to Narcotics, and showed Daigle the list. I think Rankowitz was there with Daigle. They were

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____          Signed_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_____This 13th day of Dec,
2001



# City of Norwich
## Connecticut
## Police Department

Case#

Date 12/13/01

Time started 11:20am
Time ended

Statement of    Mark Lounsbury

I,    Mark Lounsbury    date of birth 03/13/61
Of    Norwich Police Department, 70 Thames Street, Norwich, CT
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

fumbling with the transmitter, which I saw on Kristen's back at the small of her back, tucked in at her waistline. I went back to my desk, and saw the digital camera with a couple of disks near it on top of the filing cabinet near Daigle's desk. I had been assigned as case officer, so I wanted to get the disk with the pre- photos on it so it would not get lost. There was a blank disk in the camera. I took another disk and put it in, and it was blank also. As I was putting the third disk into the camera, Daigle made some comment about "Needing to take her picture again, it didn't come out," or something like that. While he was talking, I looked at the third disk--it was blank--so I gave him the camera. I didn't see him take her pictures, but Daigle later gave me a labeled disk with Kristen's photos and one of her ID on it.

I gave the list to Al, who numbered the stores in the order in which we were to go to them. Lt. Daigle assigned me to the van with him, and Kristen; and he assigned Al Costa, Smith, and Dolan to an unmarked car. At some point prior to this, I told Al that I was going to pick up some beer for myself after work, because I had none at home and hadn't planned on working. Al gave me $7 and asked me to get him a six-pack of Coors Lite.

We left the station, went to the Dairy Queen drive-thru (I didn't get anything) and then to the first store at Yantic Street. Then we went to the Falls Spirit Shop across from Indian Leap Café. Before Kristen went in, I entered the package store, and bought a six pack of Coors Lite for Al, and a 12-pack of Michelobe for myself. I went back to the van, and put the beer on the floor right behind the driver's seat. Kristen was sitting behind Daigle, who was in the front passenger seat.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____    Signed_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_____    This _13th_ day of _Dec_,
2001



# City of Norwich
## Connecticut
## Police Department

Case#

Date 12/13/01

Time started 11:20am

Time ended

Statement of        Mark Lounsbury

I,        Mark Lounsbury        date of birth 03/13/61
Of        Norwich Police Department, 70 Thames Street, Norwich, CT

Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

Kristen then went into the Falls Spirit Shop, and came back out. We went to Universal Package Store, she went in and came out. While we were heading to the Wine Rack on West Thames, Lt. Daigle spoke with HQ about a car-jacking incident. He then called Al and told him to drop Dolan at HQ so he could go to the hospital and investigate the car jacking case. I parked across the street from the Wine Rack, waiting for Al. Lt. Daigle was talking to Kristen about her work, school, etc. At some point, he said to her, "Do you drink beer?" She said she didn't; that it tasted awful; she just drank mixed drinks. Daigle said either "You don't want a beer," or, "So, you don't want a beer?" I spoke up and told Daigle "She said she doesn't like beer, she just drinks mixed drinks."

Lt. Daigle handed me one of Al's Coors Lites, saying, "You want a beer?" I told him "That's Al's beer" and gave it back to him. Daigle took the Michelobe pack out, and undid the package. I pulled a beer out, opened it, and drank it. Lt. Daigle also drank one beer--I believe it was one of Al's Coors.

Al eventually showed up, and we did the Wine Rack. After that, I drove over to Charles Toyota where Al was, and pulled up alongside of his car. Daigle handed me one of Al's Coors, saying "Here Al." I handed it to Al. Al said, "What am I going to do with this?" I don't remember what Daigle replied. He then asked Smith if he wanted a beer, and Smith said no, that he had quit drinking.

After that, we finished up the operation, going to the rest of the locations on the list. We went to the Backus Hospital, because Lt. Daigle wanted to check on Dolan and his investigation. He and I went in while Kristen stayed in the van. We then came back to HQ, in the lower lot, where I put all of the beer in my truck. I parked the van, and we all came upstairs into the office. I got the keys to an unmarked, a notebook, and went back to Backus Hospital to help Dolan with the car jacking investigation.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____        Signed_____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here_____This_____day of_____,
2001



# City of Norwich
## Connecticut
## Police Department

Case#

Date 12/13/01

Time started 11:20am
Time ended *12:55p*

Statement of        Mark Lounsbury

I,            Mark Lounsbury                        date of birth 03/13/61
Of           Norwich Police Department, 70 Thames Street, Norwich, CT
Make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true and which is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.


I came back to the station around 11pm or a little after. Lt. Daigle was there, Kristen was gone. Al was there, and I told him his beer was in my truck. He asked me to meet him in the top lot, so I did, and gave him his Coors, and a couple bottles of Michelobe. Then I went home.

I later told my Sergeant (Bakoulis) what had happened. He advised Lt. Ward, who I also told, and at that point, we contacted the Deputy Chief. I have given this statement freely, and have declined the offer of having a union representative present.


By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness_____        Signed _____

Personally appeared the signer of the forgoing statement and made oath before me to the truth of the matters contained therein.

I notarized, endorse here _____ This _____ day of _____,
2001

# EXHIBIT I

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * *

KRISTEN EICHORSZT,                          *
                    Plaintiff
                                            *     CASE NUMBER
                    VS                            3:02CV1350 (CFD)
                                            *
JAMES F. DAIGLE JR., ET AL,                       JUNE 22, 2006
                    Defendants              *

* * * * * * * * * * * * * * *     VOLUME I

DEPOSITION OF MARK LOUNSBURY

A P P E A R A N C E S:

REPRESENTING THE PLAINTIFF:

          THE   GALLAGHER LAW FIRM
          BY:   BARBARA L. COX, ATTY AT LAW
          1377 Boulevard
          New Haven, Connecticut 06511

REPRESENTING THE DEFENDANTS, MARK LOUNSBURY,
LOUIS J. FUSARO AND THE CITY OF NORWICH:

          HOWD & LUDORF
          BY:   BEATRICE S. JORDON, ESQ.
          65 Wethersfield Avenue
          Hartford, Connecticut 06114

REPRESENTING THE DEFENDANT, JAMES F. DAIGLE JR.:

          HALLORAN & SAGE.
          BY:   ERIC P. DAIGLE, ESQ.
          225 Asylum Street
          Hartford, Connecticut  06103-4303

JOAN E. PAGLIUCO
Court Reporter   (203) 929-0200   Notary Public

2

1

2

3

4

5

6          Deposition of MARK LOUNSBURY, taken on

7    behalf of the Plaintiff in the above-entitled

8    cause, wherein KRISTEN EICHORSZT is Plaintiff,

9    and JAMES F. DAIGLE JR., ET AL, are Defendants,

10   pending in the United States District Court for

11   the District of Connecticut, pursuant to Notice,

12   in accordance with the Federal Rules of Civil

13   Procedure, for the purposes of discovery and/or

14   use at trial, before Joan E. Pagliuco, a Notary

15   Public in and for the State of Connecticut,

16   County of Fairfield, at the law offices of The

17   Gallagher Law Firm, 1377 Boulevard, New Haven,

18   Connecticut on June 22, 2006, at 1:00 p.m., at

19   which time counsel appeared as hereinbefore set

20   forth.

21

22

23

1  last conversation with him.

2       Q.   What was the apology?

3       A.   I believe that he had, you know, pretty

4  much betrayed my trust.  He's my supervisor and

5  friend.

6       Q.   But what specifically was he

7  apologizing for?

8       A.   He didn't state specifically I

9  apologize for A, B or C.  He just said, "I'm

10 calling to apologize, to say I'm sorry."

11      Q.   And what did you understand him to be

12 apologizing for?

13      A.   For placing me in that position.

14      Q.   Okay.  By handing you a beer?

15      A.   By placing me in the position which led

16 up to handing me a beer and for -- possibly for

17 requesting that I purger myself in the

18 investigation.

19      Q.   Has Mr. Daigle ever shown you

20 photographs of women before?

21      A.   Yes.

22      Q.   Okay.  How many times?

23      A.   Once.