28

1          Q.    And can you describe what he showed
2     you?
3          A.    Showed me a digital photograph -- not a
4     photograph, a digital image of a woman's
5     midsection from neck to abdomen.
6          Q.    So basically from the front?
7          A.    Yes.
8          Q.    So he showed you a photograph of a
9     woman's breasts; correct?
10         A.    Yes.  Nude.
11         Q.    I'm sorry, what did you say?  I
12     couldn't hear you.
13         A.    Nude.
14         Q.    Okay.  Do you know who that woman was?
15         A.    I don't know.
16         Q.    Did Mr. Daigle tell you who the woman
17     was?
18         A.    He alluded.
19         Q.    Okay.  Who did he suggest the
20     photograph was or the image was?
21         A.    Miss Wilson.
22         Q.    And can you describe the circumstances
23     how he came to show you this image on the camera?

29

1          A.    I believe we were in the office and he

2     just walked over to me and/or said, "take a look

3     at this," showed me the picture and explained to

4     me that, you know, they were dating.

5               She wanted him to come and visit him --

6     visit her at her school in Pennsylvania, and I

7     believe he also discussed, you know, they had a

8     man-woman interaction that night at the time this

9     photograph was taken.

10         Q.    Did he tell you why the photograph came

11    to be taken?

12         A.    Part of sexual foreplay is my

13    impression.

14         Q.    And that's the only photograph of a

15    woman that Mr. Daigle has ever shown you?

16         A.    Yes.

17         Q.    Did Mr. Daigle ever tell you about

18    putting together a calendar of photographs of

19    women?

20         A.    No.

21         Q.    How often did you see Mr. Daigle at

22    work?

23         A.    Every day.

                                                    30

1          Q.    Did you tend to work Monday through

2     Friday?

3          A.    Customary Monday through Friday 8:00 to

4     4:00.

5          Q.    And did Mr. Daigle work the same shift

6     as you?

7          A.    Yes.   He was my immediate supervisor.

8          Q.    Okay.   And who was his supervisor, if

9     you know?

10         A.    That was then Lieutenant Franklin Ward.

11         Q.    The image on the digital camera that

12    Mr. Daigle showed you was of a volunteer

13    undercover operative; was it not?

14         A.    That's my understanding, yes, that's

15    what I was looking at.

16         Q.    Okay.   Did you ever report that, seeing

17    that digital image on a camera, to any member of

18    the police force?

19         A.    No.

20         Q.    How many sting operations involving

21    sales of alcohol to minors have you participated

22    in?

23         A.    Two that I -- two that I'm aware of,

1   that I can remember.

2      Q.   Okay.  And what was the first one?

3      A.   First one was the one utilizing Miss

4   Wilson as the volunteer.

5      Q.   Okay.  And what was your role in that

6   sting operation?  You understand what I mean by

7   "sting operation"?

8      A.   Yeah.  I watch T.V.

9      Q.   Okay.  It's just easier to say, isn't

10   it?  What was your role in that operation?

11      A.   I was the case officer.

12      Q.   Okay.  As the case officer, what were

13   your duties?

14      A.   I'm required to file the report as to

15   the outcome.

16      Q.   Okay.  Anything else that a case

17   officer is required to do?

18      A.   Prepare for the operation.

19      Q.   Prepare for the operation?

20      A.   Prepare for the operation.

21      Q.   And what did you have to do to prepare

22   for the operation?

23      A.   I have to create a list of the liquor

32

1    establishments in our jurisdiction, organize them

2    for visits and collect data on the volunteer.

3        Q.    What do you mean by "data on the

4    volunteer"?

5        A.    Name, date of birth, residence,

6    photograph of their driver's license, photograph

7    of them as they appear during the event.

8        Q.    Did you take the photographs of Miss

9    Wilson?

10        A.    No.

11        Q.    So I guess maybe I didn't understand

12    you.  You're required to collect the data but not

13    necessarily create it, so that --

14        A.    Just collect, put it together.

15        Q.    Okay.  So that doesn't mean that you

16    are necessarily involved in actually taking the

17    photograph, for example?

18        A.    No.

19        Q.    Okay.  Do you know how Miss Wilson came

20    to be selected as a volunteer?

21        A.    I believe she was a friend of another

22    officer, who told Mr. Daigle -- Sergeant Daigle

23    that she was willing to volunteer to assist the

33

1    sting.

2         Q.    Who was that officer?

3         A.    That was Peter Camp.

4         Q.    Do you know where Melany Wilson lived

5    at the time that she participated in the

6    operation?

7         A.    At the time I must have had it in the

8    information.

9         Q.    As you sit here today, you don't

10   recall?

11        A.    No.

12        Q.    Did you get any training in conducting

13   these sting operations?

14        A.    No, none.

15        Q.    And in terms of your assignment, who

16   did you receive your instructions from with

17   respect to the operation involving Melany Wilson?

18        A.    It would have been Sergeant Daigle,

19   Lieutenant Daigle.

20        Q.    Was he in charge of that operation?

21        A.    Yes.

22        Q.    Now, the second sting operation, was

23   that the one involving Kristen Eichorszt as the

34

1    volunteer?

2        A.    Yes.

3        Q.    And do you remember when that took

4    place?

5        A.    That would have been November of 2001.

6        Q.    And when were you assigned to

7    participate in this operation?

8        A.    At the time I was getting ready to go

9    home.  It was 4:00 o'clock in the afternoon.  I

10   was told you were working it.

11       Q.    You were told you were working that

12   evening?

13       A.    Yes.

14       Q.    And who assigned you to that operation?

15       A.    Lieutenant Daigle.

16       Q.    Okay.  So I take it you were already at

17   work?

18       A.    It was the end of the day.  Yes.

19       Q.    And was this the first time you had

20   heard that there was going to be an underage

21   alcohol operation conducted?

22       A.    I had heard unsubstantiated rumors,

23   which I didn't believe.  There was no time --

1    there was no organization or anything, just

2    possibly this might occur tonight.

3        Q.    When did you hear those rumors?

4        A.    Sometime during that day.

5        Q.    So during the same day?

6        A.    During the same day.

7        Q.    Who was in charge of that operation?

8        A.    Lieutenant Daigle.

9        Q.    Do you know if anyone -- any of his

10    superiors was involved in the discussion or

11    assignment of that operation?

12        A.    No.

13        Q.    As far as you know, who decided to

14    conduct the operation?

15        A.    Lieutenant Daigle.

16        Q.    What were your duties with respect to

17    the operation that took place on November 30th

18    2001?

19        A.    I was assigned to be a case officer.

20        Q.    Okay.  And did you have the same duties

21    as the previous underage sting operation?

22        A.    Yes.  Same thing.

23        Q.    Okay.  So I take it you came up with a

36

1    list of establishments to be visited?

2        A.    Yes.

3        Q.    Okay.  Prior to the operation, what

4    were you told the purpose was of this

5    investigation?

6        A.    Purpose?  Could you rephrase that?

7        Q.    Okay.  What types of establishments

8    were you going to be visiting?

9        A.    Package stores.

10        Q.    Was there any plan to visit any bars?

11        A.    No.

12        Q.    Okay.  And do you know why not?

13        A.    No.

14        Q.    Just to back up a minute, the operation

15    involving Miss Wilson did involve going to at

16    least one bar; didn't it?

17        A.    Yes.

18        Q.    Did you have any question about why

19    this operation involving Kristen Eichorszt was

20    different?

21        A.    Personally?

22        Q.    Yes.

23        A.    Yes.

37

1          Q.    Did you ask anyone why?

2          A.    No.

3          Q.    All right.  What was your question?

4          A.    My question, the purpose of -- what is

5     the purpose of this, to myself.

6          Q.    Were you concerned that there wasn't a

7     legitimate police purpose in this investigation?

8          A.    Could you rephrase that.

9          Q.    What did you think Mr. Daigle's purpose

10    was in conducting the investigation?

11         A.    To make money.

12         Q.    How would he make any more or less

13    money conducting an underage alcohol

14    investigation?

15         A.    The investigation will be conducted in

16    overtime, which you have your -- you were paid

17    hourly, so after you worked eight hours you're

18    now working whatever number of hours being made

19    at overtime, which is time and a half.

20         Q.    And was that overtime for Mr. Daigle as

21    well as yourself?

22         A.    Yes.

23         Q.    Did you think he had any other purpose

38

1    in calling for this operation?

2        A.    No.

3        Q.    Were you involved at all in the

4    selection of Kristen Eichorszt as the volunteer

5    operative?

6        A.    No.

7        Q.    When did you learn that she was going

8    to be the volunteer on this particular operation?

9        A.    I recall it would have been

10   approximately 4:00, 4:30 when I was advised that

11   I was working.

12       Q.    Did you know who Kristen Eichorszt was?

13       A.    Yes.

14       Q.    How did you know her?

15       A.    I know her father.  I worked original

16   safe neighborhoods patrol in the area where his

17   restaurant was located and I knew her there.  I

18   think she was fourteen or fifteen at the time she

19   worked there.  She used to work there.

20       Q.    So you knew her through the Dairy

21   Queen?

22       A.    Yeah.

23       Q.    And did you eat at the Dairy Queen?

45

1  ours, and I went through his doorway and he was

2  in his office sitting on his phone -- sitting at

3  his desk talking on his phone.  And I advised him

4  that the lieutenant wanted him in the conference

5  room.

6           And he said, "Why?"  Or "what for?"

7           And I said, "I don't know.  We got to

8  get going."

9           And I went back to the office back to

10 my desk.

11      Q.   Did you have any thoughts or concerns

12 about how Kristen Eichorszt was going to be

13 monitored using this mike?

14      A.   Not at that time, no.

15      Q.   Was there any woman, to your knowledge,

16 summoned to help put the microphone on Miss

17 Eichorszt?

18      A.   No.

19      Q.   Is that part of your police training?

20 Are you taught that if you are going to wire a

21 female, you should use another woman to at least

22 assist?

23      A.   It's not a matter of wiring.  It's a

46

1    matter of what you're doing.

2            If you are going to put -- if you are

3    going to put a wrist watch thing on somebody, you

4    don't need monitoring.

5            If you are going to put a wire on

6    somebody's collar, you don't need monitoring.

7        Q.   Okay.

8        A.   You use common sense.

9        Q.   Okay.  But my question is in your

10   training, have those issues ever been a part of

11   your training?

12       A.   Yes.

13       Q.   Okay.  And what part of your training

14   did those issues arise from?

15       A.   From patrol, searching females, female

16   suspects.

17       Q.   And if you are going to put a body wire

18   on somebody and that person is a woman, did you

19   ever get any instruction about who or how that

20   body mike should be attached?

21       A.   No.

22       Q.   Okay.  So when you discussed the female

23   suspects, you did get training about how to

50

1    on the disc.

2         Q.   Okay.

3         A.   Turned it off, took the disk out, put

4    it down.   There were two other disks.   Picked up

5    the second disk, put it in, turned it on.   There

6    was nothing on it.   Turned it off, took that one

7    out, put the third one in.

8              Lieutenant Daigle approached me and I

9    said, "I'm looking for the disk with the

10   camera" -- I mean "I'm looking in the camera for

11   the disk with the pictures for my case."

12             Turned the camera on.   There's nothing

13   on the third disk.   He -- my recollection is he

14   stated the picture didn't come out.   So, since I

15   was holding the camera with a blank disk in it, I

16   handed it to him and said, you know, "get the

17   pictures."

18        Q.   Okay.   And did you then see him take

19   pictures?

20        A.   No.

21        Q.   Okay.   Did Lieutenant Daigle say

22   anything to you about the camera needing a new

23   battery?

57

1  police vehicle was?

2      A.    Unmarked police unit would have been a

3  Ford Crown Victoria.

4      Q.    Okay.  And who was in the minivan?

5      A.    Myself, Lieutenant Daigle and Miss

6  Eichorszt.

7      Q.    And where were you sitting?

8      A.    I was driving.

9      Q.    Okay.  Where was Lieutenant Daigle

10  sitting?

11      A.    He was seated next to me in the front

12  seat.

13      Q.    And where was Miss Eichorszt?

14      A.    She was in the bench seat behind the

15  two of us.

16      Q.    Was she behind -- was she between the

17  two of you or was she behind either you or

18  Lieutenant Daigle?

19      A.    I believe she was more towards

20  Lieutenant Daigle's side at the time I saw her.

21      Q.    Okay.  And could you hear everything

22  that Miss Eichorszt said that evening as she was

23  sitting in the back of the van?

89

1    attempt to purchase.

2         Q.    Okay.  If I could show you, it says

3    that the operation was to determine whether or

4    not permit premises were in violation of

5    Connecticut Liquor Commission regulations

6    regarding the sale of liquor to minors.

7         A.    That was my understanding.

8         Q.    And Miss Eichorszt was instructed to go

9    in and attempt to purchase alcohol; correct?

10        A.    No.

11        Q.    She wasn't?  What was she instructed to

12   do?

13        A.    She was instructed to go into the

14   establishment, bring an item of liquor to the

15   counter and then depending on what --

16   irregardless of what cashier did, if the cashier

17   requested identity she would say, "oh, I'll be

18   right back.  It's in the car."

19             If the cashier were to bring up the

20   money, she was to say, "oh, I forgot my money.

21   I'm going to go get it out of my car."

22             So she was not under any circumstances

23   to be walking out of the establishment with the

90

1  liquor.

2       Q.   Okay.  So she was told to back out of

3  any transaction that would involve her purchasing

4  alcohol --

5       A.   Exactly.

6       Q.   -- correct?  What was the point of

7  that?

8       A.   I don't know.

9       Q.   Were you involved in the discussion of

10 the instructions to her?

11      A.   No.  Well, I -- no, I wasn't involved

12 in it, no.

13      Q.   Who decided how this operation was to

14 be conducted?

15      A.   Lieutenant Daigle.

16      Q.   Okay.  So it was Lieutenant Daigle's

17 decision to tell Miss Eichorszt to go in and

18 bring beer to the counter, but if the clerk

19 appeared willing to go forward with allowing her

20 to purchase it, she was to walk out?

21      A.   Yes.

22      Q.   And what was your understanding, what

23 information were you going to learn by having her

1        A.    No.

2        Q.    Did Lieutenant Daigle ever explain what

3   the purpose was of going in and having Miss

4   Eichorszt attempt to purchase liquor but leave

5   before she could actually purchase liquor in

6   those establishments that were going to sell to

7   her?

8        A.    No, he didn't explain it.

9        Q.    He didn't explain it to you?

10        A.    No.

11        Q.    Do you know if he met with any other

12   superior officer in the police department

13   concerning this sting operation?

14        A.    No.

15        Q.    Going back to your report, it says

16   "supervisor approving, Franklin J. Ward."  What

17   role did Lieutenant Ward have in this operation?

18        A.    None.

19        Q.    Why did you put that he was the

20   supervisor approving?

21        A.    Because as the head of the division, he

22   approves all activities, paperwork, brought sworn

23   statements to in that division.

93

1          Q.    Did you list him as the supervisor

2     approving because he would have to look at this

3     report?

4          A.    Yes.

5          Q.    How about reviewer Stephanie Bakoulis?

6          A.    Stefany Bakoulis.

7          Q.    Okay.

8          A.    That's a typographical error.

9                Okay.  He was the prior sergeant in the

10    detective division, and I used a previous report.

11    Apparently I didn't change that on those pages.

12    I didn't realize it.  Kind of used the same --

13    these forms are like -- you create room for so

14    many things.  So I just use the same ones over

15    and over again, some information that's

16    pertinent.

17               So this was an original, another form,

18    and I just put in the relationship to this

19    particular case and didn't change the reviewer

20    information.  It was not Stefany Bakoulis.

21         Q.    Okay.  Who was the reviewer, if you

22    recall?

23         A.    That was Lieutenant Daigle.

102

1      Q.    It doesn't?  You don't remember reading

2    that?

3      A.    I blocked it out.

4      Q.    What is the purpose of taking the

5    pre-photo, as I think you called it in your

6    statement?

7      A.    In the report?

8      Q.    Yes.

9      A.    My understanding is that it's to

10   present the underaged person as they are.

11     Q.    To --

12     A.    Their appearance.

13     Q.    To record what they looked like that

14   night?

15     A.    The appearance, yes.

16     Q.    Is that to protect the investigation

17   from a suggestion that you got somebody that

18   really looked much older?

19     A.    It's to be fair.

20     Q.    No other reason?

21     A.    None that I am aware of.

22     Q.    Have you had experience in conducting

23   any kind of investigations that involve an

# EXHIBIT J

1

<u>C O N F I D E N T I A L   I N T E R V I E W</u>

2

<u>N O R W I C H   P O L I C E   D E P A R T M E N T</u>

3

4

5

6

<u>INTERVIEW OF:  LT. FRANKLIN WARD</u>

7

8

9

HELD AT:   Norwich Police Department

10
              70 Thames Street
              Norwich, CT  06360

11

12

CONDUCTED ON:  MARCH 27, 2002

13

CONDUCTED BY:  DEPUTY CHIEF WARREN MOCEK

14

15

16

17

18

19

COPY                          Reported By:
                              Susan M. Webb

20
                              Licensed Shorthand Reporter
                              License Number 00313

21

22

23

24
                  Shea & Driscoll, LLC
                Court Reporting Associates

25
                  16 Seabreeze Drive
                  Waterford, CT  06385

1    operation.  It might have been as early as two weeks

2    before.  We had been planning to do some type of

3    enforcement activity over the Christmas holiday time

4    period, and prior to that we had wanted to do a

5    compliance check to see what the level of compliance

6    was within the city.  That's when the subject was first

7    brought up about doing this type of operation, either

8    one or two weeks before it actually happened.

9         MOCEK:  I'd like to show you the Norwich Police

10   Department incident report for that underage drinking

11   compliance operation on November 30th, 2001, case

12   number 01-34728.

13        WARD:  I am familiar with it.

14        MOCEK:  Okay.  That report lists the date and time

15   occurred as 6 to 8 p.m. on November 30th, 2001.  Were

16   you there for that operation?

17        WARD:  No, I was not.

18        MOCEK:  Why not?

19        WARD:  I was there prior to the operation, went

20   over some things with Sgt. Daigle, just the basics,

21   what the plan of operation was, what was going to

22   occur, what was going to be done, and once that was all

23   established I left.  The main reason I was not there

24   was because two supervisors were not needed to

25   supervise the operation, and he had received training

1    in such type of operations, where I had not.

2        MOCEK:  Did you also have -- you were called in in

3    the early hours of the previous morning?

4        WARD:  Yes.  That was also a contributing factor.

5    I had been called in -- I forget the time -- but

6    probably 10 p.m. the previous morning and stayed until

7    approximately 2 a.m. that morning of November 30th and

8    so, therefore, I was also tired from that previous

9    operation.

10       MOCEK:  I'd like to show you an overtime slip

11   which bears your name and the case number 01-34638.

12   Assignment is listed as burglary investigation, date

13   worked 11-30-01, and the time is written from 4 p.m. to

14   8 p.m. for a total of four hours; and it has been

15   corrected from 4 to 6 p.m. for a total of two hours.

16   Would you take a look at that overtime slip, please?

17       WARD:  Okay.

18       MOCEK:  Did you submit that overtime slip?

19       WARD:  No, I did not.

20       MOCEK:  Is that your handwriting?

21       WARD:  No, it's not.

22       MOCEK:  Do you recognize the handwriting?

23       WARD:  It looks like Sgt. Daigle's handwriting.

24       MOCEK:  The overtime slip is signed in the

25   supervisor spot?

1   Statewide Narcotic Tasks Force, the only type of

2   transmitter available was a body style mike.  The

3   pagers and watches and all the other things they have

4   available now were not available back then.

5       The typical scenario as far as when an informant

6   was going to be what we called wired, usually for

7   safety purposes, would be to -- this would be a male

8   informant -- have the male informant remove their

9   shirt, and the body microphone would be taped around

10  their waist, the radio pack of it, with the microphone

11  and antenna being taped in the shoulder or chest area

12  usually around the back and taped onto the shoulder,

13  and the shirt would be put on.

14      MOCEK:  Have you ever had occasion to use a body

15  microphone on a female confidential informant?

16      WARD:  Personally, no.  Whenever there's a female

17  confidential informant that for whatever reason is

18  going to be wired, outfitted with a body mike, then a

19  female would perform that task, a female officer would

20  perform that task.

21      MOCEK:  If a female officer were not available,

22  what other options would be available?

23      WARD:  I have not run into that situation

24  personally, but if it did happen, I would just hand the

25  body microphone to the female informant with the tape

1    and explain the process as to how it should be placed

2    on, and then I would have them go into a secure room

3    and have them do it and test it when they came out to

4    make sure that it was working properly.

5        I was going to just add that these types of

6    operations that we did were all prescheduled so it

7    wasn't -- I don't believe it was ever an issue where

8    that had to happen, because since they were

9    prescheduled and we knew we were going to be working

10   with a female who was going to be wired, we would make

11   arrangements to have a female officer there to ensure

12   that she did the wiring of the informant.

13       MOCEK:  Would there be any occasion or reason that

14   you could think of that would necessitate a male

15   officer putting a body wire on a female informant?

16       WARD:  I cannot think of any circumstance that

17   would -- where that would have to be done.

18       MOCEK:  If a female informant were to say okay,

19   I'll wear a body wire; come on in and I'll take my

20   shirt off, what would be your response?

21       WARD:  My answer obviously would be no.  It's just

22   a common sense issue that there's some things that you

23   just don't do as a police officer, and one of them

24   would be to perform -- you can't do a strip search on a

25   member of the opposite sex with or without their

18

1    permission.

2        MOCEK:  As supervisor of the detective division,

3    you control the special investigations fund.  Is that

4    correct?

5        WARD:  That is correct.

6        MOCEK:  What was the normal procedure in place on

7    November 30th, 2001 for the special investigations fund

8    account?

9        WARD:  Normal procedure that would be in place is

10   that if anyone needed money for whatever reason that

11   would need to be drawn from that account, they would

12   come see me.  I would draw the money down.  I would

13   count it.  They would count it.  I would log it in the

14   book.  I would initial it.  They would initial it.

15       MOCEK:  Who maintained the actual S.I. fund

16   logbook?

17       WARD:  I did and I still do.

18       MOCEK:  Did then Sgt. Daigle ever handle the

19   funds?

20       WARD:  Yes, he has.  Usually that would be in my

21   absence.  If I was not there that day or on vacation or

22   whatever and the money was needed, he would handle the

23   funds.

24       MOCEK:  He's familiar with how to log the funds?

25       WARD:  Yes, he is.

1    MOCEK:  Do you recall Liquor Control bringing any

2  issues to your attention for this operation?

3    WARD:  No.

4    MOCEK:  You said you had been introduced to the

5  Liquor Control people.  Is that correct?

6    WARD:  That's correct.

7    MOCEK:  So that they knew who you were, and if

8  there had been an issue or complaint, they would have

9  known who to go to?

10    WARD:  Correct.

11    MOCEK:  In conducting those underage liquor sales

12  operations, you indicated you had not had any formal

13  training such as was provided to then Sgt. Daigle.  Is

14  that correct?

15    WARD:  That is correct.

16    MOCEK:  Were you aware that photographs of the

17  operatives were taken prior to the start of the

18  operation?

19    WARD:  Yes, I was.  I believe I had -- and I

20  forget which -- it was probably prior to the start of

21  the first operation, which was the one you mentioned on

22  September 15 of 2000, and information either came from

23  Detective Deveny or Sgt. Daigle or both where I just

24  asked to be familiarized with the operations and what

25  happens and things of that nature and why certain

1   things are done and whatever or how certain things were

2   done so I was familiar with the basic protocol of what

3   to do.

4       MOCEK:  Okay.  With respect to this particular

5   operation, you also mentioned that you were introduced

6   to the operative?

7       WARD:  Yes, I was.

8       MOCEK:  That would have been Miss Wilson?  She had

9   long very blonde hair?

10      WARD:  I don't recall her name.  I do remember,

11  believe that she had very light blonde hair.  That was

12  about all I recall upon meeting her.  That would have

13  been over in the area where Sgt. Daigle sat.  I don't

14  remember if I was in there, if any photographs were

15  taken or if I was in my office.  I don't remember.

16      MOCEK:  Do you recall if she said anything of note

17  to you?

18      WARD:  No.  I don't recall, which probably means

19  she didn't say anything of note to me; otherwise, I

20  would have remembered it.

21      MOCEK:  In the introduction, you would have been

22  introduced as a lieutenant and commander of the

23  detective division I would assume, correct?

24      WARD:  Yeah.  I think Jim usually worded it as my

25  boss.  This is my boss.  He was always careful to call