36

of the overtime slip under case number, there's the
notation N/A and then the number 00-29461.

WARD:  Correct.

MOCEK:  It appears that two different hands filled
out that overtime slip.

WARD:  Yes.  Officer Sullivan put in his name, put
in the N/A, put in the date worked, and put in the time
from, 2300, and then it appears as if Sgt. Daigle put
in the case number, the liquor control checks, and then
put in the finishing time and the total time worked and
then signed it.

MOCEK:  Next is an overtime slip for Detective
Ladd, again 9-15-2000, 4 p.m. to 2 a.m., ten hours
signed by Sgt. Daigle.

WARD:  That appears -- the slip appears to be
filled out in its entirety by Sgt. Daigle.

MOCEK:  Again, here's one for Detective Lounsbury,
4 p.m. to 2 a.m., ten hours for liquor control checks
on 9-15-2000.  Who appears to have filled out this
slip?

WARD:  Sgt. Daigle as well in its entirety.

MOCEK:  So this would have been an example of a
group operation where Sgt. Daigle as the supervisor of
that group operation would have filled out the slips
for everybody involved?

```
 1    STATE OF CONNECTICUT  )
                            )  ss.
 2    COUNTY OF NEW LONDON   )

 3

 4            I, Susan M. Webb, a Notary Public duly

 5    commissioned and qualified within and for the State of

 6    Connecticut, do hereby certify that I took the confidential

 7    interview of Lt. Franklin Ward on the 27th day of March 2002,

 8    at the Norwich Police Department, 70 Thames Street, Norwich,

 9    Connecticut, commencing at 9:16 p.m.

10            I further certify that the following testimony was

11    taken by me stenographically and thereafter reduced to writing

12    under my supervision.

13            I further certify that I am not an attorney,

14    relative, or employee of any party hereto nor otherwise

15    interested in the event of this cause.

16            In witness whereof, I have hereunto set my hand

17    and affixed my seal this 10th day of April 2002.
```

Susan M. Webb

Susan M. Webb
Notary Public

My Commission Expires August 30, 2003

# EXHIBIT K

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF CONNECTICUT
3   - - - - - - - - - - - - - - - - - - - x
                                          :
4   KRISTEN EJCHORSZT,
                                          :
5                       Plaintiff,
                                          :   Civil Action
6   vs.                                       No.
                                          :   3:02CV1350
7   JAMES F. DAIGLE, JR.; LOUIS FUSARO,       (CFD)
    CHIEF OF POLICE; MARK LOUNSBURY;      :
8   POLICE DEPARTMENT OF THE CITY OF
    NORWICH; AND CITY OF NORWICH,         :
9
                        Defendants.       :
10
    - - - - - - - - - - - - - - - - - - - x
11
12
13

14              Deposition of LOUIS J. FUSARO, SR., taken

15          pursuant to the Federal Rules of Civil

16          Procedure, at the Gallagher Law Firm, 1377

17          Ellas Grasso Boulevard, New Haven,

18          Connecticut, before Janet C. Phillips, License

19          #00124, a Registered Professional Reporter and

20          Notary Public in and for the State of

21          Connecticut, on Monday, June 26, 2006, at

22          3:00 p.m.

23
24
25

1           L O U I S   J.   F U S A R O,   J R.,

2       called as a witness, having first been duly sworn

3       by Janet C. Phillips, a Notary Public in and for

4       the State of Connecticut, was examined and

5       testified as follows:

6   DIRECT-EXAMINATION

7   BY MS. COX:

8       Q.   Should I call you Chief Fusaro?

9       A.   That's fine.

10      Q.   Have you ever had your deposition taken

11  before?

12      A.   Yes.

13      Q.   Okay.  So you know that this is a basically a

14  question and answer interview between you and me and

15  maybe the other lawyers if they choose to join in, and

16  it's all being taken down by our court reporter here.

17      A.   Yes.

18      Q.   Okay.  And if you don't hear a question or you

19  don't fully understand or hear the question that I've

20  asked you, would you please let me know?  If you don't

21  ask me to repeat the question, I'll assume you've heard

22  it.  Fair enough?

23      A.   Fair enough.

24      Q.   And also if you don't understand a question,

25  please let me know.  Again, if you don't ask me to

SCRIBES, INC.

Page 6

1   but I was a military police officer, a year in Vietnam.

2        Q.    In connection with your work at Electric Boat,

3   do you have electrical training?

4        A.    I was an apprentice electrician.

5        Q.    And roughly when were you an apprentice

6   electrician?

7        A.    1965, '66.

8        Q.    When did you become a police officer or become

9   involved with police work?

10        A.    I started in the United States Army as a

11   military police officer.  When I left -- I went to

12   Vietnam.  When I left Vietnam and was discharged, I

13   started with the Norwich Police Department two weeks

14   later.

15        Q.    What year was that?

16        A.    1968.

17        Q.    Have you worked continuously for the Norwich

18   Police Department since 1968?

19        A.    Yes.

20        Q.    Okay.  And I take it you have risen through

21   the ranks?

22        A.    Yes.

23        Q.    When did you become chief?

24        A.    In June of 1997.

25        Q.    And who appoints the Chief of Police in

Page 12

1    named, but it certainly would be in the most broadest

2    sense, it would be included in the most broadest sense.

3         Q.    Okay.  So in the most broadest sense, would it

4    include any woman that a police officer would come into

5    contact with while he was on duty or in the course of

6    his performing his duties as a police officer?

7         A.    Yes.

8         Q.    Okay.  So it would include undercover

9    operatives, it would include female complainants?

10        A.    Yes.

11        Q.    Okay.  Female prisoners?

12        A.    Yes.

13        Q.    Why did you require -- question withdrawn.

14             Did you require police officers to undergo

15    sexual harassment training?

16        A.    Yes, I did.

17        Q.    And why?

18        A.    Because it's extremely important that we treat

19    people with dignity, and certainly individuals of the

20    opposite sex even more so because of the sensitive

21    nature.

22        Q.    Were you aware that -- well, question

23    withdrawn.

24             Do you recall a Kristen Vanase?

25        A.    Yes.

Page 13

1      Q.    And who was Kristen Vanase?  Am I saying her

2  name right?

3      A.    I think so.  There's a couple of different

4  ways people have pronounced it, but I believe so.  She

5  was a dispatcher.

6      Q.    With the police department?

7      A.    With the police department.

8      Q.    How long did she work at the police

9  department?

10     A.    I really don't know.

11     Q.    Was it more than a year?

12     A.    I would think it was more than a year, yes.

13     Q.    Were you aware that Kristen Vanase brought a

14  sexual harassment complaint against James Daigle?

15     A.    I don't recall that.

16     Q.    That's not something that was brought to your

17  attention?

18     A.    As part of the Internal Affairs investigation?

19     Q.    If that's what's you're talking about.

20     A.    There was -- that information came up as part

21  of the Internal Affairs investigation, that there may

22  have been some conduct that was -- that could be thought

23  of that way.

24     Q.    In your department, is there an internal

25  process whereby an employee could voice a complaint of

                         SCRIBES, INC.

1      A.    Prior to the internal investigation?

2      Q.    Yes.

3      A.    No.

4      Q.    Were you aware that James Daigle showed his

5  fellow officers photos of Sergeant Valcourt Lewis?

6      A.    No.

7      Q.    In the years 2000 to 2001, who was Daigle's

8  immediate supervisor?

9      A.    2000 to 2001, do you know what his assignment

10  was then?

11      Q.    I don't.  I believe he was in the Detective

12  Division, but --

13      A.    And that's my recollection.  And if he was, he

14  would have been working for the lieutenant and sergeant

15  in the Detective Division.  But I'm not sure at this

16  point which one it would have been at that time.

17      Q.    Now, at a certain point -- question withdrawn.

18            (Agenda marked Plaintiff's Exhibit 1 for

19            identification.)

20      Q.    Showing you what's been marked as Plaintiff's

21  Exhibit 1, this was also a Defendants' exhibit at

22  another deposition, have you ever seen the document

23  that's before you?

24      A.    I believe this is the agenda for the training

25  program that Jim Daigle and Jim Devaney attended back

SCRIBES, INC.

Page 17

1    in, whenever this program was.  Probably in the

2    2000-2001 time frame.

3        Q.   Well, if the fax cover sheet has an agenda

4    that's been faxed on April 19th of 2001, does that help

5    you pinpoint a time frame when this training took place?

6        A.   Well, I'm sure we have records of the date.  I

7    don't know that I -- it was prior to the underage

8    drinking program starting.  I don't recall exactly the

9    date of that.  I don't see a date on the agenda.

10       Q.   Do you know when the underage drinking program

11   was started in your department?

12       A.   Sometime in 2001, I believe.

13       Q.   Now, at the top of the agenda, on the second

14   page of the exhibit, it says, "Police chief's

15   breakfast."  Did you attend this training?

16       A.   I don't believe so.

17       Q.   And I think you just said that James Daigle

18   and James Devaney --

19       A.   To the best of my recollection, I think the

20   two of them attended.

21       Q.   Okay.  Was there anyone else from your

22   department who attended this training?

23       A.   I don't think so.

24       Q.   Okay.  Was there anyone else from your

25   department who was required to attend the training?

SCRIBES, INC.

1        A.    I don't recall.

2        Q.    Why was -- why were James Daigle and James

3    Devaney selected to attend this training?

4        A.    Because they were starting the program.  They

5    were actually going to be working the underage drinking

6    program.

7        Q.    And does your answer mean that they were in

8    charge of implementing the program in the department?

9        A.    Yes.

10       Q.    Did you become familiar with the protocols for

11   investigating sales of alcohol to minors in connection

12   with this program?

13       A.    In a general, you know, in only a very general

14   sense.

15       Q.    And how did you become familiar in a general

16   sense with the protocols?

17       A.    I knew they were doing the training, and I'm

18   sure they brought it back, brought that training back

19   and were to implement that as part of starting the

20   program.

21       Q.    But did they have any meetings with you to

22   advise you about the nature of the program and the

23   activities that they were to be conducting?

24       A.    In a general sense.  I'm trying to bring back

25   my recollection.

                        SCRIBES, INC.

1           Normally, the way we would do this is they

2    worked directly for the lieutenant in the Detective

3    Division, and they would have worked with him with

4    regard to the details of how the program was going to

5    run.

6           Now, I would have been involved in the general

7    sense on oversight.

8       Q.   Did the lieutenant in the Detective Division

9    receive training on these underage alcohol sting

10   operations?

11      A.   I don't recall.

12      Q.   To your knowledge, was there just one

13   training?

14      A.   That I don't remember.

15      Q.   Okay.  I guess my question is was the

16   training, to your knowledge, was the training updated on

17   any kind of periodic basis?

18      A.   Well, this was a relatively new program.  This

19   was a start-up kind of a situation.

20      Q.   And did the department receive some sort of

21   funding to conduct these investigations?

22      A.   Yes, we had some grant funding.

23      Q.   How much was it?

24      A.   I don't recall.

25      Q.   You don't.  How was the funding distributed --

                        SCRIBES, INC.

1    or question withdrawn.  That's a bad question.

2           How was the funding applied to the activities

3    related to the investigations?

4        A.    It's my recollection that it was to offset

5    overtime costs involved in putting the program on.

6        Q.    All right.  So it didn't cover the entire cost

7    of paying the police officers in connection with these

8    investigations?

9        A.    I don't recall if it covered the entire amount

10   or not.  I just don't recall that.  We've had a number

11   of grants and sometimes they work in various ways.  So I

12   just don't remember.

13       Q.    In addition to overtime costs, how else were

14   the funds applied in connection with these

15   investigations?

16       A.    In regards to what?  I don't --

17       Q.    Well, I guess what was the money for?

18       A.    My recollection, it was to cover the overtime

19   costs.

20       Q.    Okay.  And that was it?

21       A.    There may have been some ancillary type costs

22   that it covered.  I just don't recall.

23       Q.    Okay.  Was it your understanding that the

24   undercover operatives were going to be paid?

25       A.    I don't think that is my recollection at all.

                        SCRIBES, INC.

1    I think it was voluntary.  I'm not sure, though.  I

2    can't remember.  I think it was supposed to be a

3    voluntary program.  We do have paid informers, and

4    that's why I'm slightly confused here.

5        Q.    Right.  Was there any particular training

6    provided to -- well, question withdrawn.

7             What kind of training is provided to police

8    officers generally about working with undercover

9    operatives?

10       A.    The training is on-the-job kind of training.

11   It's not a separate training program just for that.

12   They learn that from their supervisors and from working

13   with people who deal with undercover operatives.

14       Q.    All right.  And how --

15       A.    And then as part of some of the detective

16   training programs, a portion of that training will be

17   geared towards undercover operatives.

18       Q.    And is the detective training something that's

19   separate or is that also provided on the job?

20       A.    Both.  It's done both ways.

21       Q.    So there are separate courses that

22   detectives --

23       A.    Periodically, the course is designed for

24   Detective Divisions, detectives, that we'll send them

25   to.

SCRIBES, INC.

1    Q.    And as part of that training, is there any

2  kind of -- or issues dealing with using minors as

3  undercover operatives addressed?

4    A.    I'm not sure.

5    Q.    Are there issues involving working with

6  undercover female operatives that are addressed as part

7  of the detective's training?

8    A.    I'm not sure of that either.

9    Q.    Where would one go to find out whether or not

10  these areas are addressed as part of the training for

11  detectives?

12    A.    You'd have to research the individual training

13  programs and what their lesson plan involved.

14    Q.    All right.  And who in your department is

15  familiar with those training programs?

16    A.    Those programs are put on by the Police

17  Academy in Meriden and by various other law enforcement

18  groups that we may use over the course of time.

19    Q.    Who determines when a member of your police

20  force is sent for additional training?

21    A.    A list of training programs comes out.

22  Officers will ask for it.  Supervisors will recommend.

23  And ultimately, I'll sign off to send people based on

24  those recommendations.

25    Q.    Do you recall how it was that James Daigle and

SCRIBES, INC.

e6276160-1020-11db-928f-0000e23ed989

1    James Devaney were selected to receive training in the

2    underage alcohol undercover investigations?

3        A.    No, I don't.

4        Q.    Do you recall when you got the -- when your

5    department started receiving the grant monies in

6    connection with these alcohol sales to minors

7    investigations?

8        A.    I wouldn't recall when we got the money.  My

9    recollection is that early 2001 was probably the time

10   frame when the grant became effective.

11       Q.    Okay.  And what steps did you take to ensure

12   that officers were properly trained to conduct these

13   underage alcohol investigations?

14       A.    We sent them to the programs provided by the

15   Coalition To Stop Underage Drinking, who was trying to

16   get these programs started.

17       Q.    Is there anywhere in your department where

18   written materials related to this training were

19   maintained?

20       A.    Any written materials for the training would

21   have been maintained in the Detective Division.

22       Q.    All right.  Was there any particular --

23   question withdrawn.

24            Was there any person who was in charge of

25   maintaining written training materials?

                    SCRIBES, INC.

Page 24

1       A.    It would have been the sergeant.  I'm guessing

2    about this.  It's -- they bring the training materials

3    back and the unit that's going to be involved in this,

4    in this case, the Detective Division, would maintain

5    them.

6       Q.    Okay.  As part of the internal investigation,

7    was the person who was responsible for maintaining the

8    training manuals identified?

9       A.    I don't know if an individual was.  I know

10   deputy chief who conducted the investigation

11   investigated what training was involved.

12      Q.    And that was Chief Mocek?

13      A.    Deputy Chief Mocek, yes.

14      Q.    Are you familiar with the policies about

15   selecting undercover volunteers for these alcohol sting

16   operations?

17      A.    Did I -- say that again.  Sorry.

18      Q.    Are you aware of the policy about selecting

19   individuals to participate as undercover operatives in

20   these underage sting investigations?

21      A.    I'm aware that that was part of the training

22   program.

23      Q.    But in terms of the particular attributes that

24   would make someone appropriate to act as an undercover

25   operative, you're not familiar with?

                    SCRIBES, INC.

1      A.    If I was, I'm certainly not at this point.

2      Q.    Prior to Ms. Ejchorszt's complaint, did you

3   ever review reports of previous alcohol investigations?

4      A.    I knew of the results, the results of them.

5   The results of them would have been reported to me, or

6   the deputy chief, depending on the circumstance.

7      Q.    Okay.  And were you aware of the fact that all

8   of the alcohol sting operations conducted by your

9   department used female volunteers?

10     A.    I certainly am now.

11     Q.    Right.  At the time?

12     A.    I don't know that that ever came to mind.

13     Q.    What sort of training was provided to the

14  undercover operatives in the sting operations by your

15  department?

16     A.    I believe they were briefed prior to the

17  operations.

18     Q.    Okay.  Do you recall if there was any kind of

19  checklist that was required to be given to the

20  operatives?

21     A.    I'm not aware if there was or wasn't.

22     Q.    Were you familiar with the use of listening

23  devices on placed on an undercover operative in

24  connection with these alcohol sting investigations?

25     A.    I was after the complaint by Ms. Ejchorszt.

SCRIBES, INC.

1      Q.    What kind of training do your officers receive

2    with respect to the use of listening devices on an

3    operative?

4      A.    Again, part of any given detective training

5    program that may or may not be included depending on the

6    subject matter and on-the-job kind of training within

7    the Detective Division itself.

8      Q.    Are you familiar with whether -- question

9    withdrawn.

10         What steps do you take to make sure that your

11   police officers are appropriately trained in the use of

12   these listening devices?

13     A.    Sending them to appropriate detective training

14   programs and the on-the-job training from experienced

15   detectives.

16     Q.    Are you aware of anyone in your department who

17   hasn't received training in the use of wire devices?

18     A.    There may be some.

19     Q.    What steps do you take to ensure that those

20   individuals don't participate in the use of using wire

21   devices?

22     A.    I would expect their supervisors to not allow

23   them to do that.

24     Q.    Is that something that is addressed in your

25   department?

                    SCRIBES, INC.

Page 27

1        A.    In some formal matter?

2        Q.    Even in an informal matter.

3        A.    I don't think I quite understand.

4        Q.    Okay.  I'm just -- I'm trying to understand

5    how you go about ensuring that your officers are

6    properly trained in the use of wire devices.

7        A.    Well, it's like any piece of equipment.  I

8    wouldn't expect a supervisor would allow someone to use

9    it who they didn't feel was competent in the use of it.

10       Q.    So have you had conversations with the

11   supervisors then that that is -- they're supposed to

12   ensure that the people working under them have had

13   appropriate training in the use of wire devices prior to

14   being involved in any kind of situation where they have

15   to use them?

16       A.    Specifically with wire devices?

17       Q.    Yes.

18       A.    No.

19       Q.    As part of the training in the use of wire

20   devices, is there any attention paid to using a wire

21   device on a female operative?

22       A.    By a male?

23       Q.    Yes.

24       A.    It becomes a pretty common sense issue.  We

25   certainly wouldn't treat a voluntary -- a volunteer

SCRIBES, INC.

1    operative to a lesser degree than we would female

2    prisoners or other females that we come in contact with.

3    So I wouldn't expect a male officer to fit a wire device

4    to a female operative.

5         Q.    Okay.  But is there any kind of rule, can I go

6    to your department and look at rules or guidelines

7    written down that might educate me on those issues?

8         A.    Specifically for that --

9         Q.    Yes?

10        A.    -- one?  No.  It's a common sense issue.

11        Q.    Okay.  How about searching a female?

12        A.    We do have rules for searching.

13        Q.    You do?

14        A.    Yes.

15        Q.    And they're written down someplace?

16        A.    Yes.

17        Q.    Okay.  And do those relate primarily to

18   prisoners or suspects?

19        A.    Prisoners, suspects or investigatory

20   detentions.

21        Q.    And do those rules have some sort of title?

22   Where would I go to find those in your department?

23        A.    It would be a policy.

24        Q.    Okay.  It's a written policy?

25        A.    Yes.

```
 1        Q.    And do you know the title of the policy?  Is
 2   it a policy about strip searching?
 3        A.    Prisoner policy, there is a strip search
 4   policy.
 5        Q.    And where is that policy maintained?
 6        A.    The training lieutenant maintains the
 7   policies.
 8        Q.    Who is the training lieutenant presently?
 9        A.    Lieutenant Michael Blanchette.
10        Q.    Is there only one training lieutenant in your
11   department?
12        A.    Yes.
13        Q.    And what are his duties with respect to
14   training?
15        A.    His duties encompass all aspects of training,
16   maintaining the database that we have on what training
17   officers get, enrolling people for various training
18   courses, making recommendations for training courses,
19   doing instruction.
20        Q.    So there's a database that essentially keeps
21   track of the training that officers in your department
22   have received?
23        A.    Yes.
24        Q.    How long has the department maintained that
25   database?
```

SCRIBES, INC.

1    A.    I would say probably in a computerized format,

2    from the late 80's, maybe early 90's.

3        Q.    And if I wanted to look at the training that a

4    particular officer had received in your department,

5    would I go to that database or would I go to the

6    individual's personnel file?

7        A.    Well, the database would be a listing of the

8    types of training that the individual received.    The

9    training file itself would have more detailed

10   information.

11       Q.    All right.    And is there a training, a

12   separate training file on the officers in your

13   department?

14       A.    Yes.

15       Q.    Is that training file maintained separately

16   from the personnel file?

17       A.    Yes.

18       Q.    Are you aware of the number of alcohol,

19   underage alcohol investigations your department

20   conducted?

21       A.    In that time frame?

22       Q.    Prior to November 30th of 2001.

23       A.    No.    Without doing some research, I wouldn't

24   know that.

25       Q.    Well, the reason I chose November 30th, 2001

SCRIBES, INC.

```
 1   is that's the date of Kristen Ejchorszt's --

 2        A.    Right.

 3        Q.    Do you have a --

 4        A.    Sense?

 5        Q.    A reasonable guestimate?

 6        A.    I guess if I were to have to guess, four.

 7        Q.    Did you play any role in any of those underage

 8   alcohol sales investigations?

 9        A.    You mean as an active participant?

10        Q.    Yes.

11        A.    No.

12        Q.    Were you advised prior to any of the

13   investigations that they were going to take place?

14        A.    In a general sense, I would have known that

15   they were going on.  Whether or not the specific

16   operation would have been reported to me directly, I'm

17   not sure.  I can't remember at this point.  There's

18   several layers of supervisory layers that would come

19   into play before that minutiae came to me.

20        Q.    What supervisory layers would intervene?

21        A.    The commander of the Detective Division, and

22   then the deputy chief, and then me.

23        Q.    Now, part of this case involves the use of

24   photographs.  What part of an officer's -- well,

25   question withdrawn.
```

1          What was your understanding of the types of

2    photographs that were supposed to be taken in connection

3    with these underage alcohol investigations?

4        A.   Just a general photograph showing the

5    individual obviously fully clothed in clothing that they

6    were going to be going out with in an effort to show

7    what the undercover operative looked -- what the

8    appearance was, just a general photograph.

9        Q.   And why would that be important, to document

10   how the operative looked?

11       A.   So that we weren't using someone who looked --

12   who was underage that looked 25, 26 years old, 30 years

13   old, just to show that it wasn't -- we weren't using

14   someone who obviously looked of age, but wasn't.

15       Q.   And was there any other reason for taking a

16   photograph of an undercover operative?

17       A.   I can't think of any.

18       Q.   What is the policy in your department if a

19   female volunteer needs to use a wire device regarding

20   who puts it on that individual?

21       A.   We would expect that a female officer would do

22   that.

23       Q.   Okay.  And if there was a plan to use a female

24   undercover operative, would you expect that the

25   individual who's in charge of the investigation would

SCRIBES, INC.

1   make sure that a female police officer was present at

2   the time?

3       A.   Yes, I would expect that to happen.

4       Q.   And is that part of the training that a police

5   officer receives in your department?

6       A.   Part of the training that a police officer

7   receives deals with male/female issues with regard to

8   basically whatever you do where there's some sensitive

9   issues such as this, that you would use somebody of the

10  same gender.

11      Q.   Are you aware of who was in charge of the

12  undercover investigation that used Melanie Wilson as the

13  operative?

14      A.   James Daigle.

15      Q.   And how about the investigation using Teresa

16  Early as the undercover?

17      A.   James Daigle would have been the immediate

18  supervisor.

19      Q.   Did you ever review -- question withdrawn.

20           Prior to this investigation, did you ever

21  review the reports of those two investigations?

22      A.   I don't recall prior to the Internal Affairs

23  investigation.  I don't recall using any of those.

24      Q.   Now, with respect to the investigation that

25  used Kristen Ejchorszt as the undercover, do you know

SCRIBES, INC.

Page 34

1   who decided to conduct that investigation?

2        A.    Specifically who?

3        Q.    Yes.

4        A.    No.  It would have been between James Daigle

5   and a lieutenant, which would have been Franklin Ward at

6   the time.

7        Q.    Did you have any role in setting up that

8   investigation?

9        A.    No.

10       Q.    Did you have any role in assigning officers to

11   the investigation?

12       A.    No.

13       Q.    Do you know who did?

14       A.    I can make an assumption.  It would have been

15   Jim Daigle and Franklin Ward who were the two

16   supervisors.

17       Q.    And did Franklin Ward have any training in

18   conducting these alcohol investigations?

19       A.    He was a very experienced detective.  I don't

20   know if he specifically had that training.

21       Q.    But if I wanted to find that out, I could go

22   to your database and look up to see whether or not he

23   had had alcohol investigation training?

24       A.    You should be able to, yes.

25       Q.    Did you have any involvement in selecting

SCRIBES, INC.

1    Kristen Ejchorszt as the undercover for that

2    investigation?

3         A.    No.

4         Q.    Did you know the Ejchorszt family?

5         A.    No.

6         Q.    When is the first time you saw Kristen

7    Ejchorszt?

8         A.    December 3rd.

9         Q.    Of 2001?

10        A.    2001.

11        Q.    And how was it that you came to see her that

12   day?

13        A.    I had spoken to her father, complaining about

14   this matter, and asked that they come in so that we

15   could talk to them and get a statement from her and open

16   an investigation.

17        Q.    Did you first talk to him on the telephone?

18        A.    I believe so.

19        Q.    And when did they come in?

20        A.    Within a couple of hours, I believe, of that

21   phone call.

22        Q.    All right.  And was a statement taken from her

23   on that date?

24        A.    Yes.

25        Q.    What action did you take in response to the

                         SCRIBES, INC.

Page 36

1   information that she gave you that day?

2        A.   I assigned the deputy chief to open an

3   investigation.

4        Q.   Okay.  And that was Deputy Chief Mocek?

5        A.   Yes.

6        Q.   Okay.  Did you take any other action?

7        A.   That night?

8        Q.   Yes, that day or that night.

9        A.   Well, it was that night.  He took a statement

10  from her and I instructed him to open an investigation.

11              Shortly after that, I notified the city

12  manager that I had something that I thought was

13  extremely sensitive and that I thought we should also

14  include a labor attorney.  And we have special counsel

15  that we use as a labor attorney.

16              And I met with the city manager and the

17  personnel director and we did that.

18       Q.   Okay.

19       A.   And the corporation counsel.

20       Q.   Okay.  What's the next step that you took in

21  response to the information that Kristen Ejchorszt had

22  given you?

23       A.   I administratively suspended James Daigle.

24       Q.   Okay.  When was that?

25       A.   I believe it was on the 7th.

                    SCRIBES, INC.

Page 37

1      Q.   Why did you wait to suspend James Daigle until

2   December 7th?

3      A.   I didn't suspend him.  I put him on

4   administrative leave.

5      Q.   Why did you wait until December 7th to put

6   James Daigle on administrative leave?

7      A.   Because I didn't feel it was necessary to do

8   it before that.

9      Q.   Did you take any steps to ensure that James

10   Daigle didn't destroy evidence between December 3rd,

11   when you got the complaint, and December 7th, when you

12   put him on the administrative leave?

13      A.   Well, incidentally, James Daigle was coming

14   out of the Detective Division to Patrol.  His desk had

15   already been cleaned out.  He had already been removed

16   from the Detective Division and would be sharing a desk

17   as a patrol lieutenant.

18      Q.   When did he change desks?

19      A.   In that -- sometime between the 30th and the

20   third, in that time frame.  He already was in the

21   process of transferring out of the Detective Division to

22   Patrol.

23      Q.   But did he have -- could he have had access to

24   his old computer in the Detective Division?

25      A.   I don't believe so.

SCRIBES, INC.

1      Q.   So between --

2      A.   He had already been, whatever they do to

3  change user had already been --

4      Q.   Do you know what date his computer use was

5  changed?

6      A.   No, I don't.

7      Q.   Is there a record of that change?

8      A.   I don't know.

9      Q.   Who would maintain records of changes in the

10  use of computers?

11      A.   I don't know that there's an actual record.

12  It would have been done as the normal course of business

13  because he was being transferred at that point in time.

14  That night would have been his last night in the

15  Detective Division, the 30th.  Was that a Friday night?

16      Q.   I believe so.

17      A.   Okay.  If it was a Friday night, that was his

18  last night -- last day.  So in other words, preparations

19  were already being made for him to transfer out.  And

20  those are the kinds of things that would happen, clean

21  out the desk, get the computer ready for a new person.

22  Those kinds of things already happened.

23      Q.   Are the computer passwords protected in the --

24      A.   Yes.

25      Q.   Let's just look at the computers in the

SCRIBES, INC.

1    Detective Division.

2        A.    Yes, the network, you sign on with a user name

3    and password.

4        Q.    All right.  And are those user name and

5    passwords confidential?

6        A.    Yes.

7        Q.    When was James Daigle formally to begin his

8    new assignment?

9        A.    Sunday, whatever that date between the 30th

10   and the 3rd.

11       Q.    Do you remember what day of the week of the

12   Ejchorszts came in?

13       A.    I think it was a Friday.  I'm just looking at

14   a calendar.  No, I can't go back that way.

15       Q.    The 3rd would be a Monday, wouldn't it, if the

16   30th --

17       A.    My recollection is that the Ejchorszts came in

18   on a Friday night, they came in late, they came either

19   late in the afternoon or early evening, four or

20   five o'clock, six o'clock about.

21       Q.    But in any event, the report of your

22   investigation says that they came in on December 3rd?

23       A.    It was definitely December 3rd.  I just don't

24   remember for sure what day of the week.  My recollection

25   is it was a Friday night.  Maybe I'm wrong.  I'm not

                        SCRIBES, INC.

Page 40

1    sure.

2        Q.    Did you make any attempts to locate disks of

3    photos that --

4        A.    As part of the deputy chief's investigation,

5    he certainly did.

6        Q.    So it was the deputy chief who made the

7    effort?

8        A.    Yes.  He was assigned to do the investigation.

9        Q.    And did he report to you about the progress of

10   his investigation along the way?

11       A.    In a general sense, realizing that I'm

12   responsible for hiring, firing, promoting and demoting,

13   so I need to have a -- make an unbiased decision at the

14   end of the investigation.

15       Q.    Yes.  Did you feel confident because of the

16   change in James Daigle's assignment that he would not

17   have access to his old computer in the Detective

18   Division after December 3rd?

19       A.    Yes.

20       Q.    Did you make any order that he was not to

21   access that computer?

22       A.    I told him he was not to interfere with the

23   investigation in any way or any of the individuals

24   involved in the investigation.  I don't recall if I

25   specifically said anything about the computer.  But the

SCRIBES, INC.

1   Detective Division is a locked office off ours and

2   occupied when they're open.

3        Q.   When James Daigle was reassigned, did he turn

4   in his key to the Detective Division?

5        A.   He would have turned in his key, his -- the

6   weapon we issue for two detectives, those kinds of

7   things.

8        Q.   Okay.  There's much mention of Kristen

9   Ejchorszt having a crush on another one of your

10  officers, Peter Kamp, in this investigatory report.

11  What significance does that have to you?

12       A.   What significance?

13       Q.   Yes.

14       A.   It was either a fact or it wasn't.  I'm not

15  too sure it has any significance to me.

16       Q.   I don't have any other questions.

17            MR. DAIGLE:  I have no questions, Chief.

18            MS. JORDAN:  No questions.

19            (Time noted:  4:05 p.m.)

20       (Jurat follows on page 42, no omission.)

21

22

23

24

25

e6276160-1020-11db-928f-0000e23ed989

**CERTIFIED COPY**

<u>C E R T I F I C A T E</u>

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _____ JUL 10 2006 _____, 2006.

_____
Janet C. Phillips
Notary Public
CSR License #00124

My Commission expires:
October 31, 2006