Slip Copy                                                                                                     Page 13

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

intervening in the interim," "are of a different nature," and "involve different actors," they constitute "discrete acts" and should be barred by the statute of limitations. Defs' Mem. Supp. Mot. Summ. J. at 6 (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112-15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Distinguishing between series of acts which constituted or created a hostile work environment on the one hand and discrete acts of a discriminatory character which individually constituted discrete retaliatory acts, albeit with some continuity or relation to one another, the Supreme Court foreclosed recovery for the latter acts except insofar as they fell within the limitation period. *Morgan,* 536 U.S. at 113.

In order to invoke the continuing violation exception, Plaintiff must show either: (1) "specific ongoing discriminatory policies or practices" or (2) "specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Weeks,* 273 F.3d at 82 (brackets in original) (quoting *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998), in turn quoting *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994)). The Second Circuit has held, however, that "[a]bsent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception." *Id.* at 84; *see also Quinn,* 159 F.3d at 766 (holding that the acts alleged by the plaintiff, separated by a three-year gap and three one-year gaps, were "not continuous in time with one another or with the timely acts that she has alleged," and that such discontinuity was fatal to her "continuing violation" theory); *Annis v. County of Westchester,* 136 F.3d 239, 246 (2d Cir.1998) (finding that discrimination allegedly suffered before and after a six-year gap " cannot be joined as a 'continuing violation' "); *Selan v. Kiley,* 969 F.2d 560, 566-67 (7th Cir.1992) (finding that a two-year gap between alleged discriminatory events "negates the contention that the acts were continuous or connected").

The Court finds that Plaintiff has not submitted evidence sufficient to find that all of the acts complained of were committed in furtherance of a continuing policy or practice of racial discrimination, and as such, Plaintiff's allegations regarding the 1995 examination and other allegations regarding conduct occurring prior to June 15, 2001 are dismissed. Those events may, however, "constitute relevant background evidence" in a proceeding where the remainder of the allegations are at issue. *Morgan,* 536 U.S. 101, 112, 122 S.Ct. 2061, 153 L.Ed.2d 106 (quoting *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)). Plaintiff's allegations regarding the 1999 examination and the resulting eligibility list are not dismissed. Although the examination was administered prior to June 15, 2001, the promotion eligibility list generated by that examination did not expire until December 6, 2002. The allegations surrounding the examination and the eligibility list may be considered as one " mechanism" pursuant to the "continuing violation" theory and therefore are not barred by the statute of limitations.

### 2. *Plaintiff's Fourteenth Amendment Claims*

*14 In the Amended Complaint Plaintiff claims, pursuant to 42 U.S.C. § 1983, that Defendants discriminated against him by using a racially biased examination system and using promotion eligibility lists in a discriminatory manner (Count Three) and violated his right to equal protection by giving him a racially biased examination and by failing to remedy that bias (Count Five).[FN12] Am. Compl. ¶ ¶ 34-35; 38-39. Defendants argue that Plaintiff's § 1983 claims must fail because Plaintiff cannot prove that the City of Hartford's promotional examination was purposefully discriminatory. *See* Defs' Mem. Supp. Mot. Summ. J. at 6-10.

> FN12. Although it is clear that an employee can bring an employment discrimination suit under § 1983 without bringing a Title VII claim, *see Annis v. County of Westchester,* 36 F.3d 251 (2d Cir.1994), the § 1983 claim must be based on a distinct violation of a constitutional right, such as a claim for denial of equal protection. *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 14
Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

*Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994)). Without any authority cited to the contrary, the Court will assume that Count Three of the Amended Complaint is also brought pursuant to the equal protection clause of the Fourteenth Amendment and will consider it along with Count Five here.

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Traditional equal protection claims involve alleged discrimination or disparate treatment against people based on a protected or suspect classification, such as race. *Id.; accord Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001). To prevail on his claim, Plaintiff must show both: (1) that he was treated differently from other similarly situated individuals and (2) that the alleged differential treatment was based on " impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assoc.,* 273 F.3d at 499 (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994)).

Pursuant to *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the test for a violation of the Constitution based on employment discrimination is stricter than the test under Title VII. *See Wintz v. Port Authority of New York & New Jersey,* 551 F.Supp. 1323, 1325 (S.D.N.Y.1982); *Geller v. Markham,* 481 F.Supp. 835, 839 (D.Conn.1979) ("In *Washington v. Davis,* when the Court announced that disparate impact alone is insufficient to establish a prima facie case of a violation of the Equal Protection Clause, it carefully distinguished this rule from the rule which is applicable in statutory Title VII claims."). Three years later, the Supreme Court made it clear that the *Washington v. Davis* "intent" standard applies to § 1983 claims based on the Fourteenth Amendment. *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Courts since then have held that a § 1983 plaintiff, to prevail, must establish that the defendants purposefully discriminated against him based on his race. *Knight v. Nassau County Civil Serv. Comm'n,* 649 F.2d 157 (2d Cir.), *cert. denied,* 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981). When such a showing is not made, the case will fail. Even in cases involving suspect classifications subject to heightened scrutiny under the Fourteenth Amendment, disparate effects alone are insufficient to establish an equal protection violation. *See Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 372-73, 121 S.Ct. 955, 967, 148 L.Ed.2d 866, 883 (2001) (citing *Washington v. Davis,* 426 U.S. at 239).

*15 The parties' dispute on this issue centers around whether Plaintiff has proved that the City of Hartford's promotional examination was " purposefully discriminatory." *See* Defs' Mem. Supp. Mot. Summ. J. at 8-10; Pl's Mem. Opp. Mot. Summ. J. at 20-21. " 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case [the City of Hartford], selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S. at 279 (internal citation omitted); *accord McClesky v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Proof of such discriminatory intent must rely on objective factors, some of which were outlined in *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See Feeney,* 442 U.S. at 279 n. 24. In *Arlington Heights,* the Supreme Court outlined factors indicative of discriminatory intent, including, *inter alia,* (1) "[t]he impact of the official action," i.e., "whether it bears more heavily on one race than another," (2) "[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes," (3) " [t]he specific sequence of events leading up to the challenged decision," (4) "[d]epartures from the normal procedural sequence," (5) "substantive departures ... particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 15

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

(6) "[t]he legislative or administrative history ... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." 429 U.S. 252, 266-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (internal citations and quotation marks omitted). The requisite discriminatory purpose need not be express and may be proved indirectly, however, a law or other governmental policy, "neutral on its face and serving ends otherwise within the power of government to pursue, is [not] invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." *Washington v. Davis,* 426 U.S. at 241-42.

Under the standard promulgated in *Davis,* Plaintiff must provide more than evidence of disparate impact in order to prove intentional discrimination and be entitled to relief on his Equal Protection claim. Specifically, Plaintiff must present evidence to establish that, because of his race, he was treated less favorably than whites and that such treatment was purposeful or intentional. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. Defendants contend that there is no evidence of intentional discrimination in this case, arguing that the facts that they arranged for individuals from other municipal police departments to administer the oral examinations and administered validated written examinations demonstrate the lack of invidious racial discrimination. Defs' Mem. Supp. Mot. Summ. J. at 9-10. One of Plaintiff's pieces of key evidence, the October 27, 1999 letter from Bruce Davey, makes reference to the disparate impact of the 1999 written examination upon minority candidates, but concludes that "the results are defensible based on the test's validity." [FN13]

> FN13. In his October 27 letter, Davey discusses the adverse impact on minority candidates, stating that the pass rate for Black and Hispanic candidates was 41% and 40% respectively, as compared to an overall pass rate of 70%. Davey goes on to discuss the showing of validity necessary to justify use of the test in the face of such adverse impact. He states that the examination "was developed based on a thorough analysis of the competencies required to perform the Sergeant's job, and the test questions were selected for their importance based on a review by a panel of seven law enforcement experts. Moreover, many of the individual questions have been statistically validated as predictors of job performance." *See* Oct. 27, 1999 letter, Comstock Aff. at Exh. 2.

*16 Plaintiff, however, attacks Defendants' alleged unwillingness to disclose the October 27, 1999 letter from Bruce Davey and Associates. Pl's Mem. Opp. Mot. Summ. J. at 20. Plaintiff also argues that the Defendants should have disclosed a subsequent letter, dated January 6, 2000, that Davey wrote in response to the questions and concerns of the attorney for the plaintiffs in *Cintron v. Vaughn.* In the second letter, Davey went into more detail about the validation process for the examination and provides further and more in-depth evidence of its validity. *See* Exh. 3 to Comstock Aff. Plaintiff does not indicate what kind of disclosure is contemplated or how the lack thereof evinces purposeful or intentional discrimination on the part of Defendants. In light of the fact that both letters affirm the test's validity, it is difficult to see how Defendants would be under any obligation to independently disclose its contents.[FN14]

> FN14. Moreover, as discussed earlier, the undisputed evidence shows that upon request, Ms. Comstock, the Principal Personnel Analyst at the time, provided a copy of Mr. Davey's communication to Attorney Schulman, who represented plaintiffs involved in *Cintron v. Vaughn.* Pl's Rule 56(a)(2) Statement ¶ 42.

As the Supreme Court observed in *Washington v. Davis,* it is not clear "how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denies 'any person ... equal protection of the laws' simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups." 426 U.S. at 245. Justice White goes on to say that employees who are less competent, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 16

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

measured by the tests, cannot complain of discrimination vis-a-vis those employees who are more competent. Specifically, the Court held that the fact that "other Negroes also failed to score well would, alone, not demonstrate that respondents individually were being denied equal protection of the laws by the application of an otherwise valid qualifying test being administered to prospective police recruits." *Id.* at 246.

This is similar to what Plaintiff is claiming here. Although he has alleged that the content of the examinations are biased against minorities, he has failed to produce evidence in that regard. The evidence before the Court demonstrates that the 1999 examination had an "adverse impact" on minority applicants and that Plaintiff believes that his scores for the oral examination were altered. FN15 Plaintiff has also claimed that there was no discernable difference between the 1999 examination and the examination given in 2003. Plaintiff has admitted, however, that when he took the 1995, 1999 and 2003 police sergeant examinations, he found nothing about the questions on the three exams to suggest that white candidates would understand them better than black candidates would. *Id.* ¶¶ 16, 47, 66. Moreover, during the oral portion of the exam, the oral panelists-which were not members of or affiliated with the Hartford Police Department-did not do or say anything to indicate to Plaintiff that his race mattered to them. *Id.* ¶¶ 16, 48, 67. Plaintiff has not shown that the examinations were invalid or racially biased. This is not the purposeful invidious race-based discrimination necessary for a finding that Defendants' promotional policies and procedures violate the equal protection clause of the Fourteenth Amendment. *See Washington v. Davis,* 426 U.S. at 239 ("Our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact").

FN15. As noted above, however, Plaintiff has no evidence indicating that the scores he received from the oral panelists on the 1995 exam were not an honest assessment of his performance on that exam nor that panelists' grading was racially skewed. Pl's Rule 56(a)(2) Statement ¶ 19.

*17 Plaintiff also makes the unsupported assertion that the oral panelists were predominately white and thus, by implication, biased against him on the basis of his race. *Id.* at 20. The only evidence on this issue, however, is presented in Defendants' Rule 56(a)(1) Statement, which provides the races of the oral examiners for the 1999 examination. As Plaintiff admits, the evidence shows that for the 1999 oral examination, five of the panelists were white, three were black and one was hispanic. *See* Pl's Rule 56(a)(2) Statement ¶ 37. This is not sufficient to constitute evidence of purposeful discrimination.

Plaintiff contends that evidence showing that decisionmakers promoted white officers in the absence of vacancies, extended lists from which white officers would benefit and closed lists where a significant number of minority officers would benefit provides the requisite evidence of purposeful discrimination. Pl's Mem. Opp. Mot. Summ. J. at 21. Specifically, Plaintiff has presented evidence going to show that two officers were promoted to the rank of lieutenant in the absence of any existing vacancies. *See* Pl's Aff. at Exh. B (showing the promotions of Cancel and Camilleri on July 28, 1996 and the status report for the week of July 29, 1996 showing two overages for the lieutenant position). Similarly, the status report for January 4, 1999 shows that there were four captains and one vacancy for the captain position in that week. The status report for the following week, dated January 11, 1999, shows seven captains and an overage of two captains, indicating that, at least that one time, persons were promoted in the absence of vacancies. *See* Kenton Aff. at Exh. A (containing the status reports for the weeks of January 4 and 11, 1999). Plaintiff also notes that the status report for January 4, 1999 shows that there were four deputy chiefs although only three positions were authorized, resulting in one overage. *See* Kenton Aff. at Exh. A. Plaintiff cites, as another example, the status reports for the weeks of March 9, 1998 and April 14, 1998, which show that two officers were promoted to Assistant Chiefs in the absence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy   Page 17

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

any existing vacancies. *See id.* Plaintiff contends that during these periods, the "vacancies in the ranks of sergeant remained empty" and argues that this "arbitrary exercise of power" is within the chief of police's control and evidences a pattern of discrimination against minority officers. *See* Pl's Mem. Opp. Mot. Summ. J. at 17-18. Plaintiff does not, however, present evidence as to the race of the persons promoted. Moreover, Plaintiff offers no evidence to show that the promotions were made in a discriminatory manner.[FN16]

> FN16. Plaintiff also cites the promotion of Deputy Chief Daryl Roberts from the rank of lieutenant to deputy chief without having served as a captain as evidence of the arbitrary and discriminatory exercise of power. Pl's Mem. Opp. Mot. Summ. J. at 18. Plaintiff, however, fails to note that Roberts is also a black male.

Similarly, Plaintiff offers no evidence to support his theory that promotion lists were not extended for discriminatory reasons, and specifically, that filling only nine of the eighteen police sergeant vacancies in May of 1997 was motivated by racial bias against Plaintiff. Due to his position on the promotional eligibility lists-i.e., at the bottom of the list in relation to unfilled vacancies-Plaintiff would have been eligible for promotion only to the extent that another individual, ranked higher on the list, would not have been promoted. Although Plaintiff argues that the promotional eligibility lists were shut down in a discriminatory manner, the only evidence presented with regard to this issue indicates that at the time the 1995 promotional list expired, seven of the next ten eligible candidates for promotion were white, two were hispanic and only one-Plaintiff-was black. *See* Pl's Rule 56(a)(2) Statement ¶¶ 28-30. Defendants assert that not all vacancies are filled at all times and that more often than not, they are not filled.[FN17] *See* Defs' Mem. Supp. Mot. Summ. J. at 12. In the face of such a paucity of evidence of discrimination, Plaintiff's bald assertion that the manner in which the list was closed down was "inconsistent with the customary policy of the Hartford Police Department"-which, according to Plaintiff, was to extend lists until all vacancies had been filled-is insufficient to conclude that the list was not extended for discriminatory reasons. The failure to fill available vacancies has the same impact on any candidate eligible for promotion as it does on Plaintiff and he has presented no evidence to show that Defendants declined to fill vacancies for discriminatory reasons. Without more evidence it cannot be said that, even if the police chiefs exercised power "arbitrarily," they also did so in a purposefully discriminatory manner.

> FN17. It is undisputed that vacancies have frequently remained unfilled. For example, the parties agree that as of September 13, 1999, two captain, four lieutenant, seven sergeant and five police officer positions remained unfilled, as of October 18, 1999, two captain, four lieutenant, seven sergeant, two detective and six police officer positions remained unfilled, as of January 31, 2005, one assistant chief, eleven lieutenant, sixteen sergeant, seven detective and sixty-eight police officer positions remained unfilled and as of June 20, 2005, one captain, six lieutenant, fifteen sergeant, three detective and seven police officer positions remained unfilled. Defendants cite numerous other instances of this practice. *See* Pl's Rule 56(a)(2) Statement ¶ 78.

*18 Plaintiff also provides statistics purporting to show the existence of a "deliberate policy to insure that whites remain in power in the Hartford Police Department." *See* Pl's Mem. Opp. at 16; Exh. A to Pl's Aff. These statistics show, however, that from 1984 to 1999 the percentage of minority officers increased from 25.20 percent to 37.15 percent and the percentage of female officers increased from 6.6 percent to 11.25 percent. *See* Exh. A to Pl's Aff. During this same period of time, the percentage of minorities in a rank above "officer" increased from 6.67 percent in 1984 to 10.21 percent in 1999, whereas the percentage of whites in a rank above "officer" decreased from 28.69 percent in 1984 to 23.40 percent in 1999. *Id.*

Based on the undisputed facts, it has not been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                  Page 18
Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

shown that Defendants acted in such a way as to "purposefully discriminate" against Plaintiff, but only that the 1999 police sergeant examination had a disparate impact on minority candidates. *See id.* ¶ 76. Accordingly, summary judgment is granted on Counts Three and Five of the Amended Complaint.

### 3. *42 U.S.C. § 1983 Claim against the City of Hartford*

#### a. *Policy or Custom*

A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (rejecting respondeat superior as a basis of § 1983 liability); *see also Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 399, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (stating that "in enacting § 1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights," and holding that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor"). In order to hold a municipality liable under 42 U.S.C. § 1983, Plaintiff must "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983), additional citations omitted). Summary judgment is appropriate when a plaintiff fails to present any evidence or allegation of an official policy. *See Sagendorf-Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996).

Such a municipal policy need not be express; the policy or custom may be inferred from the informal actions or omissions of supervisory municipal officials. *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Accordingly, "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista,* 702 F.2d at 397; *see also Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870-71 (2d Cir.1992) ("So long as the discriminatory practices of city officials are persistent and widespread, they 'could be so permanent and well settled as to constitute a custom or usage with the force of law,' and thereby generate municipal liability.") (quoting *Monell,* 436 U.S. at 691). Before the actions of a subordinate city employee could give rise to § 1983 liability, however, "the discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco,* 971 F.2d at 871 (citing *Praprotnik,* 485 U.S. at 130; *Krulik v. Board of Educ. of the City of New York,* 781 F.2d 15, 23 (2d Cir.1986)). A municipality thus becomes accountable for acquiescing in a "custom" only when it knowingly tolerates a pattern or practice of unconstitutional conduct.

**\*19** Defendants argue that the "undisputed facts of this case demonstrate that, even if the allegations in the complaint are true, they could not have taken place pursuant to any established policy of the City of Hartford, as the City's adopted policies are ones of non-discrimination." Defs' Mem. Supp. Mot. Summ. J. at 15. Plaintiff does not dispute the fact that the official city policy prohibits racial discrimination. However, Plaintiff asserts that despite the non-discrimination policy in the City Charter, "the Police Chief had policy making authority by exercising, repeatedly and with the acquiescence of the City, the power to extend or not extend [promotional eligibility lists]." Pl's Mem. Opp. at 25.

If, as Plaintiff argues, his contention is that the actions complained of were "taken or caused by an official whose actions represent official policy," then it is the job of this Court to "determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000) (citations omitted). It is not sufficient for Plaintiff to show that the official had *discretion* in a certain area; "[o]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 19
Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

1983 liability." *Id.* (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), in turn quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)).

"[T]he official in question need not be a municipal policymaker for all purposes." *Id.* With respect to the conduct challenged, the official must be " responsible under state law for making policy in that area of the [municipality's] business." *Id.* (quoting *Praprotnik,* 485 U.S. at 123); *see also Pembaur,* 475 U.S. at 481 (plurality opinion) (holding that the official must "possess[ ] final authority to establish municipal policy with respect to the action ordered"). The issue of whether the official in question is a "final policymaker" in a given area is a question of law "to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *accord Jeffes,* 208 F.3d at 57. The Second Circuit has held that "[w]here a plaintiff relies ... on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes,* 208 F.3d at 57-58.

To determine who possesses final policymaking authority, the Court looks to state law. *McMillian v. Monroe County,* 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (explaining that a court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"). The City of Hartford adopted Equal Employment Opportunity ("EEO") policies in 2002. Pl's Rule 56(a)(2) Statement ¶ 105. The City of Hartford Affirmative Action and EEO Policy states that "it is the policy of the City of Hartford to uniformly apply criteria for recruitment, selection, assignment, evaluation, compensation, promotion, discipline and other personnel actions without regard to race, color, sex, religion, national origin, age, mental or physical disability, sexual orientation, marital status or ancestry." *Id.* ¶ 106 (quoting Kenton Aff. ¶ 9). The Hartford Charter, in effect through December of 2003, provides that "all powers vested in the City of Hartford shall be exercised by the Court of Common Council," *see* Chapter II, Section 8, that " final policy-making authority over the organization, the conduct and operation of all City departments, including the creation of personnel policy, is vested in the Court of Common Council," *see* Chapter III, Section 14, that "no person in the classified service of the city of seeking admission thereto shall be appointed, promoted, reduced, removed or in any way favored or discriminated against because of his race, his national origin or his political or religious opinions or affiliations," *see* Chapter XVI, Section 12, that the Director of Personnel has the authority to "prepare and recommend to the personnel board rules to carry out of the provisions of this chapter," *see* Chapter XVI, Section 2, that the Personnel Board has "the authority to adopt or amend rules recommended by the Personnel Director after public hearing," *see* Chapter XVI, Section 5, and that the Court of Common Council has "final authority to approve or disapprove the rules adopted by the Personnel Board," *see* Chapter XVI, Section 5. Pl's Rule 56(a)(2) Statement ¶¶ 107-12 (quoting the Hartford City Charter).

*20 Nowhere in the Charter is the Police Chief given any power to create policy with respect to employment decisions. The Charter, Chapter X, Section 2, provides only that:
The chief of police shall be in direct command of the department of police. Subject to the provisions of Chapter XVI of this charter he shall appoint and remove all other officers and employees of the department. He shall assign all members of the department to their respective posts, shifts, details and duties. He shall makes rules and regulations, in conformity with the ordinances of the city, concerning the operation of the department and the conduct of all officers and employees thereof.

*Id.* ¶ 113 (quoting Hartford City Charter, Ch. X. § 2). Notably, the Police Chief's powers to appoint or remove-including his power to make promotions-are expressly made "subject to" the antidiscrimination provisions of Chapter XVI. In contrast to this grant of discretion with respect to employment decisions, the Police Chief is given authority to make rules and regulations-in conformity with city ordinances-concerning the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01350-CFD   Document 112-3   Filed 10/04/2006   Page 8 of 12

Page 21 of 25

Slip Copy                                                                                                     Page 20

Slip Copy, 2006 WL 1438649 (D.Conn.)
(Cite as: Slip Copy)

operation of the department and the conduct of its employees.

This separation of policymaking authority from a grant of discretion is the situation contemplated by the Supreme Court in *Pembaur,* 475 U.S. at 484 n. 12:

[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

According to *Pembaur,* a grant of discretion is not equivalent to policymaking authority and, importantly, does not give rise to municipal liability. Plaintiff must show something more than that the Police Chief had authority to exercise discretion in making hiring and promotion decisions. *See Looby v. City of Hartford,* 152 F.Supp.2d 181, 188-89 (D.Conn.2001) (holding, in "the absence of any evidence that the Director of Personnel or the Personnel Board had delegated their authority to make employment policy to the Chief," that the municipality was entitled to summary judgment on the plaintiff's § 1983 claims).

*21 In this case, as in *Looby,* Defendants Croughwell, Barrows and Marquis, during their respective tenures as police chiefs, were constrained by policies established in the Personnel Rules and by the Court of Common Council and the City Manager. Important to this issue, Plaintiff has admitted that Rule VII of the City of Hartford Personnel Rules and Regulations provides that it is the Personnel Director who, with the approval of the Personnel Board, has the discretion to extend a promotional eligibility list for up to one year. Pl's Rule 56(a)(2) Statement ¶ 3. When promotional vacancies do occur within a City of Hartford department, it is the Director of Personnel who certifies to the department head names of eligible employees from the eligibility list. *Id.* ¶ 4. Plaintiff has not presented any evidence showing that the individual defendants had any ability to alter these policies. Based on the foregoing, it is evident that the individual defendants did not have policymaking authority with respect to promotions nor with respect to extending promotional eligibility lists. Accordingly, the City of Hartford is entitled to summary judgment on all § 1983 claims.

4. *42 U.S.C. § 1983 Claims against the Individual Defendants*

a. *Personal Involvement*

As stated above, the doctrine of respondeat superior does not apply to § 1983 actions. Accordingly, for Plaintiff to maintain a cause of action against an official (i.e., the individual defendants), he must show that the official was "personally involved in the alleged deprivation of his constitutional rights." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997); *accord Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) ("when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required"). In order to hold supervisory officials liable under § 1983, Plaintiff must show that he or she:
(1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 21
Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

*Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Plaintiff does not allege that the individual defendants sat on any oral examination panel that evaluated Plaintiff or that any of them altered or affected his scores in any way. *See* Pl's Rule 56(a)(2) Statement ¶ 84. Moreover, Plaintiff concedes that his name never appeared on a certification list for promotion provided to Defendants Croughwell, Barrows or Marquis while each was serving as police chief. *See id.* ¶¶ 73-75. Plaintiff does allege, however, that the individual defendants directly participated in the constitutional deprivation. Specifically, Plaintiff claims that the individual defendants, in a discriminatory manner, (1) extended promotional eligibility lists when candidates were white, (2) promoted white candidates in the absence of vacancies and (3) declined to extend the promotional eligibility lists when minorities made up a large percentage of the remaining candidates. Pl's Mem. Opp. Mot. Summ. J. at 26.

*22 Plaintiff admits, however, that not all vacancies existing at any particular rank within the Hartford Police Department are filled. *See* Pl's Rule 56(a)(2) Statement ¶ 76. Plaintiff also admits that it is the Personnel Director who, with the approval of the Personnel Board, has the discretion to extend promotional eligibility lists. *Id.* ¶ 3. Defendants assert that the question of whether vacancies are filled depends on a number of varying factors, whereas Plaintiff contends that "the Police Chief has enormous discretion in this matter and has on occasion extended lists for two extension periods, such as in the case of the 2000 Captain's list." *Id.* (citing Buyak Aff. ¶ 3; Roberts Aff. ¶ 4). Although Plaintiff claims that the 2000 Captain's list was extended for two six-month periods, it is clear that a failure to extend eligibility lists is not uncommon. For example, with regard to the duration of eligibility promotion lists, the parties agree that the 1975 police sergeant eligibility list was not extended beyond its original two-year duration, the 1982 list was not extended, the 1990 list was extended for an additional year, the 1995 list was not extended, the 2000 list was extended for an additional year and the 2004 list was scheduled to expire on February 27, 2006. *Id.* ¶¶ 85-90. Similarly, it has been established that the 1976 police lieutenant eligibility list was not extended beyond its original two-year duration, the 1981 and 1990 lists were both extended for an additional year, the 1994 list was not extended beyond its original two-year duration and the 2001 list was extended for an additional year. *Id.* ¶¶ 98-102.

Plaintiff also alleges that the individual defendants are liable under a failure to remedy theory. Specifically, Plaintiff claims that the individual defendants "did not take action to invalidate the 1998/9 sergeant's list when the adverse racial impact of the test became apparent." Pl's Mem. Opp. at 26. The Court assumes that by becoming "apparent," the Plaintiff is referring to the October 27, 1999 letter from Bruce Davey and Associates to Susan Comstock. As stated previously, however, the letter makes reference to the disparate impact of this examination but ultimately confirms its validity. Moreover, Plaintiff conceded that he did not "know for a fact" whether Susan Comstock shared the letter in question with anyone or whether anyone ever shared the letter with Chief Croughwell, acting Chief Barrows or Chief Marquis. *See* Pl's Depo. at 31-33. Accordingly, Plaintiff does not proffer sufficient evidence to find the individual defendants personally liable.

b. *Qualified Immunity*

Defendants argue that even if the Court finds that the individual defendants were personally involved in the alleged constitutional deprivations, summary judgment should still be granted in their favor because they are shielded from liability by the doctrine of qualified immunity. "Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as of the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *accord Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (finding qualified immunity to be "essentially [a] legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 22
Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

question").

*23 "The privilege of qualified immunity generally shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ying Jing Gan,* 996 F.2d at 532 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Government officials are entitled to qualified immunity if the alleged unlawful action is, as a matter of law, objectively reasonable when " assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), in turn quoting *Harlow v. Fitzgerald,* 457 U.S. at 818-19). To determine whether a particular rule was "clearly established" at the time of the alleged constitutional deprivation, the Second Circuit directs courts to consider:
(1) whether the right in question was defined with " reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Id.* at 533 (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

Even where a plaintiff's federal rights and the scope of an official's permissible conduct are shown to be "clearly established," the privilege of qualified immunity "should be upheld unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *Id.* (quoting *Anderson v. Creighton,* 483 U.S. at 640). A government official's actions are "objectively unreasonable" and not protected by qualified immunity when "no officer of reasonable competence could have made the same choice in similar circumstances." *Anthony v. City of New York,* 339 F.3d 129, 137 (2d Cir.2003) (quoting *Lennon v. Miller,* 66 F.3d 416,

420-21 (2d Cir.1995)); *see also Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citation and quotation marks omitted).

Summary judgment is appropriate in cases where the defendant can show that it was unclear at the time he or she acted that "the interest asserted by the plaintiff was protected by federal law" or, even if the plaintiff's rights were "clearly established" and his interests clearly protected by federal law, where it was at least "objectively reasonable for [the official] to believe that his acts did not violate those rights." *Ying Jing Gan,* 996 F.2d at 532 (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). The asserted constitutional right, i.e., to be free from racial discrimination, was "clearly established" at the time the alleged wrongful acts occurred. Defendants have demonstrated, however, that promotional eligibility lists were often not extended past their original term and it is undisputed that Plaintiff's name never appeared on a list certified to any of the individual defendants. Moreover, Plaintiff has not established that the failure to extend promotional eligibility lists had a disparate impact on minority candidates. Accordingly, Plaintiff has not shown that the individual defendants' acts were so unreasonable that "no officer of reasonable competence could have made the same choice in similar circumstances. " *Anthony,* 339 F.3d at 137. Accordingly, because Plaintiff has not shown the requisite level of personal involvement and because the individual defendants are protected by the defense of qualified immunity, the individual defendants are entitled to summary judgment on all § 1983 claims.

*5. 42 U.S.C. § 1983 Claims against the Individual Defendants in Official Capacities*

*24 As Defendants correctly argue, any § 1983 claims against the Individual Defendants in their Official Capacities should be dismissed, as public officials named in their official capacities are not " persons" subject to suit under § 1983. *Will v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 23

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

*Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and thus " is no different from a suit against the State itself"). Plaintiff, however, claims that he is suing the individual defendants only in their individual capacities and not in their official capacities, thus rendering Defendants' argument and decision on this issue unnecessary. *See* Pl's Mem. Opp. Mot. Summ. J. at 28-29.

### 6. *42 U.S.C. § 1983 Claims against the Hartford Police Department*

Although a municipality is subject to suit pursuant to 42 U.S.C. § 1983, *Monell,* 436 U.S. at 690, a municipal police department is not a municipality nor a "person" within the meaning of § 1983. *See Dean v. Barber,* 951 F.2d 1210, 1215 (11th Cir.1992) (affirming district court's dismissal of claims against county sheriff's department because, under state law, sheriff's department lacked capacity to be sued); *accord Nicholson v. Lenczewski,* 356 F.Supp.2d 157, 163-64 (D.Conn.2005) (collecting cases). A municipal police department is "a sub-unit or agency of the municipal government through which the municipality fulfills its policing function." *Nicholson,* 356 F.Supp.2d at 164. "Because a municipal police department is not an independent legal entity, it is not subject to suit under section 1983." *Id.* at 164; *accord Jones v. Waterbury Police Dep't,* No. 3:04cv2137 (MRK), 2005 U.S. Dist. LEXIS 9411, *4 (D.Conn.2005). Accordingly, Plaintiff's § 1983 claims against the Hartford Police Department are dismissed.

### 7. *Retaliation Claim*

With regard to his § 1983 retaliation claim, Plaintiff has not alleged a cognizable violation of the Constitution, unless Plaintiff has erroneously failed to cite the First Amendment. *See Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (holding that a § 1983 claim must be "based on a distinct violation of a constitutional right") (quoting *Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994)). Plaintiff would be granted an opportunity to amend his complaint in this regard, however, in light of the fact that Plaintiff's § 1983 claims have been dismissed on other grounds, leave to amend would be futile and is denied.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 36] is granted on all remaining counts and Defendants' Motion to Strike [Doc. No. 53] is granted in part and denied in part. The Clerk shall close the case.

SO ORDERED.

D.Conn.,2006.
Knight v. Hartford Police Dept.
Slip Copy, 2006 WL 1438649 (D.Conn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3627556 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Portions of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Oct. 24, 2005) Original Image of this Document (PDF)
• 2005 WL 3627557 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Support of Motion to Strike Portions of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Oct. 24, 2005) Original Image of this Document (PDF)
• 2005 WL 3627558 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Oct. 24, 2005) Original Image of this Document (PDF)
• 2005 WL 2892146 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment (Sep. 27, 2005) Original Image of this Document (PDF)
• 2005 WL 2892148 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Sep. 24, 2005) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 24

Slip Copy, 2006 WL 1438649 (D.Conn.)
**(Cite as: Slip Copy)**

• 3:04cv00969 (Docket) (Jun. 15, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.