UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIRSTEN EJCHORSZT,<br>    Plaintiff<br><br>v.<br><br>JAMES F. DAIGLE, JR.,<br>LOUIS F. FUSARO, Chief of Police<br>MARK LOUNSBURY; POLICE<br>DEPARTMENT OF THE CITY OF<br>NORWICH, AND CITY OF NORWICH<br>    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    Civil Action No. 3:02CV1350(CFD) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

In August 2002, Kirsten Ejchorszt commenced an action in the Connecticut Superior Court against defendants Louis T. Fusaro (the Chief of the Norwich Police Department), the City of Norwich ("Norwich"), and the Norwich Police Department[1] (collectively the "Norwich defendants"), Mark Lounsbury, a Norwich police officer, and James F. Daigle, Jr., a former Norwich police officer. The Norwich defendants subsequently filed a notice to remove the case to this court. Ejchorszt's claims stem from an incident in November 2001, during which Daigle allegedly took semi-nude photographs of Ejchorszt during a "sting" operation conducted by Daigle.

Counts One though Eight and Twelve of the complaint allege various state and federal claims against Daigle. Those claims are not at issue here. In Count Nine Ejchorszt alleges that

---

[1] "A municipal police department, however, is not a municipality nor a "person" within the meaning of section 1983." Nicholson v. Lenczewski, 356 F. Supp.2d 157, 164 (D. Conn. 2005). Thus, the Norwich Police Department and the City of Norwich will be treated as a single defendant for the analysis under section 1983.

Fusaro is liable for negligent supervision under Connecticut law, in Count Ten that the City of Norwich is responsible for indemnifying Ejchorszt for the acts of Daigle, Lounsbury and Fusaro, and in Count Eleven that all of the defendants are liable under 42 U.S.C. § 1983. Lounsbury and the Norwich defendants have filed a motion for summary judgment, seeking to dismiss those counts. Ejchorszt does not oppose the motion for summary judgment as to Lounsbury on all of the claims directed against him. Accordingly, the motion for summary judgment in favor of Lounsbury is granted without objection. For the reasons set forth below, the remainder of the motion is granted in part and denied in part.

I.   **Background**[2]

In November of 2001, Daigle was a Norwich police officer with the rank of lieutenant.[3] He was responsible for implementing Norwich's underage alcohol sales prohibition program. This "sting" approach used underage volunteers to attempt to buy alcoholic beverages from bars and liquor stores either while wearing concealed audio recording devices or accompanied by undercover Connecticut Department of Liquor Control officers.

On November 30, 2001, Ejchorszt agreed to volunteer for a sting operation that was to take place that evening. She was twenty years old at the time. Daigle decided that Ejchorszt would wear a concealed body microphone "wire" during the investigation. He took her into a conference room in the police headquarters to affix the wire. Daigle asked Ejchorszt to remove

---

[2] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs and other evidence submitted by the parties. They are undisputed by the Norwich defendants and Ejchorszt unless otherwise noted.

[3] Daigle was promoted from sergeant to lieutenant in November of 2001.

her shirt, and then he removed her brassiere.  Daigle affixed the wire to Ejchorszt, touching her breast in the process.  He then informed Ejchorszt that he had to photograph her bare chest and back.  According to Ejchorszt, Daigle told her that the purpose of the photographs was to prove that she was not concealing false identification cards in her undergarments.[4]  Daigle took several photographs of Ejchorszt's bare chest and back using a department digital camera.  Daigle then allowed Ejchorszt to get dressed and they left the conference room.

When Daigle and Ejchorszt returned to the station after the sting operation, he again took her to the conference room and asked her to remove her shirt.  Daigle photographed Ejchorszt with her bra on, and then asked her to remove her bra and took more photographs.  According to Ejchorszt, Daigle also told her that he was required to strip search her, but that he would not do so because he knew her father.  Finally, Daigle told Ejchorszt that he would return the photographic disk to her after downloading the pictures onto his computer, and asked her not to talk to other officers about the sting operation.

On December 3, 2001, Ejchorszt and her father filed a complaint about Daigle with Chief Fusaro.  Deputy Chief Warren Mocek was assigned to investigate Ejchorszt's complaint.  As a result of publicity about the investigation, two additional young women who had participated as volunteers in the underage alcohol sting program came forward with allegations that Daigle had taken similar nude and semi-nude photographs of them with the pretext that they were needed for legitimate police purposes.[5]  Following Mocek's six-month long investigation, Daigle was

---

[4] During a subsequent internal police department investigation into Daigle's conduct, he testified that the purpose of the photographs was to document that the wire was in place.

[5] These women also filed suit in the District of Connecticut against Daigle and the Norwich Defendants.  See Wilson v. Norwich, Civil No. 3:02-cv-1026(CFD) and Earl v. Daigle,

terminated from the Norwich Police Department for, among other things, conduct unbecoming an officer, violation of the department's strip search policy, failure to conform to the police code and canon of ethics, inappropriate use of his official position, neglect of duty, incompetence, and poor judgment.

In 1987 and 1998 Daigle had taken consensual nude and partially nude photographs of two female civilian employees of the Norwich Police Department and shared these photographs with other members of the Norwich Police Department. Sometime before the incident in this case, Fusaro became aware of Daigle's photographs of one of the employees during an investigation of another police officer, but he had never seen those photographs.

Daigle had received training on conducting strip searches of female prisoners, and had received sexual harassment training. Prior to November 2001, he had also received training on conducting alcohol sting operations, but received no particularized training on working with underage volunteers.

## II.    Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

---

Civil No. 3:03-cv-01323(SRU). The Norwich defendants filed motions for summary judgment in these cases. Their motion for summary judgment was granted absent opposition in the Earl case. Their motion for summary judgment in the Wilson case is currently pending before this Court.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 5(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is

summary judgment proper." Maffucci, 923 F.2d at 982.

### III.    The Norwich Defendants' Motion

The Norwich defendants concede Daigle violated Ejchorszt's civil rights. However, these defendants argue that they are not liable for Daigle's conduct. The Court will first address the issues concerning the federal constitutional claims in Count Eleven, then the state law claims in Counts Nine and Ten.

#### A.    Section 1983 Claims

Count Eleven is a claim brought against Norwich and Fusaro under 42 U.S.C. § 1983 alleging violations of Ejchorszt's right to bodily privacy, unreasonable intrusion of Ejchorszt's person, and violations of equal protection under the Fourteenth Amendment to the United States Constitution. See Poe v. Leonard, 282 F.3d 123, 138-39 (2d Cir. 2002) (recognizing Fourteenth Amendment right to bodily privacy in a similar context).[6]

In order to state a § 1983 claim against a municipality or its "policymakers," a plaintiff must allege that the unconstitutional act occurred pursuant to an official policy or custom. Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658 (1978). Also, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." Poe, 282 F.3d at 140. However, a supervisor may be liable if the plaintiff can "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." Id., at 134 (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1978)).

---

[6] Because it does not affect the outcome, the Court will assume that Ejchorszt's right to be free from unreasonable intrusion of her person and to equal protection of the law are also implicated.

Ejchorszt argues that Norwich is liable for Daigle's conduct because it delegated policymaking authority to Daigle for the liquor investigation program, and that, through Daigle, Norwich established a policy or custom of exploiting volunteers. Ejchorszt also argues that Fusaro is liable, in his capacity as Daigle's supervisor, because he failed to properly train and supervise Daigle.[7] Finally, Ejchorszt argues that Fusaro was also a "policymaker" for Norwich, and that his failure to properly supervise and train Daigle represented municipal policy.

### 1. Daigle as a Purported "Final Policymaker"

According to Ejchorszt, Daigle was vested with authority to make official municipal policy about the operation of the underage alcohol sting program, and thus Norwich should be liable for the manner in which Daigle operated the program.[8] "Where a plaintiff relies . . . on the

---

[7] This theory of liability is inconsistent with the fact that Fusaro is sued only in his official capacity. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225-226 (2d Cir. 2004) ("when the defendant sued . . . under § 1983 is . . . an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom" (internal citation omitted)). However, because it does not affect the outcome of this motion, the Court will consider each theory of liability suggested by Ejchorszt.

To the extent that Ejchorszt intended to sue Fusaro in his individual capacity the doctrine of qualified immunity applies. In the context of supervisory liability the usual qualified immunity analysis contains an additional element; not only must the federal right the plaintiff alleges was violated have been clearly established, but the theory under which the supervisor may be held liable must also have been clearly established. See Poe, 282 F.3d at 140. In Poe the Second Circuit set forth the following test for overcoming a supervisor's qualified immunity:

> [the plaintiff] must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [his subordinate] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the plaintiff].

Id. at 142. As set forth below in the text, this test has not been satisfied and Fusaro would be entitled to qualified immunity.

[8] The Norwich defendants argue that it is inappropriate to consider Ejchorszt's delegation argument because it was not contained in the complaint. Because the Court finds that Ejchorszt

theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-482, 106 S.Ct. 1292, 1299 (1986) (internal footnote omitted). According to the Supreme Court of the United States:

> the authority to make municipal policy is necessarily the authority to make final policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.

City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926 (1988) (plurality opinion) (holding that whether official is policymaker is governed by state law and is not issue of fact for jury to decide). See also Jett v. Dallas Independent School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2723 (1989) (endorsing position of Praprotnik plurality that determination of who has policymaking authority is a legal question based on state law). In Anthony v. City of New York the United States Court of Appeals for the Second Circuit confirmed that it does not accept "the view that mere exercise of discretion was sufficient to establish municipal liability." 339 F.3d 129, 139 (2d Cir. 2003). Thus, in Anthony the court rejected the plaintiff's argument that a New

---

has failed to raise an issue of material fact as to whether final policymaking authority was delegated to Daigle, it is unnecessary to consider whether the defendants had adequate notice of this theory of liability.

York Police Department sergeant who authorized two officers to take the plaintiff into custody was "a final decision-maker because he had discretion to determine how to handle the particular situation at" the scene. Id. at 139-40.

Professor Chemerinsky, in analyzing the decisions of the United States Supreme Court and lower federal courts providing guidance on when a municipal official becomes a policymaker for § 1983 purposes states that "much remains unclear as to which municipal officials should be deemed to possess final decision-making authority." E. Chemerinsky, Federal Jurisdiction § 8.5, p. 497 (4th ed.2003). However, "[t]he crucial question . . . is whether under state or local law, including relevant customs or practices, the person has policy-making authority for the city." Id. at p. 499

Construing the evidence in the light most favorable to the plaintiff, Daigle had considerable discretion in the implementation of Norwich's undercover alcohol operation. For example, he determined when to conduct "stings," which stores and bars to investigate, which other police officers would assist and which civilian volunteers to recruit. However, Ejchorszt has neither established that these tactical decisions by Daigle were "final" nor that they represented official policy for the purpose of deciding policymaker status under Section 1983.

Daigle's decisions cannot be viewed as final because he was still subject to overall supervision by his superiors. Daigle's decisions were at all times subject to review by several layers within his chain of command. Further, Daigle was subject to department policy that was not of his own making. Indeed, after his conduct came to light Daigle was investigated and discharged for violating official policy including the department's strip search policy, the police code and canon of ethics, and for inappropriate use of his official position.

In addition, Ejchorszt has failed to demonstrate that Daigle's decision making amounted to "policymaking." Plaintiff has pointed to no state or local law, or custom or practice with the force of law that gave Daigle policymaking authority for Norwich, even within the limited area of the liquor control program. There are many similar initiatives undertaken by police departments to reduce certain types of criminal conduct, but they do not necessarily confer "policymaker" status on the officers leading those efforts. It would seem that tactical decisions by unit leaders on operational aspects of law enforcement would not ordinarily confer policymaker status on those unit leaders. Cf. Auriemma v. Rice, 957 F.2d 397, 401 (7th Cir. 1992) ("[t]hat a particular agent is the apex of a bureaucracy makes the decision 'final' but does not forge a link between 'finality' and 'policy'") quoted by Hurdle v. Board of Education of the City of New York 113 Fed.Appx. 423, 427 (2d Cir. 2004) (holding that decision-making authority does not equate to policymaking authority). Accordingly, Ejchorszt has failed to establish that Daigle was a final policymaker for Norwich concerning the liquor law enforcement program.

Ejchorszt has also failed to present a genuine issue of material fact that Norwich had an official custom of exploiting volunteers. "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388 (1997). However, there is no evidence that other Norwich officers engaged in similar sexual exploitation, or that policymaking officials were aware of Daigle's conduct before Ejchorszt's complaint.

## 2. Failure to Supervise by Fusaro

Ejchorszt claims that Fusaro is liable under § 1983 for failing to properly supervise Daigle in the sting program, especially in light of his prior knowledge of Daigle's incident involving the photographs of his coworker.

According to the United States Court of Appeals for the Second Circuit:

> a supervisor may be found liable for his deliberate indifference to the rights of others . . . for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury.

Poe, 282 F.3d at 140. "Plaintiff[ ] must establish [defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' but that [defendant] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct." Amnesty America v. Town of West Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (citing Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir.1995)).

When a policymaking supervisor for a city is responsible for grossly negligent supervision, both the supervisor and the city may be liable. Amnesty America, 361 F.3d at 126 ("[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989))). For example, in Fiacco v. City of Rensselaer, the Second Circuit found that a plaintiff may establish a basis for municipal liability by alleging that the city's policymakers were "knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by the failure of the City defendants to exercise

reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force." 783 F.2d 319, 326-27 (2d Cir. 1986). In Poe v. Leonard, the Second Circuit considered whether a Connecticut state police supervisor was liable for a video recording his subordinate secretly made of a female volunteer while she was changing clothes in preparation for filming a training video for state police recruits. 282 F.3d 123 (2d Cir. 2002). The Court held that the supervisor's prior knowledge of another training film by the officer which had an "over long focus on the [female] civilian's . . . upper thigh region" and an expressed desire by the officer to show "a lot of cleavage" in the new film was not enough to provide notice to the supervisor to invoke supervisory liability. Id. at 145-47. The Court refused to consider other relevant prior conduct by the officer because the supervisor was unaware of that conduct, and the Court found that the supervisor could not be liable for failing to review his subordinates' disciplinary record upon assuming command, absent some independent reason for him to do so. Id. at 142.

Recently, another court within this district found no basis for municipal liability based on a police chief's failure to screen a constable prior to reappointment. Atwood v. Town of Ellington, 427 F. Supp.2d 136, 148 (D. Conn. 2006). Even though the constable had a history "which may have been suggestive of aggressive or violent tendencies toward women" the court found that the police chief was not aware of this history and even if the chief were aware of it, the constable's prior inappropriate conduct "would not necessarily have made it 'plainly obvious' to the Town at the time that [the constable] might have had sexually abusive propensities." Id. at

148.[9]  In a later decision, the Atwood Court also rejected the plaintiff's supervisory liability claim against the constable's superior officer, a state trooper working for the Town of Ellington under a "resident trooper" arrangement.  Atwood v. Town of Ellington, 468 F. Supp.2d 340 (D. Conn. 2007).  Even though the state trooper was aware of the constable's past inappropriate conduct, the Atwood Court found that behavior insufficiently predictive of the constable's later unconstitutional act.  Id. at 358.

In this case, Ejchorszt has shown only that Fusaro was aware of one set of photographs taken years earlier by Daigle of a consenting female colleague.  Ejchorszt also argues that "the repeated choice of a female operative should have been a red-flag to any of Daigle's so-called supervisors."  However, Ejchorszt admits that Fusaro was not aware that Daigle only recruited female volunteers for the alcohol control program.  Even drawing all reasonable inferences in Ejchorszt's favor, this history was not enough to make it plainly obvious to Fusaro, or to Norwich, that Daigle might abuse his position of authority in running the liquor sting operation to cause young women to pose for semi-nude photographs.  It thus fails the Poe test that the information known to the supervisor be sufficient to put a reasonable supervisor on notice that there was a high risk that the subordinate would violate another person's constitutional rights. Poe, 282 F.3d at 146.

### 3. Failure to train

Fusaro and Norwich also claim that they cannot be liable for failure to properly train

---

[9] In Atwood, the constable sexually assaulted an intoxicated woman after he brought her back to her motel room following an altercation outside a bar.  In the year preceeding the sexual assault, the constable had twice handcuffed a female volunteer ambulance squad member against her will and without justification, and threatened another female volunteer ambulance squad member with pepper spray, also without justification.  Atwood, 427 F. Supp.2d at 141.

Daigle because more training would not have prevented his wilful misconduct and because police departments are not responsible for providing training on what should be obvious matters. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton, 489 U.S. at 389, 109 S.Ct. 1197. A plaintiff must also show that there is "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury," such that it 'actually caused' the constitutional violation." Amnesty America, 361 F.3d at 129 (quoting City of Canton, 489 U.S. at 39, 109 S.Ct. 1197).

In order to establish that failure to train constitutes deliberate indifference to the constitutional rights of the public, a plaintiff must establish (1) that a policymaker knows "to a moral certainty" that his employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and finally (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). However, a supervisor or municipality will not be liable where a "one-time negligent administration of the [training] program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. at 408, 117 S.Ct. 1382. Further, it is not sufficient to show that a particular officer is unsatisfactorily trained. See City of Canton, 489 U.S. at 390-91, 109 S.Ct. 1197 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten

liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program").

Here Fusaro arguably knew that Daigle was likely to work with young female volunteers during his alcohol sting operations. However, there is no evidence, and it cannot reasonably be argued, that Daigle was faced with a difficult choice in deciding whether or not to abuse his position of authority to take partially nude photos of Ejchorszt. Further, even if Daigle's acts reflect a mistake in judgment rather than wilful misconduct, there is no evidence that his mistake was the result of a faulty training program. Daigle did not need more training to convince him that this conduct was wrong; any reasonable person – or police officer – would likely know that this conduct was entirely inappropriate and could not be justified. Thus there is no genuine issue of fact about whether Daigle's conduct was caused by a faulty training program.

In addition, there is no genuine issue of fact suggesting that Fusaro was deliberately indifferent to Ejchorszt's rights. While Ejchorszt was one of three young women Daigle had victimized in this manner, there is no evidence that Fusaro knew about the prior incidents. In addition, there is no other evidence from which to infer that Fusaro should have known that failing to provide Daigle with additional training would result in Ejchorszt's injuries, or that training would have prevented Daigle's conduct.

The undisputed facts combined with the disputed facts construed in the light most favorable to Ejchorszt are not sufficient to permit a reasonable jury to find Fusaro or Norwich liable for Daigle's violation of Ejchorszt's constitutional rights under any of the theories advanced by Ejchorszt. Thus, summary judgment is granted in favor Fusaro and Norwich on Count Eleven of Ejchorszt's complaint.

### B. State Law Claims

#### 1. Negligent Supervision

Count Nine is a state law claim against Fusaro for negligent supervision of Daigle. Under Connecticut law, "a municipal employee . . . has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act." Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 166, 544 A.2d 1185 (1988) (Internal quotation marks omitted). See also Conn. Gen. Stat. § 52-557n ("Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law"). Generally, supervising employees is such a discretionary activity. Gordon, 208 Conn. at 180, 544 A.2d 1185 ("the general deployment of police officers is a discretionary governmental action as a matter of law.") See also Peters ex rel. Estate of Peters v. Town of Greenwich, Docket No. CV950147192S, 2001 WL 51671, at *9 (Conn. Super. 2001) (compiling cases granting motions to strike claims of negligent supervision of police officers).

Ejchorszt argues that she falls within the "imminent harm" exception to this general rule because she was an identifiable victim whom Fusaro had a duty to protect.[10] "The imminent harm exception to discretionary act immunity applies when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm. By its own terms, this test requires that three parts be statisfied: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her

---

[10] While Ejchorszt did not brief this issue, she did raise it during oral argument.

conduct is likely to subject that victim to that harm." Violano v. Fernandez, 280 Conn. 310, 329, 907 A.2d 1188, 1199 - 1200 (Conn. 2006) (holding that it was appropriate to grant motion to strike based on governmental immunity). An "identifiable victim" may be any member of a narrowly defined class of foreseeable victims. Purzycki v. Fairfield, 244 Conn. 101, 108, 708 A.2d 937 (1998) (holding that imminent harm exception applied to schoolchild who was tripped while walking down unsupervised stairs because the danger was limited in terms of duration and geographical area and risk of harm was significant and foreseeable). Here, while the class of female underage alcohol sting volunteers may be narrowly defined, Ejchorszt has not presented evidence that they faced an imminent harm about which Fusaro or Norwich should have been aware. As described above, Ejchorszt has not presented evidence that Fusaro should have known that Daigle was likely to sexually exploit the female volunteers he recruited. Thus, summary judgment is also granted as to Count Nine.

### 2.     **Indemnification**

Count Ten seeks indemnification of Daigle by Norwich under Conn. Gen. Stats. § 7-465.[11] Conn. Gen. Stats. § 7-465 requires municipalities to indemnify employees for liability

---

[11] Conn. Gen. Stats. § 7-465 provides in part that:
Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty.

Ejchorszt's complaint also claims that she is entitled to indemnification under Conn. Gen. Stat. § 52-557n. However, Ejchorszt did not pursue this theory of liability in her

imposed for violations of any person's civil rights as long as the employee "was acting in the performance of his duties and within the scope of his employment" and the injury "was not the result of any wilful or wanton act." Ejchorszt claims that Norwich is liable for the carelessness and negligence of Daigle and Fusaro.

    Norwich argues that it cannot be liable because Daigle's actions were not within the scope of his employment and because they were wilful and wanton. Daigle took the photographs of Ejchorszt at the Norwich Police Station, during the course of an approved enforcement program. Daigle used his authority as a police officer to obtain the photographs and claimed that they were needed for a legitimate evidentiary purpose. Accordingly, there is at least a genuine issue of fact about whether Daigle's acts were within the scope of his employment.

    "[W]anton acts are the equivalent of acts done recklessly or with callous disregard," but are not equivalent to acts committed with indifference or negligence to the rights of others. City of West Haven v. Hartford Ins. Co., 221 Conn. 149, 161, 602 A.2d 988, 994 (Conn. 1992); Manifold v. Ragaglia, 94 Conn. App. 103, 115-16, 891 A.2d 106 (2006). "[F]indings regarding . . . reckless indifference or malicious intent of the defendants are factual findings." Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P., 97 Conn. App. 541, 577, 905 A.2d 1214, 1235 (Conn. App. 2006). Here, although it is a close question even for the Court, there is a genuine issue of material fact about whether Daigle acted wantonly or merely with indifference or negligence towards Ejchorszt's rights. In particular, Daigle's deposition transcript reveals that he claims that he believed that his actions were not inconsistent with

---

    opposition to the motion for summary judgment.

department policy and that there was a legitimate police purpose for the photographs.

However, summary judgment is granted to the extent that Count Ten is based on indemnification for Fusaro's alleged failure to supervise because summary judgment has been granted as to each of Ejchorszt's claims against Fusaro.

### IV. Conclusion

The Norwich defendants' motion for summary judgment [Dkt. # 102] is granted as to Counts Nine (negligent supervision against Fusaro), and Eleven (§ 1983 violations against Lounsbury, Fusaro, and Norwich). It is denied as to Count Ten (indemnification).

SO ORDERED this   21st   day of March, 2007, at Hartford, Connecticut.

      /s/ Christopher F. Droney
      **CHRISTOPHER F. DRONEY**
      **UNITED STATES DISTRICT JUDGE**